# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

U.S.C.A. – 7th Circuit
FILED
FEB 1 4 2011
GINO J. AGNELLO
CLERK
OTTENDED
COD

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., et al.,

Plaintiffs-Appellants,

v.

CITY OF CHICAGO and VILLAGE OF OAK PARK,

Defendants-Appellees.

## SEPARATE APPENDIX TO BRIEF FOR PLAINTIFFS-APPELLANTS NATIONAL RIFLE ASSOCIATION, et al.

*Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, Case Nos. 08-3696, 08-3697 Honorable Milton I. Shadur Presiding*

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6415
Facsimile: (312) 360-6996

*Counsel for Appellants:*
*National Rifle Association of America, Inc. and Dr. Gene A. Reisinger, Case No. 10-3965*

Stephen A. Kolodziej
Brenner, Ford, Monroe & Scott, Ltd
33 North Dearborn Street, Suite 300
Chicago, IL 60602
Telephone: (312) 781-1970
Facsimile: (312) 781-9202

Stephen P. Halbrook
3925 Chain Bridge Rd., Suite 403
Fairfax, VA 22030

*Counsel for Appellants:*
*National Rifle Association of America, Inc., Kathryn Tyler, Van Welton, and Brett Benson, Case No. 10-3957*

Stephen P. Halbrook
3925 Chain Bridge Rd., Suite 403
Fairfax, VA 22030

**ORAL ARGUMENT REQUESTED**

# APPENDIX

## TABLE OF CONTENTS

| Page | Dkt. No. | Date | Description |
|------|----------|------|-------------|
| A-1 | 77-1 | 06/28/10 | _McDonald v. City of Chicago, et al, 561 U.S. ___ (2010)_, No. 08-4244 - United States Supreme Court Opinion (No. 1521)–Judgment reversed and remanded |
| A-46 | 77-1 | 06/28/10 | _McDonald v. City of Chicago, et al, 561 U.S. ___ (2010)_, No. 08-4244 – Supreme Court Opinion (No. 1521) – Judgment reversed and remanded (Opinion of Thomas, J, concurring.) |
| A-102 | 84 | 06/29/10 | _National Rifle Association, et al. v. City of Chicago, et al_, No. 08-4241 - Supreme Court Order granting Writ of Certiorari and remanding to Seventh Circuit |
| A-103 | 81 | 06/29/10 | _National Rifle Association, et al. v. Village of Oak Park, et al_, No. 08-4243 – Supreme Court Order granting Writ of Certiorari and remanding to Seventh Circuit |
| A-104 | 92 | 08/25/10 | _National Rifle Association, et al. v. City of Chicago, et al_, No. 08-4241 – Seventh Circuit Order remanding to District Court |
| A-106 | 89 | 08/25/10 | _National Rifle Association, et al. v. Village of Oak Park, et al_, No. 08-4243 – Seventh Circuit Order remanding to District Court |
| A-107 | 63 | 10/12/10 | _National Rifle Association, et al. v. City of Chicago, et al_, No. 08-3697 – District Court Order dismissing case as moot |
| A-108 | 53 | 10/12/10 | _National Rifle Association, et al. v. Village of Oak Park, et al_, No. 08-3696 - District Court Order dismissing case as moot |

| | | | |
|---|---|---|---|
| A-109 | 64 | 10/21/10 | *National Rifle Association, et al. v. City of Chicago, et al.*, No. 08-3697, NRA, et al. Motion for Entry of Schedule for Motion for Attorneys' Fees |
| A-111 | 54 | 10/21/10 | *National Rifle Association, et al. v. Village of Oak Park, et al.*, No. 08-3696 – NRA, et al. Motion for Entry of Schedule for Motion for Attorneys' Fees |
| A-113 | 71-1 | 12/15/10 | *National Rifle Association, et al. v. City of Chicago, et al.*, No. 08-3697 - Report of Proceedings of City of Chicago, Committee on Police and Fire Hearing to Discuss Gun Violence and Firearm Registration Regulation |
| A-144 | | 12/21/10 | *National Rifle Association, et al. v. Village of Oak Park, et al.*, Nos. 08 C 3696, 08 C 3697 – 12/21/10 Transcript of Proceedings |
| A-149 | 76 | 12/27/10 | *National Rifle Association, et al. v. City of Chicago, et al.*, No. 08-3697 – Notice of Appeal |
| A-166 | 68 | 12/27/10 | *National Rifle Association, et al. v. Village of Oak Park, et al.,*, Nos. 08 C 3696 - Notice of Appeal |

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1521

OTIS McDONALD, ET AL., PETITIONERS v. CITY OF
CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, II–D, III–A, and III–B, in which THE CHIEF JUSTICE, JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, and an opinion with respect to Parts II–C, IV, and V, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join.

Two years ago, in *District of Columbia* v. *Heller*, 554 U. S. ___ (2008), we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home. The city of Chicago (City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia's, but Chicago and Oak Park argue that their laws are constitutional because the Second Amendment has no application to the States. We have previously held that most of the provisions of the Bill of Rights apply with full force to both the Federal Government and the States. Applying the standard that is well established in our case law, we hold that the Second Amendment right is fully

applicable to the States.

I

Otis McDonald, Adam Orlov, Colleen Lawson, and David Lawson (Chicago petitioners) are Chicago residents who would like to keep handguns in their homes for self-defense but are prohibited from doing so by Chicago's firearms laws. A City ordinance provides that "[n]o person shall . . . possess . . . any firearm unless such person is the holder of a valid registration certificate for such firearm." Chicago, Ill., Municipal Code §8–20–040(a) (2009). The Code then prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City. §8–20–050(c). Like Chicago, Oak Park makes it "unlawful for any person to possess . . . any firearm," a term that includes "pistols, revolvers, guns and small arms . . . commonly known as handguns." Oak Park, Ill., Municipal Code §§27–2–1 (2007), 27–1–1 (2009).

Chicago enacted its handgun ban to protect its residents "from the loss of property and injury or death from firearms." See Chicago, Ill., Journal of Proceedings of the City Council, p. 10049 (Mar. 19, 1982). The Chicago petitioners and their *amici*, however, argue that the handgun ban has left them vulnerable to criminals. Chicago Police Department statistics, we are told, reveal that the City's handgun murder rate has actually increased since the ban was enacted[1] and that Chicago residents now face one of the highest murder rates in the country and rates of other violent crimes that exceed the average in comparable cities.[2]

---

[1] See Brief for Heartland Institute as *Amicus Curiae* 6–7 (noting that handgun murder rate was 9.65 in 1983 and 13.88 in 2008).

[2] Brief for Buckeye Firearms Foundation, Inc., et al., as *Amici Curiae* 8–9 ("In 2002 and again in 2008, Chicago had more murders than any other city in the U.S., including the much larger Los Angeles and New

Opinion of the Court

Several of the Chicago petitioners have been the targets of threats and violence. For instance, Otis McDonald, who is in his late seventies, lives in a high-crime neighborhood. He is a community activist involved with alternative policing strategies, and his efforts to improve his neighborhood have subjected him to violent threats from drug dealers. App. 16–17; Brief for State Firearm Associations as *Amici Curiae* 20–21; Brief for State of Texas et al. as *Amici Curiae* 7–8. Colleen Lawson is a Chicago resident whose home has been targeted by burglars. "In Mrs. Lawson's judgment, possessing a handgun in Chicago would decrease her chances of suffering serious injury or death should she ever be threatened again in her home."[3] McDonald, Lawson, and the other Chicago petitioners own handguns that they store outside of the city limits, but they would like to keep their handguns in their homes for protection. See App. 16–19, 43–44 (McDonald), 20–24 (C. Lawson), 19, 36 (Orlov), 20–21, 40 (D. Lawson).

After our decision in *Heller*, the Chicago petitioners and two groups[4] filed suit against the City in the United States District Court for the Northern District of Illinois. They sought a declaration that the handgun ban and several related Chicago ordinances violate the Second and Fourteenth Amendments to the United States Constitution. Another action challenging the Oak Park law was filed in the same District Court by the National Rifle Association (NRA) and two Oak Park residents. In addition, the NRA and others filed a third action challenging the Chicago

_____

York" (internal quotation marks omitted)); see also Brief for International Law Enforcement Educators and Trainers Association et al. as *Amici Curiae* 17–21, and App. A (providing comparisons of Chicago's rates of assault, murder, and robbery to average crime rates in 24 other large cities).

[3] Brief for Women State Legislators et al. as *Amici Curiae* 2.

[4] The Illinois State Rifle Association and the Second Amendment Foundation, Inc.

ordinances. All three cases were assigned to the same District Judge.

The District Court rejected plaintiffs' argument that the Chicago and Oak Park laws are unconstitutional. See App. 83–84; *NRA, Inc. v. Oak Park,* 617 F. Supp. 2d 752, 754 (ND Ill. 2008). The court noted that the Seventh Circuit had "squarely upheld the constitutionality of a ban on handguns a quarter century ago," *id.,* at 753 (citing *Quilici v. Morton Grove,* 695 F. 2d 261 (CA7 1982)); and that *Heller* had explicitly refrained from "opin[ing] on the subject of incorporation vel non of the Second Amendment," *NRA,* 617 F. Supp. 2d, at 754. The court observed that a district judge has a "duty to follow established precedent in the Court of Appeals to which he or she is beholden, even though the logic of more recent caselaw may point in a different direction." *Id.,* at 753.

The Seventh Circuit affirmed, relying on three 19th-century cases—*United States v. Cruikshank,* 92 U. S. 542 (1876), *Presser v. Illinois,* 116 U. S. 252 (1886), and *Miller v. Texas,* 153 U. S. 535 (1894)—that were decided in the wake of this Court's interpretation of the Privileges or Immunities Clause of the Fourteenth Amendment in the *Slaughter-House Cases,* 16 Wall. 36 (1873). The Seventh Circuit described the rationale of those cases as "defunct" and recognized that they did not consider the question whether the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right to keep and bear arms. *NRA, Inc. v. Chicago,* 567 F. 3d 856, 857, 858 (2009). Nevertheless, the Seventh Circuit observed that it was obligated to follow Supreme Court precedents that have "direct application," and it declined to predict how the Second Amendment would fare under this Court's modern "selective incorporation" approach. *Id.,* at 857–858 (internal quotation marks omitted).

We granted certiorari. 557 U. S. ___ (2009).

## II

### A

Petitioners argue that the Chicago and Oak Park laws violate the right to keep and bear arms for two reasons. Petitioners' primary submission is that this right is among the "privileges or immunities of citizens of the United States" and that the narrow interpretation of the Privileges or Immunities Clause adopted in the *Slaughter-House Cases, supra,* should now be rejected. As a secondary argument, petitioners contend that the Fourteenth Amendment's Due Process Clause "incorporates" the Second Amendment right.

Chicago and Oak Park (municipal respondents) maintain that a right set out in the Bill of Rights applies to the States only if that right is an indispensable attribute of *any* "civilized" legal system. Brief for Municipal Respondents 9. If it is possible to imagine a civilized country that does not recognize the right, the municipal respondents tell us, then that right is not protected by due process. *Ibid.* And since there are civilized countries that ban or strictly regulate the private possession of handguns, the municipal respondents maintain that due process does not preclude such measures. *Id.,* at 21–23. In light of the parties' far-reaching arguments, we begin by recounting this Court's analysis over the years of the relationship between the provisions of the Bill of Rights and the States.

### B

The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government. In *Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243 (1833), the Court, in an opinion by Chief Justice Marshall, explained that this question was "of great importance" but "not of much difficulty." *Id.,* at 247. In less than four pages, the Court firmly rejected the proposition that the first eight Amendments operate as limitations on the

States, holding that they apply only to the Federal Government. See also *Lessee of Livingston* v. *Moore*, 7 Pet. 469, 551–552 (1833) ("[I]t is now settled that those amendments [in the Bill of Rights] do not extend to the states").

The constitutional Amendments adopted in the aftermath of the Civil War fundamentally altered our country's federal system. The provision at issue in this case, §1 of the Fourteenth Amendment, provides, among other things, that a State may not abridge "the privileges or immunities of citizens of the United States" or deprive "any person of life, liberty, or property, without due process of law."

*Four years after* the adoption of the Fourteenth Amendment, this Court was asked to interpret the Amendment's reference to "the privileges or immunities of citizens of the United States." The *Slaughter-House Cases*, *supra*, involved challenges to a Louisiana law permitting the creation of a state-sanctioned monopoly on the butchering of animals within the city of New Orleans. Justice Samuel Miller's opinion for the Court concluded that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.*, at 79. The Court held that other fundamental rights—rights that predated the creation of the Federal Government and that "the State governments were created to establish and secure"—were not protected by the Clause. *Id.*, at 76.

In drawing a sharp distinction between the rights of federal and state citizenship, the Court relied on two principal arguments. First, the Court emphasized that the Fourteenth Amendment's Privileges or Immunities Clause spoke of "the privileges or immunities of citizens *of the United States,*" and the Court contrasted this phrasing with the wording in the first sentence of the Fourteenth Amendment and in the Privileges and Immunities Clause

Opinion of the Court

of Article IV, both of which refer to *state* citizenship.[5] (Emphasis added.) Second, the Court stated that a contrary reading would "radically chang[e] the whole theory of the relations of the State and Federal governments to each other and of both these governments to the people," and the Court refused to conclude that such a change had been made "in the absence of language which expresses such a purpose too clearly to admit of doubt." *Id.,* at 78. Finding the phrase "privileges or immunities of citizens of the United States" lacking by this high standard, the Court reasoned that the phrase must mean something more limited.

Under the Court's narrow reading, the Privileges or Immunities Clause protects such things as the right

"to come to the seat of government to assert any claim [a citizen] may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions . . . [and to] become a citizen of any State of the Union by a *bona fide* residence therein, with the same rights as other citizens of that State." *Id.,* at 79–80 (internal quotation marks omitted).

Finding no constitutional protection against state intrusion of the kind envisioned by the Louisiana statute, the Court upheld the statute. Four Justices dissented. Justice Field, joined by Chief Justice Chase and Justices Swayne and Bradley, criticized the majority for reducing the Fourteenth Amendment's Privileges or Immunities

---

[5] The first sentence of the Fourteenth Amendment makes "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof . . . citizens of the United States *and of the State wherein they reside.*" (Emphasis added.) The Privileges and Immunities Clause of Article IV provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of *Citizens in the several States.*" (Emphasis added.)

Clause to "a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage." *Id.,* at 96; see also *id.,* at 104. Justice Field opined that the Privileges or Immunities Clause protects rights that are "in their nature . . . fundamental," including the right of every man to pursue his "calling," without the imposition of unequal or discriminatory restrictions. *Id.,* at 96–97. Justice Bradley's dissent observed that "we are not bound to resort to implication . . . to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself." *Id.,* at 118. Justice Bradley would have construed the Privileges or Immunities Clause to include those rights enumerated in the Constitution as well as some unenumerated rights. *Id.,* at 119. Justice Swayne described the majority's narrow reading of the Privileges or Immunities Clause as "turn[ing] . . . what was meant for bread into a stone." *Id.,* at 129 (dissenting opinion).

Today, many legal scholars dispute the correctness of the narrow *Slaughter-House* interpretation. See, *e.g., Saenz v. Roe,* 526 U. S. 489, 522, n. 1, 527 (THOMAS, J., dissenting) (scholars of the Fourteenth Amendment agree "that the Clause does not mean what the Court said it meant in 1873"); Amar, Substance and Method in the Year 2000, 28 Pepperdine L. Rev. 601, 631, n. 178 (2001) ("Virtually no serious modern scholar—left, right, and center—thinks that this [interpretation] is a plausible reading of the Amendment"); Brief for Constitutional Law Professors as *Amici Curiae* 33 (claiming an "overwhelming consensus among leading constitutional scholars" that the opinion is "egregiously wrong"); C. Black, A New Birth of Freedom 74–75 (1997).

Three years after the decision in the *Slaughter-House Cases,* the Court decided *Cruikshank,* the first of the three 19th-century cases on which the Seventh Circuit relied.

92 U. S. 542. In that case, the Court reviewed convictions stemming from the infamous Colfax Massacre in Louisiana on Easter Sunday 1873. Dozens of blacks, many unarmed, were slaughtered by a rival band of armed white men.[6] Cruikshank himself marched unarmed African-American prisoners through the streets and then had them summarily executed.[7] Ninety-seven men were indicted for participating in the massacre, but only nine went to trial. Six of the nine were acquitted of all charges; the remaining three were acquitted of murder but convicted under the Enforcement Act of 1870, 16 Stat. 140, for banding and conspiring together to deprive their victims of various constitutional rights, including the right to bear arms.[8]

The Court reversed all of the convictions, including those relating to the deprivation of the victims' right to bear arms. Cruikshank, 92 U. S., at 553, 559. The Court wrote that the right of bearing arms for a lawful purpose "is not a right granted by the Constitution" and is not "in any manner dependent upon that instrument for its existence." Id., at 553. "The second amendment," the Court continued, "declares that it shall not be infringed; but this . . . means no more than that it shall not be infringed by Congress." Ibid. "Our later decisions in Presser v. Illinois, 116 U. S. 252, 265 (1886), and Miller v. Texas, 153 U. S. 535, 538 (1894), reaffirmed that the Second Amendment applies only to the Federal Government." Heller, 554 U. S., at ___, n. 23 (slip op., at 48, n. 23).

———————

[6] See C. Lane, The Day Freedom Died 265–266 (2008); see also Brief for NAACP Legal Defense & Education Fund, Inc., as Amicus Curiae 3, and n. 2.

[7] See Lane, supra, at 106.

[8] United States v. Cruikshank, 92 U. S. 542, 544–545 (statement of the case), 548, 553 (opinion of the Court) (1875); Lawrence, Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes, 67 Tulane L. Rev. 2113, 2153 (1993).

Opinion of ALITO, J.

C

As previously noted, the Seventh Circuit concluded that *Cruikshank*, *Presser*, and *Miller* doomed petitioners' claims at the Court of Appeals level. Petitioners argue, however, that we should overrule those decisions and hold that the right to keep and bear arms is one of the "privileges or immunities of citizens of the United States." In petitioners' view, the Privileges or Immunities Clause protects all of the rights set out in the Bill of Rights, as well as some others, see Brief for Petitioners 10, 14, 15–21, but petitioners are unable to identify the Clause's full scope, Tr. of Oral Arg. 5–6, 8–11. Nor is there any consensus on that question among the scholars who agree that the *Slaughter-House Cases'* interpretation is flawed. See *Saenz*, *supra*, at 522, n. 1 (THOMAS, J., dissenting).

We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the *Slaughter-House* holding.

At the same time, however, this Court's decisions in *Cruikshank*, *Presser*, and *Miller* do not preclude us from considering whether the Due Process Clause of the Fourteenth Amendment makes the Second Amendment right binding on the States. See *Heller*, 554 U. S., at ___, n. 23 (slip op., at 48, n. 23). None of those cases "engage[d] in the sort of Fourteenth Amendment inquiry required by our later cases." *Ibid.* As explained more fully below, *Cruikshank*, *Presser*, and *Miller* all preceded the era in which the Court began the process of "selective incorporation" under the Due Process Clause, and we have never previously addressed the question whether the right to keep and bear arms applies to the States under that theory.

Opinion of the Court

Indeed, *Cruikshank* has not prevented us from holding that other rights that were at issue in that case are binding on the States through the Due Process Clause. In *Cruikshank*, the Court held that the general "right of the people peaceably to assemble for lawful purposes," which is protected by the First Amendment, applied only against the Federal Government and not against the States. See 92 U. S., at 551–552. Nonetheless, over 60 years later the Court held that the right of peaceful assembly was a "fundamental right[] . . . safeguarded by the due process clause of the Fourteenth Amendment." *De Jonge* v. *Oregon*, 299 U. S. 353, 364 (1937). We follow the same path here and thus consider whether the right to keep and bear arms applies to the States under the Due Process Clause.

## D

### I

In the late 19th century, the Court began to consider whether the Due Process Clause prohibits the States from infringing rights set out in the Bill of Rights. See *Hurtado* v. *California*, 110 U. S. 516 (1884) (due process does not require grand jury indictment); *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897) (due process prohibits States from taking of private property for public use without just compensation). Five features of the approach taken during the ensuing era should be noted.

First, the Court viewed the due process question as entirely separate from the question whether a right was a privilege or immunity of national citizenship. See *Twining* v. *New Jersey*, 211 U. S. 78, 99 (1908).

Second, the Court explained that the only rights protected against state infringement by the Due Process Clause were those rights "of such a nature that they are included in the conception of due process of law." *Ibid.* See also, e.g., *Adamson* v. *California*, 332 U. S. 46 (1947); *Betts* v. *Brady*, 316 U. S. 455 (1942); *Palko* v. *Connecticut*,

Opinion of the Court

302 U. S. 319 (1937); *Grosjean v. American Press Co.*, 297
U. S. 233 (1936); *Powell v. Alabama*, 287 U. S. 45 (1932).
While it was "possible that some of the personal rights
safeguarded by the first eight Amendments against Na-
tional action [might] also be safeguarded against state
action," the Court stated, this was "not because those
rights are enumerated in the first eight Amendments."
*Twining*, *supra*, at 99.

The Court used different formulations in describing the
boundaries of due process. For example, in *Twining*, the
Court referred to "immutable principles of justice which
inhere in the very idea of free government which no mem-
ber of the Union may disregard." 211 U. S., at 102 (inter-
nal quotation marks omitted). In *Snyder v. Massachu-
setts*, 291 U. S. 97, 105 (1934), the Court spoke of rights
that are "so rooted in the traditions and conscience of our
people as to be ranked as fundamental." And in *Palko*, the
Court famously said that due process protects those rights
that are "the very essence of a scheme of ordered liberty"
and essential to "a fair and enlightened system of justice."
302 U. S., at 325.

Third, in some cases decided during this era the Court
"can be seen as having asked, when inquiring into
whether some particular procedural safeguard was re-
quired of a State, if a civilized system could be imagined
that would not accord the particular protection." *Duncan
v. Louisiana*, 391 U. S. 145, 149, n. 14 (1968). Thus, in
holding that due process prohibits a State from taking
private property without just compensation, the Court
described the right as "a principle of natural equity, rec-
ognized by all temperate and civilized governments, from
a deep and universal sense of its justice." *Chicago, B. &
Q. R. Co.*, *supra*, at 238. Similarly, the Court found that
due process did not provide a right against compelled
incrimination in part because this right "has no place in
the jurisprudence of civilized and free countries outside

the domain of the common law." *Twining, supra,* at 113.

Fourth, the Court during this era was not hesitant to hold that a right set out in the Bill of Rights failed to meet the test for inclusion within the protection of the Due Process Clause. The Court found that some such rights qualified. See, *e.g., Gitlow v. New York,* 268 U. S. 652, 666 (1925) (freedom of speech and press); *Near v. Minnesota ex rel. Olson,* 283 U. S. 697 (1931) (same); *Powell, supra* (assistance of counsel in capital cases); *De Jonge, supra* (freedom of assembly); *Cantwell v. Connecticut,* 310 U. S. 296 (1940) (free exercise of religion). But others did not. See, *e.g., Hurtado, supra* (grand jury indictment requirement); *Twining, supra* (privilege against self-incrimination).

Finally, even when a right set out in the Bill of Rights was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from the protection or remedies provided against abridgment by the Federal Government. To give one example, in *Betts* the Court held that, although the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, the Due Process Clause required appointment of counsel in state criminal proceedings only where "want of counsel in [the] particular case . . . resulted[] in a conviction lacking in . . . fundamental fairness." 316 U. S., at 473. Similarly, in *Wolf v. Colorado,* 338 U. S. 25 (1949), the Court held that the "core of the Fourth Amendment" was implicit in the concept of ordered liberty and thus "enforceable against the States through the Due Process Clause" but that the exclusionary rule, which applied in federal cases, did not apply to the States. *Id.,* at 27–28, 33.

2

An alternative theory regarding the relationship be-

tween the Bill of Rights and §1 of the Fourteenth Amendment was championed by Justice Black. This theory held that §1 of the Fourteenth Amendment totally incorporated all of the provisions of the Bill of Rights. See, e.g., Adamson, supra, at 71–72 (Black, J., dissenting); Duncan, supra, at 166 (Black, J., concurring). As Justice Black noted, the chief congressional proponents of the Fourteenth Amendment espoused the view that the Fourteenth Amendment made the Bill of Rights applicable to the States and, in so doing, overruled this Court's decision in Barron.[9] None—[10]

Adamson, 332 U. S., at 72 (dissenting opinion).

[9] Senator Jacob Howard, who spoke on behalf of the Joint Committee on Reconstruction and sponsored the Amendment in the Senate, stated that the Amendment protected all of "the personal rights guaranteed and secured by the first eight amendments of the Constitution." Cong. Globe, 39th Cong., 1st Sess., 2765 (1866) (hereinafter 39th Cong. Globe). Representative John Bingham, the principal author of the text of §1, said that the Amendment would "arm the Congress . . . with the power to enforce the bill of rights as it stands in the Constitution today." Id., at 1088; see also id., at 1089–1090. A. Amar, The Bill of Rights: Creation and Reconstruction 183 (1998) (hereinafter Amar, Bill of Rights). After ratification of the Amendment, Bingham maintained the view that the rights guaranteed by §1 of the Fourteenth Amendment "are chiefly defined in the first eight amendments to the Constitution of the United States." Cong. Globe, 42d Cong., 1st Sess., App. 84 (1871). Finally, Representative Thaddeus Stevens, the political leader of the House and acting chairman of the Joint Committee on Reconstruction, stated during the debates on the Amendment that "the Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States." 39th Cong. Globe 2459; see also M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 112 (1986) (counting at least 30 statements during the debates in Congress interpreting §1 to incorporate the Bill of Rights); Brief for Constitutional Law Professors as Amici Curiae 20 (collecting authorities and stating that "[n]ot a single senator or representative disputed [the incorporationist] understanding" of the Fourteenth Amendment).

[10] The municipal respondents and some of their amici dispute the significance of these statements. They contend that the phrase "privi-

Opinion of the Court

theless, the Court never has embraced Justice Black's "total incorporation" theory.

3

While Justice Black's theory was never adopted, the Court eventually moved in that direction by initiating what has been called a process of "selective incorporation," i.e., the Court began to hold that the Due Process Clause fully incorporates particular rights contained in the first eight Amendments. See, e.g., Gideon v. Wainwright, 372 U. S. 335, 341 (1963); Malloy v. Hogan, 378 U. S. 1, 5–6

leges or immunities" is not naturally read to mean the rights set out in the first eight Amendments, see Brief for Historians et al. as Amici Curiae 13–16, and that "there is support in the legislative history for no fewer than four interpretations of the . . . Privileges or Immunities Clause." Brief for Municipal Respondents 69 (quoting Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406 (2008); brackets omitted). They question whether there is sound evidence of "any strong public awareness of nationalizing the *entire* Bill of Rights." Brief for Municipal Respondents 69 (quoting Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L. J. 1509, 1600 (2007)). Scholars have also disputed the total incorporation theory. See, e.g., Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5 (1949); Berger, Incorporation of the Bill of Rights in the Fourteenth Amendment: A Nine-Lived Cat, 42 Ohio St. L. J. 435 (1981).

Proponents of the view that §1 of the Fourteenth Amendment makes all of the provisions of the Bill of Rights applicable to the States respond that the terms privileges, immunities, and rights were used interchangeably at the time, see, e.g., Curtis, supra, at 64–68, and that the position taken by the leading congressional proponents of the Amendment was widely publicized and understood, see, e.g., Wildenthal, supra, at 1564–1566, 1590; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L. Rev. 695 (2009). A number of scholars have found support for the total incorporation of the Bill of Rights. See Curtis, supra, at 57–130; Aynes, On Misreading John Bingham and the Fourteenth Amendment, 103 Yale L. J. 57, 61 (1993); see also Amar, Bill of Rights 181–230. We take no position with respect to this academic debate.

Opinion of the Court

(1964); *Pointer v. Texas*, 380 U. S. 400, 403–404 (1965); *Washington v. Texas*, 388 U. S. 14, 18 (1967); *Duncan*, 391 U. S., at 147–148; *Benton v. Maryland*, 395 U. S. 784, 794 (1969).

The decisions during this time abandoned three of the previously noted characteristics of the earlier period.[11] The Court made it clear that the governing standard is not whether any "civilized system [can] be imagined that would not accord the particular protection." *Duncan*, 391 U. S., at 149, n. 14. Instead, the Court inquired whether a particular Bill of Rights guarantee is fundamental to our scheme of ordered liberty and system of justice. *Id.*, at 149, and n. 14; see also *id.*, at 148 (referring to those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" (emphasis added; internal quotation marks omitted)).

The Court also shed any reluctance to hold that rights guaranteed by the Bill of Rights met the requirements for protection under the Due Process Clause. The Court eventually incorporated almost all of the provisions of the Bill of Rights.[12] Only a handful of the Bill of Rights pro-

---

[11] By contrast, the Court has never retreated from the proposition that the Privileges or Immunities Clause and the Due Process Clause present different questions. And in recent cases addressing unenumerated rights, we have required that a right also be "implicit in the concept of ordered liberty." See, e.g., *Washington v. Glucksberg*, 521 U. S. 702, 721 (1997) (internal quotation marks omitted).

[12] With respect to the First Amendment, see *Everson v. Board of Ed. of Ewing*, 330 U. S. 1 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U. S. 296 (1940) (Free Exercise Clause); *De Jonge v. Oregon*, 299 U. S. 353 (1937) (freedom of assembly); *Gitlow v. New York*, 268 U. S. 652 (1925) (free speech); *Near v. Minnesota ex rel. Olson*, 283 U. S. 697 (1931) (freedom of the press).

With respect to the Fourth Amendment, see *Aguilar v. Texas*, 378 U. S. 108 (1964) (warrant requirement); *Mapp v. Ohio*, 367 U. S. 643 (1961) (exclusionary rule); *Wolf v. Colorado*, 338 U. S. 25 (1949) (freedom from unreasonable searches and seizures).

With respect to the Fifth Amendment, see *Benton v. Maryland*, 395

Opinion of the Court

tections remain unincorporated.[13]

Finally, the Court abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court." *Malloy*, 378 U. S., at 10–11 (internal quotation marks omitted). Instead, the Court decisively held that incorporated Bill of

U. S. 784 (1969) (Double Jeopardy Clause); *Malloy v. Hogan*, 378 U. S. 1 (1964) (privilege against self-incrimination); *Chicago, B. & Q. R. Co. v. Chicago*, 166 U. S. 226 (1897) (Just Compensation Clause).

With respect to the Sixth Amendment, see *Duncan v. Louisiana*, 391 U. S. 145 (1968) (trial by jury in criminal cases); *Washington v. Texas*, 388 U. S. 14 (1967) (compulsory process); *Klopfer v. North Carolina*, 386 U. S. 213 (1967) (speedy trial); *Pointer v. Texas*, 380 U. S. 400 (1965) (right to confront adverse witness); *Gideon v. Wainwright*, 372 U. S. 335 (1963) (assistance of counsel); *In re Oliver*, 333 U. S. 257 (1948) (right to a public trial).

With respect to the Eighth Amendment, see *Robinson v. California*, 370 U. S. 660 (1962) (cruel and unusual punishment); *Schilb v. Kuebel*, 404 U. S. 357 (1971) (prohibition against excessive bail).

[13] In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict, see n. 14, *infra*), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause. See *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U. S. 257, 276, n. 22 (1989) (declining to decide whether the excessive-fines protection applies to the States); see also *Engblom v. Carey*, 677 F. 2d 957, 961 (CA2 1982) (holding as a matter of first impression that the "Third Amendment is incorporated into the Fourteenth Amendment for application to the states"). Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation.

Opinion of the Court

Rights protections" "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.*, at 10; see also *Mapp v. Ohio*, 367 U. S. 643, 655–656 (1961); *Ker v. California*, 374 U. S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U. S. 108, 110 (1964); *Pointer*, 380 U. S., at 406; *Duncan, supra*, at 149, 157–158; *Benton*, 395 U. S., at 794–795; *Wallace v. Jaffree*, 472 U. S. 38, 48–49 (1985).[14]

Employing this approach, the Court overruled earlier decisions in which it had held that particular Bill of Rights

---

[14] There is one exception to this general rule. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials. See *Apodaca v. Oregon*, 406 U. S. 404 (1972); see also *Johnson v. Louisiana*, 406 U. S. 356 (1972) (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials). But that ruling was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation. In *Apodaca*, eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. See *Johnson, supra*, at 395 (Brennan, J., dissenting); Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, *Apodaca*, 406 U. S., at 406 (plurality opinion), and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials, *id.*, at 414–415 (Stewart, J., dissenting); *Johnson, supra*, at 381–382 (Douglas, J., dissenting). Justice Powell's concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases. *Apodaca*, therefore, does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government. See *Johnson, supra*, at 395–396 (Brennan, J., dissenting) (footnote omitted) ("In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States, the Sixth Amendment's jury trial guarantee, however it is to be construed, has identical application against both State and Federal Governments").

guarantees or remedies did not apply to the States. See, e.g., Mapp, supra (overruling in part Wolf, 338 U. S. 25); Gideon, 372 U. S. 335 (overruling Betts, 316 U. S. 455); Malloy, supra (overruling Adamson, 332 U. S. 46, and Twining, 211 U. S. 78); Benton, supra, at 794 (overruling Palko, 302 U. S. 319).

### III

With this framework in mind, we now turn directly to the question whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process. In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to our scheme of ordered liberty, Duncan, 391 U. S., at 149, or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," Washington v. Glucksberg, 521 U. S. 702, 721 (1997) (internal quotation marks omitted).

### A

Our decision in Heller points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day,[15] and in Heller, we held that individual self-defense is "the central component" of the Second Amendment right. 554 U. S., at ___ (slip op., at 26); see also id., at ___ (slip op., at 56) (stating that the "inherent right of self-defense has been central to the Second Amendment right"). Explaining that "the need for defense of self, family, and property is most acute" in the home, ibid., we found that this right applies to handguns because they are "the most preferred

---

[15] Citing Jewish, Greek, and Roman law, Blackstone wrote that if a person killed an attacker, "the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame." 4 W. Blackstone, Commentaries on the Laws of England 182 (reprint 1992).

Opinion of the Court

firearm in the nation to 'keep' and use for protection of one's home and family," *id.,* at ___ (slip op., at 57) (some internal quotation marks omitted); see also *id.,* at ___ (slip op., at 56) (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense); *id.,* at ___ (slip op., at 57) ("[T]he American people have considered the handgun to be the quintessential self-defense weapon"). Thus, we concluded, citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." *Id.,* at ___ (slip op., at 58).

*Heller* makes it clear that this right is "deeply rooted in this Nation's history and tradition." *Glucksberg, supra,* at 721 (internal quotation marks omitted). *Heller* explored the right's origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U. S., at ___ (slip op., at 19–20), and that by 1765, Blackstone was able to assert that the right to keep and bear arms was "one of the fundamental rights of Englishmen," *id.,* at ___ (slip op., at 20).

Blackstone's assessment was shared by the American colonists. As we noted in *Heller,* King George III's attempt to disarm the colonists in the 1760's and 1770's "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Id.,* at ___ (slip op., at 21); see also L. Levy, Origins of the Bill of Rights 137–143 (1999) (hereinafter Levy).

The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of

---

[16] For example, an article in the Boston Evening Post stated, "For it is certainly beyond human art and sophistry, to prove the British subjects, to whom the privilege of possessing arms is expressly recognized by the Bill of Rights, and, who live in a province where the law requires them to be equip'd with arms, &c. are guilty of an illegal act, in calling upon one another to be provided with them, as the law directs." Boston Evening Post, Feb. 6, 1769, in Boston Under Military Rule 1768–1769, p. 61 (1936) (emphasis deleted).

Opinion of the Court

Rights. "During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric." *Heller, supra,* at ___ (slip op., at 25) (citing Letters from the Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti-Federalist 234, 242 (H. Storing ed. 1981)); see also Federal Farmer: An Additional Number of Letters to the Republican, Letter XVIII (Jan. 25, 1788), in 17 Documentary History of the Ratification of the Constitution 360, 362–363 (J. Kaminski & G. Saladino eds. 1995); S. Halbrook, The Founders' Second Amendment 171–278 (2008). Federalists responded, not by arguing that the right was insufficiently important to warrant protection but by contending that the right was adequately protected by the Constitution's assignment of only limited powers to the Federal Government. *Heller, supra,* at ___ (slip op., at 25–26); cf. The Federalist No. 46, p. 296 (C. Rossiter ed. 1961) (J. Madison). Thus, Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government. See Levy 143–149; J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 155–164 (1994). But those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution. See 1 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 327–331 (2d ed. 1854); 3 *id.,* at 657–661; 4 *id.,* at 242–246, 248–249; see also Levy 26–34; A. Kelly & W. Harbison, The American Constitution: Its Origins and Development 110, 118 (7th ed. 1991). This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here. This understanding persisted in the years immediately following the ratification of the Bill of Rights. In addition

to the four States that had adopted Second Amendment analogues before ratification, nine more States adopted state constitutional provisions protecting an individual right to keep and bear arms between 1789 and 1820. *Heller, supra,* at ___ (slip op., at 27–30). Founding-era legal commentators confirmed the importance of the right to early Americans. St. George Tucker, for example, described the right to keep and bear arms as "the true palladium of liberty" and explained that prohibitions on the right would place liberty "on the brink of destruction." 1 Blackstone's Commentaries, Editor's App. 300 (S. Tucker ed. 1803); see also W. Rawle, A View of the Constitution of the United States of America, 125–126 (2d ed. 1829) (reprint 2009); 3 J. Story, Commentaries on the Constitution of the United States §1890, p. 746 (1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them").

## B

### 1

By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense. See M. Doubler, Civilian in Peace, Soldier in War 87–90 (2003); Amar, Bill of Rights 258–259. Abolitionist authors wrote in support of the right. See L. Spooner, The Unconstitutionality of Slavery 66 (1860) (reprint 1965); J. Tiffany, A Treatise on the Unconstitutionality of American Slavery 117–118 (1849) (reprint 1969). And when attempts were

made to disarm "Free-Soilers" in "Bloody Kansas," Senator
Charles Sumner, who later played a leading role in the
adoption of the Fourteenth Amendment, proclaimed that
"[n]ever was [the rifle] more needed in just self-defense
than now in Kansas." The Crime Against Kansas: The
Apologies for the Crime: The True Remedy, Speech of Hon.
Charles Sumner in the Senate of the United States 64–65
(1856). Indeed, the 1856 Republican Party Platform pro-
tested that in Kansas the constitutional rights of the
people had been "fraudulently and violently taken from
them" and the "right of the people to keep and bear arms"
had been "infringed." National Party Platforms 1840–
1972, p. 27 (5th ed. 1973).[17]

After the Civil War, many of the over 180,000 African
Americans who served in the Union Army returned to the
States of the old Confederacy, where systematic efforts
were made to disarm them and other blacks. See Heller,
554 U. S., at ____ (slip op., at 42); E. Foner, Reconstruction:
America's Unfinished Revolution 1863–1877, p. 8 (1988)
(hereinafter Foner). The laws of some States formally
prohibited African Americans from possessing firearms.
For example, a Mississippi law provided that "no freed-
man, free negro or mulatto, not in the military service of
the United States government, and not licensed so to do by
the board of police of his or her county, shall keep or carry
fire-arms of any kind, or any ammunition, dirk or bowie
knife." Certain Offenses of Freedmen, 1865 Miss. Laws
p. 165, §1, in 1 Documentary History of Reconstruction
289 (W. Fleming ed. 1950); see also Regulations for
Freedmen in Louisiana, in id., at 279–280; H. R. Exec.

─────────
[17] Abolitionists and Republicans were not alone in believing that the
right to keep and bear arms was a fundamental right. The 1864
Democratic Party Platform complained that the confiscation of firearms
by Union troops occupying parts of the South constituted "the interfer-
ence with and denial of the right of the people to bear arms in their
defense." National Party Platforms 1840–1972, at 34.

Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866) (describing a Kentucky law); E. McPherson, The Political History of the United States of America During the Period of Reconstruction 40 (1871) (describing a Florida law); id., at 33 (describing an Alabama law).[18]

Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves. In the first session of the 39th Congress, Senator Wilson told his colleagues: "In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country." 39th Cong. Globe 40 (1865). The Report of the Joint Committee on Reconstruction— which was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents shortly after Congress approved the Fourteenth Amendment[19]—contained numerous examples of such abuses. See, e.g., Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, pp. 219, 229, 272, pt. 3,

[18] In South Carolina, prominent black citizens held a convention to address the State's black code. They drafted a memorial to Congress, in which they included a plea for protection of their constitutional right to keep and bear arms: "We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed . . . that the late efforts of the Legislature of this State to pass an act to deprive us [of] arms be forbidden, as a plain violation of the Constitution.'" S. Halbrook, Freedmen, The Fourteenth Amendment, and The Right to Bear Arms, 1866–1876, p. 9 (1998) (hereinafter Halbrook, Freedmen) (quoting 2 Proceedings of the Black State Conventions, 1840–1865, p. 302 (P. Foner & G. Walker eds. 1980)). Senator Charles Sumner relayed the memorial to the Senate and described the memorial as a request that black citizens "have the constitutional protection in keeping arms." 39th Cong. Globe 337.

[19] See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 265–266 (1914); Adamson v. California, 332 U. S. 46, 108–109 (1947) (appendix to dissenting opinion of Black, J.).

pp. 46, 140, pt. 4, pp. 49–50 (1866); see also S. Exec. Doc.
No. 2, 39th Cong., 1st Sess., 23–24, 26, 36 (1865). In one
town, the "marshal [took] all arms from returned colored
soldiers, and [was] very prompt in shooting the blacks
whenever an opportunity occur[red]." H. R. Exec. Doc.
No. 70, at 233 (internal quotation marks omitted).    As
Senator Wilson put it during the debate on a failed pro-
posal to disband Southern militias: "There is one unbroken
chain of testimony from all people that are loyal to this
country, that the greatest outrages are perpetrated by
armed men who go up and down the country searching
houses, disarming people, committing outrages of every
kind and description." 39th Cong., Globe 915 (1866).[20]

Union Army commanders took steps to secure the right
of all citizens to keep and bear arms,[21] but the 39th Con-

---

[20] Disarmament by bands of former Confederate soldiers eventually
gave way to attacks by the Ku Klux Klan. In debates over the later
enacted Enforcement Act of 1870, Senator John Pool observed that the
Klan would "order the colored men to give up their arms; saying that
everybody would be Kukluxed in whose house fire-arms were found."
Cong. Globe, 41st Cong., 2d Sess., 2719 (1870); see also H. R. Exec. Doc.
No. 268, 42d Cong., 2d Sess., 2 (1872).

[21] For example, the occupying Union commander in South Carolina
issued an order stating that "[t]he constitutional rights of all loyal and
well disposed inhabitants to bear arms, will not be infringed." General
Order No. 1, Department of South Carolina, January 1, 1866, in 1
Documentary History of Reconstruction 208 (W. Fleming ed. 1950).
Union officials in Georgia issued a similar order, declaring that "[a]ll
men, without the distinction of color, have the right to keep arms to
defend their homes, families or themselves." Cramer, "This Right is
Not Allowed by Governments That Are Afraid of The People": The
Public Meaning of the Second Amendment When the Fourteenth
Amendment was Ratified, 17 Geo. Mason L. Rev. 823, 854 (2010)
(hereinafter Cramer) (quoting Right to Bear Arms, Christian Recorder,
Feb. 24, 1866, pp. 1–2). In addition, when made aware of attempts by
armed parties to disarm blacks, the head of the Freedmen's Bureau in
Alabama "made public [his] determination to maintain the right of the
negro to keep and to bear arms, and [his] disposition to send an armed
force into any neighborhood in which that right should be systemati-

gress concluded that legislative action was necessary. Its efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental.

The most explicit evidence of Congress' aim appears in §14 of the Freedmen's Bureau Act of 1866, which provided that "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery." 14 Stat. 176–177 (emphasis added).[22] Section 14 thus explicitly guaranteed that "all the citizens," black and white, would have "the constitutional right to bear arms."

The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms.[23] Section 1 of the Civil Rights Act

cally interfered with." Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, p. 140 (1866).

[22] The Freedmen's Bureau bill was amended to include an express reference to the right to keep and bear arms, see 39th Cong., Globe 654 (Rep. Thomas Eliot), even though at least some Members believed that the unamended version would have protected the right, see *id.*, at 743 (Sen. Lyman Trumbull)).

[23] There can be do doubt that the principal proponents of the Civil Rights Act of 1866 meant to end the disarmament of African Americans in the South. In introducing the bill, Senator Trumbull described its purpose as securing to blacks the "privileges which are essential to freeman." *Id.*, at 474. He then pointed to the previously described Mississippi law that "prohibited] any negro or mulatto from having fire-arms," and explained that the bill would "destroy" such laws. *Ibid.* Similarly, Representative Sidney Clarke cited disarmament of freedmen in Alabama and Mississippi as a reason to support the Civil Rights Act and to continue to deny Alabama and Mississippi representation in Congress: "I regret, sir, that justice compels me to say, to the disgrace

Opinion of the Court

guaranteed the "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." *Ibid.* This language was virtually identical to language in §14 of the Freedmen's Bureau Act, 14 Stat. 176–177 ("the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal"). And as noted, the latter provision went on to explain that one of the "laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal" was "the constitutional right to bear arms." *Ibid.* Representative Bingham believed that the Civil Rights Act protected the same rights as enumerated in the Freedmen's Bureau bill, which of course explicitly mentioned the right to keep and bear arms. 39th Cong. Globe 1292. The unavoidable conclusion is that the Civil Rights Act, like the Freedmen's Bureau Act, aimed to protect "the constitutional right to bear arms" and not simply to prohibit discrimination. See also Amar, Bill of Rights 264–265 (noting that one of the "core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances" of freedmen who had been stripped of their arms and to "affirm the full and equal right of every citizen to self-defense").

Congress, however, ultimately deemed these legislative

of the Federal Government, that the reconstructed State authorities of Mississippi were allowed to rob and disarm our veteran soldiers and arm the rebels fresh from the field of treasonable strife. Sir, the disarmed loyalists of Alabama, Mississippi, and Louisiana are powerless to-day, and oppressed by the pardoned and encouraged rebels of those States. They appeal to the American Congress for protection. In response to this appeal I shall vote for every just measure of protection, for I do not intend to be among the treacherous violators of the solemn pledge of the nation." *Id.,* at 1838–1839.

Opinion of the Court

remedies insufficient. Southern resistance, Presidential vetoes, and this Court's pre–Civil-War precedent persuaded Congress that a constitutional amendment was necessary to provide full protection for the rights of blacks.[24] Today, it is generally accepted that the Fourteenth Amendment was understood to provide a constitutional basis for protecting the rights set out in the Civil Rights Act of 1866. See *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U. S. 375, 389 (1982); see also Amar, Bill of Rights 187; Calabresi, Two Cheers for Professor Balkin's Originalism, 103 Nw. U. L. Rev. 663, 669–670 (2009).

In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection. Senator Samuel Pomeroy described three "indispensable" "safeguards of liberty under our form of Government." 39th Cong., Globe 1182. One of these, he said, was the right to keep and bear arms:

"Every man . . . should have the right to bear arms for the defense of himself and family and his homestead. And if the cabin door of the freedman is broken open and the intruder enters for purposes as vile as were known to slavery, then should a well-loaded musket be in the hand of the occupant to send the polluted wretch to another world, where his wretchedness will forever remain complete." *Ibid.*

Even those who thought the Fourteenth Amendment unnecessary believed that blacks, as citizens, "have equal

---

[24] For example, at least one southern court had held the Civil Rights Act to be unconstitutional. That court did so, moreover, in the course of upholding the conviction of an African-American man for violating Mississippi's law against firearm possession by freedmen. See Decision of Chief Justice Handy, Declaring the Civil Rights Bill Unconstitutional, N. Y. Times, Oct. 26, 1866, p. 2, col. 3.

Opinion of the Court

right to protection, and to keep and bear arms for self-defense." *Id.*, at 1073 (Sen. James Nye); see also Foner 258–259.[25]

Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental. In an 1868 speech addressing the disarmament of freedmen, Representative Stevens emphasized the necessity of the right: "Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty." "The Fourteenth amendment, now so happily adopted, settles the whole question." Cong. Globe, 40th Cong., 2d Sess., 1967. And in debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South. See Halbrook, Freedmen 120–131. Finally, legal commentators from the period emphasized the fundamental nature of the right. See, *e.g.,* T. Farrar, Manual of the Constitution of the United States of America §118, p. 145 (1867) (reprint 1993); J. Pomeroy, An Introduction to the Constitutional Law of the United States §239, pp. 152–153 (3d ed. 1875).

The right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified. In 1868, 22 of the 37 States in the Union had state constitutional provisions

---

[25] Other Members of the 39th Congress stressed the importance of the right to keep and bear arms in discussing other measures. In speaking generally on reconstruction, Representative Roswell Hart listed the "'right of the people to keep and bear arms'" as among those rights necessary to a "'republican form of government.'" 39th Cong. Globe 1629. Similarly, in objecting to a bill designed to disarm southern militias, Senator Willard Salsbury argued that such a measure would violate the Second Amendment. *Id.,* at 914–915. Indeed, the bill "ultimately passed in a form that disbanded militias but maintained the right of individuals to their private firearms." Cramer 858.

A-29

explicitly protecting the right to keep and bear arms. See
Calabresi & Agudo, Individual Rights Under State Consti-
tutions when the Fourteenth Amendment was Ratified in
1868: What Rights Are Deeply Rooted in American His-
tory and Tradition? 87 Texas L. Rev. 7, 50 (2008).[26] Quite
a few of these state constitutional guarantees, moreover,
explicitly protected the right to keep and bear arms as an
individual right to self-defense. See Ala. Const., Art. I,
§28 (1868); Conn. Const., Art. I, §17 (1818); Ky. Const.,
Art. XIII, §25 (1850); Mich. Const., Art. XVIII, §7 (1850);
Miss. Const., Art. I, §15 (1868); Mo. Const., Art. I, §8
(1865); Tex. Const., Art. I, §13 (1869); see also Mont.
Const., Art. III, §13 (1889); Wash. Const., Art. I, §24
(1889); Wyo. Const., Art. I, §24 (1889); see also State v.
McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986). What is
more, state constitutions adopted during the Reconstruc-
tion era by former Confederate States included a right to
keep and bear arms. See, e.g., Ark. Const., Art. I, §5
(1868); Miss. Const., Art. I, §15 (1868); Tex. Const., Art. I,
§13 (1869). A clear majority of the States in 1868, there-
fore, recognized the right to keep and bear arms as being
among the foundational rights necessary to our system of
Government.[27]

---

[26] More generally worded provisions in the constitutions of seven
other States may also have encompassed a right to bear arms. See
Calabresi & Agudo, 87 Texas L. Rev., at 52.

[27] These state constitutional protections often reflected a lack of law
enforcement in many sections of the country. In the frontier towns that
did not have an effective police force, law enforcement often could not
pursue criminals beyond the town borders. See Brief for Rocky Moun-
tain Gun Owners et al. as Amici Curiae 15. Settlers in the West and
elsewhere, therefore, were left to "repel[] force by force when the
intervention of society . . . [was] too late to prevent an injury." District
of Columbia v. Heller, 554 U. S. ——, —— (2008) (slip op., at 21) (inter-
nal quotation marks omitted). The settlers' dependence on game for
food and economic livelihood, moreover, undoubtedly undergirded these
state constitutional guarantees. See id., at ——, —— (slip op., at 26,

Opinion of the Court

In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.

2

Despite all this evidence, municipal respondents contend that Congress, in the years immediately following the Civil War, merely sought to outlaw "discriminatory measures taken against freedmen, which it addressed by adopting a non-discrimination principle" and that even an outright ban on the possession of firearms was regarded as acceptable, "so long as it was not done in a discriminatory manner." Brief for Municipal Respondents 7. They argue that Members of Congress overwhelmingly viewed §1 of the Fourteenth Amendment "as an antidiscrimination rule," and they cite statements to the effect that the section would outlaw discriminatory measures. *Id.*, at 64.

This argument is implausible.

First, while §1 of the Fourteenth Amendment contains "an antidiscrimination rule," namely, the Equal Protection Clause, municipal respondents can hardly mean that §1 does no more than prohibit discrimination. If that were so, then the First Amendment, as applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion; the Fourth Amendment, as applied to the States, would not prohibit all unreasonable searches and seizures but only discriminatory searches and seizures—and so on. We assume that this is not municipal respondents' view, so what they must mean is that the Second Amendment should be singled out for special—and specially unfavorable—treatment. We reject that suggestion.

Second, municipal respondents' argument ignores the

36, 42).

Opinion of the Court

clear terms of the Freedmen's Bureau Act of 1866, which acknowledged the existence of the right to bear arms. If that law had used language such as "the equal benefit of laws concerning the bearing of arms," it would be possible to interpret it as simply a prohibition of racial discrimination. But §14 speaks of and protects "the constitutional right to bear arms," an unmistakable reference to the right protected by the Second Amendment. And it protects the "full and equal benefit" of this right in the States. 14 Stat. 176–177. It would have been nonsensical for Congress to guarantee the full and equal benefit of a constitutional right that does not exist.

Third, if the 39th Congress had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers. In the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in the formal sense. Any such law—like the Chicago and Oak Park ordinances challenged here—presumably would have permitted the possession of guns by those acting under the authority of the State and would thus have left firearms in the hands of the militia and local peace officers. And as the Report of the Joint Committee on Reconstruction revealed, see supra, at 24–25, those groups were widely involved in harassing blacks in the South.

Fourth, municipal respondents' purely antidiscrimination theory of the Fourteenth Amendment disregards the plight of whites in the South who opposed the Black Codes. If the 39th Congress and the ratifying public had simply prohibited racial discrimination with respect to the bearing of arms, opponents of the Black Codes would have been left without the means of self-defense—as had abolitionists in the Kansas in the 1850's.

Fifth, the 39th Congress' response to proposals to disband and disarm the Southern militias is instructive. Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them. See 39th Cong. Globe 914; Halbrook, Freedmen, *supra*, 20–21. Disarmament, it was argued, would violate the members' right to bear arms, and it was ultimately decided to disband the militias but not to disarm their members. See Act of Mar. 2, 1867, §6, 14 Stat. 485, 487; Halbrook, Freedmen 68–69; Cramer 858–861. It cannot be doubted that the right to bear arms was regarded as a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner.

## IV

Municipal respondents' remaining arguments are at war with our central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. Municipal respondents, in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.

Municipal respondents' main argument is nothing less than a plea to disregard 50 years of incorporation precedent and return (presumably for this case only) to a bygone era. Municipal respondents submit that the Due Process Clause protects only those rights "recognized by all temperate and civilized governments, from a deep and universal sense of [their] justice.'" Brief for Municipal Respondents 9 (quoting *Chicago, B. & Q. R. Co.*, 166 U. S., at 238). According to municipal respondents, if it is possible to imagine *any* civilized legal system that does not recognize a particular right, then the Due Process Clause

does not make that right binding on the States. Brief for Municipal Respondents 9. Therefore, the municipal respondents continue, because such countries as England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand either ban or severely limit handgun ownership, it must follow that no right to possess such weapons is protected by the Fourteenth Amendment. *Id.*, at 21–23.

This line of argument is, of course, inconsistent with the long-established standard we apply in incorporation cases. See *Duncan*, 391 U. S., at 149, and n. 14. And the present-day implications of municipal respondents' argument are stunning. For example, many of the rights that our Bill of Rights provides for persons accused of criminal offenses are virtually unique to this country.[28] If our

---

[28] For example, the United States affords criminal jury trials far more broadly than other countries. See, *e.g.*, Van Kessel, Adversary Excesses in the American Criminal Trial, 67 Notre Dame L. Rev. 403 (1992); Leib, A Comparison of Criminal Jury Decision Rules in Democratic Countries, 5 Ohio St. J. Crim. L. 629, 630 (2008); Henderson, The Wrongs of Victim's Rights, 37 Stan. L. Rev. 937, 1003, n. 296 (1985); see also *Roper* v. *Simmons*, 543 U. S. 551, 624 (2005) (SCALIA, J., dissenting) ("In many significant respects the laws of most other countries differ from our law—including such explicit provisions of our Constitution as the right to jury trial"). Similarly, our rules governing pretrial interrogation differ from those in countries sharing a similar legal heritage. See Dept. of Justice, Office of Legal Policy, Report to the Attorney General on the Law of Pretrial Interrogation: Truth in Criminal Justice Report No. 1 (Feb. 12, 1986), reprinted in 22 U. Mich. J. L. Ref. 437, 534–542 (1989) (comparing the system envisioned by *Miranda* v. *Arizona*, 384 U. S. 436 (1966), with rights afforded by England, Scotland, Canada, India, France, and Germany). And the "Court-pronounced exclusionary rule . . . is distinctively American." *Roper, supra,* at 624 (SCALIA, J., dissenting) (citing *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 416 (1971) (Burger, C.J., dissenting) (noting that exclusionary rule was "unique to American jurisprudence" (internal quotation marks omitted))); see also Sklansky, Anti-Inquisitorialism, 122 Harv. L. Rev. 1634, 1648–1656, 1689–1693 (2009) (discussing the differences between American and European confronta-

Opinion of ALITO, J.

understanding of the right to a jury trial, the right against self-incrimination, and the right to counsel were necessary attributes of *any* civilized country, it would follow that the United States is the only civilized Nation in the world.

Municipal respondents attempt to salvage their position by suggesting that their argument applies only to substantive as opposed to procedural rights. Brief for Municipal Respondents 10, n. 3. But even in this trimmed form, municipal respondents' argument flies in the face of more than a half-century of precedent. For example, in *Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 8 (1947), the Court held that the Fourteenth Amendment incorporates the Establishment Clause of the First Amendment. Yet several of the countries that municipal respondents recognize as civilized have established state churches.[29] If we were to adopt municipal respondents' theory, all of this Court's Establishment Clause precedents involving actions taken by state and local governments would go by the boards.

Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a

---

[29] England and Denmark have state churches. See Torke, The English Religious Establishment, 12 J. of Law & Religion 399, 417–427 (1995–1996) (describing legal status of Church of England); Constitutional Act of Denmark, pt. I, §4 (1953) ("The Evangelical Lutheran Church shall be the Established Church of Denmark"). The Evangelical Lutheran Church of Finland has attributes of a state church. See Christensen, Is the Lutheran Church Still the State Church? An Analysis of Church-State Relations in Finland, 1995 B. Y. U. L. Rev. 585, 596–600 (describing status of church under Finnish law). The Web site of the Evangelical Lutheran Church of Finland states that the church may be usefully described as both a "state church" and a "folk church." See J. Seppo, The Current Condition of Church-State Relations in Finland, online at http://evl.fi/EVLen.nsf/Documents/83DDBEF4A28712AC2257307D00417C6?OpenDocument&lang=EN (all Internet materials as visited June 23, 2010, and available in Clerk of Court's case file).

deadly implement and thus has implications for public safety. Brief for Municipal Respondents 11. And they note that there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. *Id.*, at 11, 13–17.

The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. See, *e.g., Hudson* v. *Michigan,* 547 U. S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States* v. *Leon,* 468 U. S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker* v. *Wingo,* 407 U. S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda* v. *Arizona,* 384 U. S. 436, 517 (1966) (Harlan, J., dissenting); *id.,* at 542 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases . . . will return a killer, a rapist or other criminal to the streets . . . to repeat his crime"); *Mapp,* 367 U. S., at 659. Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications.

We likewise reject municipal respondents' argument that we should depart from our established incorporation methodology on the ground that making the Second Amendment binding on the States and their subdivisions is inconsistent with principles of federalism and will stifle experimentation. Municipal respondents point out—quite correctly—that conditions and problems differ from local-ity to locality and that citizens in different jurisdictions

Opinion of ALITO, J.

have divergent views on the issue of gun control. Munici-
pal respondents therefore urge us to allow state and local
governments to enact any gun control law that they deem
to be reasonable, including a complete ban on the posses-
sion of handguns in the home for self-defense. Brief for
Municipal Respondents 18–20, 23.

There is nothing new in the argument that, in order to
respect federalism and allow useful state experimentation,
a federal constitutional right should not be fully binding
on the States. This argument was made repeatedly and
eloquently by Members of this Court who rejected the
concept of incorporation and urged retention of the two-
track approach to incorporation. Throughout the era of
"selective incorporation," Justice Harlan in particular,
invoking the values of federalism and state experimenta-
tion, fought a determined rearguard action to preserve the
two-track approach. See, e.g., Roth v. United States, 354
U. S. 476, 500–503 (1937) (Harlan, J., concurring in result
in part and dissenting in part); Mapp, supra, at 678–680
(Harlan, J., dissenting); Gideon, 372 U. S., at 352 (Harlan,
J., concurring); Malloy, 378 U. S., at 14–33 (Harlan, J.,
dissenting); Pointer, 380 U. S., at 408–409 (Harlan, J.,
concurring in result); Washington, 388 U. S., at 23–24
(Harlan, J., concurring in result); Duncan, 391 U. S., at
171–193 (Harlan, J., dissenting); Benton, 395 U. S., at
808–809 (Harlan, J., dissenting); Williams v. Florida, 399
U. S. 78, 117 (1970) (Harlan, J., dissenting in part and
concurring in result in part).

Time and again, however, those pleas failed. Unless we
turn back the clock or adopt a special incorporation test
applicable only to the Second Amendment, municipal
respondents' argument must be rejected. Under our prece-
dents, if a Bill of Rights guarantee is fundamental from an
American perspective, then, unless stare decisis counsels

McDONALD v. CHICAGO

Opinion of ALITO, J.

otherwise,[30] that guarantee is fully binding on the States and thus limits (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as amici supporting petitioners, "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." Brief for State of Texas et al. as Amici Curiae 23.

Municipal respondents and their amici complain that incorporation of the Second Amendment right will lead to extensive and costly litigation, but this argument applies with even greater force to constitutional rights and remedies that have already been held to be binding on the States. Consider the exclusionary rule. Although the exclusionary rule "is not an individual right," Herring v. United States, 555 U. S. ___ (2009) (slip op., at 5), but a "judicially created rule," id., at ___ (slip op., at 4), this Court made the rule applicable to the States. See Mapp, supra, at 660. The exclusionary rule is said to result in "tens of thousands of contested suppression motions each year." Stuntz, The Virtues and Vices of the Exclusionary Rule, 20 Harv. J. Law & Pub. Pol'y, 443, 444 (1997).

---

[30] As noted above, see n. 13, supra, cases that predate the era of selective incorporation held that the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement do not apply to the States. See Hurtado v. California, 110 U. S. 516 (1884) (indictment); Minneapolis & St. Louis R. Co. v. Bombolis, 241 U. S. 211 (1916) (civil jury).

As a result of Hurtado, most States do not require a grand jury indictment in all felony cases, and many have no grand juries. See Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, State Court Organization 2004, pp. 213, 215–217 (2006) (Table 38), online at http://bjs.ojp.usdoj.gov/content/pub/pdf/sco04.pdf.

As a result of Bombolis, cases that would otherwise fall within the Seventh Amendment are now tried without a jury in state small claims courts. See, e.g., Cheung v. Eighth Judicial Dist. Court, 121 Nev. 867, 124 P. 3d 550 (2005) (no right to jury trial in small claims court under Nevada Constitution).

Opinion of ALITO, J.

Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to "interest-balancing" and have sustained a variety of restrictions. Brief for Municipal Respondents 23–31. In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, 554 U. S., at ___–___ (slip op., at 62–63), and this Court decades ago abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," *Malloy, supra*, at 10–11 (internal quotation marks omitted).

As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting *amici* cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller.* Municipal respondents cite precisely one case (from the late 20th century) in which such a ban was sustained. See Brief for Municipal Respondents 26–27 (citing *Kalodimos v. Morton Grove*, 103 Ill. 2d 483, 470 N. E. 2d 266 (1984)); see also Reply Brief for Respondents NRA et al. 23, n. 7 (asserting that no other court has ever upheld a complete ban on the possession of handguns). It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U. S., at ___ (slip op., at 54). We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying

of firearms in sensitive places such as schools and gov-
ernment buildings, or laws imposing conditions and quali-
fications on the commercial sale of arms." *Id.,* at —
(slip op., at 54–55). We repeat those assurances here.
Despite municipal respondents' doomsday proclamations,
incorporation does not imperil every law regulating
firearms.

Municipal respondents argue, finally, that the right to
keep and bear arms is unique among the rights set out in
the first eight Amendments "because the reason for codify-
ing the Second Amendment (to protect the militia) differs
from the purpose (primarily, to use firearms to engage in
self-defense) that is claimed to make the right implicit in
the concept of ordered liberty." Brief for Municipal Re-
spondents 36–37. Municipal respondents suggest that the
Second Amendment right differs from the rights hereto-
fore incorporated because the latter were "valued for
[their] own sake." *Id.,* at 33. But we have never previ-
ously suggested that incorporation of a right turns on
whether it has intrinsic as opposed to instrumental value,
and quite a few of the rights previously held to be incorpo-
rated—for example the right to counsel and the right to
confront and subpoena witnesses—are clearly instrumen-
tal by any measure. Moreover, this contention repackages
one of the chief arguments that we rejected in *Heller, i.e.,*
that the scope of the Second Amendment right is defined
by the immediate threat that led to the inclusion of that
right in the Bill of Rights. In *Heller,* we recognized that
the codification of this right was prompted by fear that the
Federal Government would disarm and thus disable the
militia, but we rejected the suggestion that the right was
valued only as a means of preserving the militias. 554
U. S., at — (slip op., at 26). On the contrary, we stressed
that the right was also valued because the possession of
firearms was thought to be essential for self-defense. As
we put it, self-defense was "the *central component* of the

Opinion of ALITO, J.

right itself." *Ibid.*

## V

### A

We turn, finally, to the two dissenting opinions. JUSTICE STEVENS' eloquent opinion covers ground already addressed, and therefore little need be added in response. JUSTICE STEVENS would " 'ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments.' " *Post,* at 8 (quoting *Malloy,* 378 U. S., at 24 (Harlan, J., dissenting)). The question presented in this case, in his view, "is whether the particular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom." *Post,* at 27. He would hold that "[t]he rights protected against state infringement by the Fourteenth Amendment's Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights." *Post,* at 9.

As we have explained, the Court, for the past half-century, has moved away from the two-track approach. If we were now to accept JUSTICE STEVENS' theory across the board, decades of decisions would be undermined. We assume that this is not what is proposed. What is urged instead, it appears, is that this theory be revived solely for the individual right that *Heller* recognized, over vigorous dissents.

The relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle. It is far too late to exhume what Justice Brennan, writing for the Court 46 years ago, derided as "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *Malloy, supra,* at 10–11 (internal quotation marks omitted).

MᴄDONALD v. CHICAGO

Opinion of ALITO, J.

B

JUSTICE BREYER's dissent makes several points to which we briefly respond. To begin, while there is certainly room for disagreement about *Heller*'s analysis of the history of the right to keep and bear arms, nothing written since *Heller* persuades us to reopen the question there decided. Few other questions of original meaning have been as thoroughly explored.

JUSTICE BREYER's conclusion that the Fourteenth Amendment does not incorporate the right to keep and bear arms appears to rest primarily on four factors: First, "there is no popular consensus" that the right is fundamental, *post*, at 9; second, the right does not protect minorities or persons neglected by those holding political power, *post*, at 10; third, incorporation of the Second Amendment right would "amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the States and the Federal Government" and preventing local variations, *post*, at 11; and fourth, determining the scope of the Second Amendment right in cases involving state and local laws will force judges to answer difficult empirical questions regarding matters that are outside their area of expertise, *post*, at 11–16. Even if we believed that these factors were relevant to the incorporation inquiry, none of these factors undermines the case for incorporation of the right to keep and bear arms for self-defense.

First, we have never held that a provision of the Bill of Rights applies to the States only if there is a "popular consensus" that the right is fundamental, and we see no basis for such a rule. But in this case, as it turns out, there is evidence of such a consensus. An *amicus* brief submitted by 58 Members of the Senate and 251 Members of the House of Representatives urges us to hold that the right to keep and bear arms is fundamental. See Brief for Senator Kay Bailey Hutchison et al. as *Amici Curiae* 4.

Opinion of ALITO, J.

Another brief submitted by 38 States takes the same position. Brief for State of Texas et al. as *Amici Curiae* 6.

Second, petitioners and many others who live in high-crime areas dispute the proposition that the Second Amendment right does not protect minorities and those lacking political clout. The plight of Chicagoans living in high-crime areas was recently highlighted when two Illinois legislators representing Chicago districts called on the Governor to deploy the Illinois National Guard to patrol the City's streets.[31] The legislators noted that the number of Chicago homicide victims during the current year equaled the number of American soldiers killed during that same period in Afghanistan and Iraq and that 80% of the Chicago victims were black.[32] *Amici* supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime.[33] If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials.

───────────

[31] See Mack & Burnette, 2 Lawmakers to Quinn: Send the Guard to Chicago, Chicago Tribune, Apr. 26, 2010, p. 6.

[32] Jansen & Knowles, Send in Troops? Chicago Sun-Times, Apr. 26, 2010, p. 2; see also Brief for NAACP Legal Defense & Education Fund, Inc., as *Amicus Curiae* 5, n. 4 (stating that in 2008, almost three out of every four homicide victims in Chicago were African Americans); *id.,* at 5–6 (noting that "each year [in Chicago], many times more African Americans are murdered by assailants wielding guns than were killed during the Colfax massacre" (footnote omitted)).

[33] See Brief for Women State Legislators et al. as *Amici Curiae* 9–10, 14–16; Brief for Jews for the Preservation of Firearms Ownership as *Amicus Curiae* 3–4; see also Brief for Pink Pistols et al. as *Amici Curiae* in *District of Columbia v. Heller,* O. T. 2007, No. 07–290, pp. 5–11.

Third, JUSTICE BREYER is correct that incorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U. S., at ___ (slip op., at 64). This conclusion is no more remarkable with respect to the Second Amendment than it is with respect to all the other limitations on state power found in the Constitution.

Finally, JUSTICE BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. See *supra*, at 38–39. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, *supra*, at ___ (slip op., at 62–63).

\* \* \*

In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. See *Duncan*, 391 U. S., at 149, and n. 14. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. The judgment of the

Opinion of ALITO, J.

Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

Cite as: 561 U. S. ____ (2010)                    1

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

No. 08–1521

OTIS McDONALD, ET AL., PETITIONERS *v.* CITY OF CHICAGO, ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 28, 2010]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in the Second Amendment "fully applicable to the States." *Ante,* at 1. I write separately because I believe there is a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment's text and history.

Applying what is now a well-settled test, the plurality opinion concludes that the right to keep and bear arms applies to the States through the Fourteenth Amendment's Due Process Clause because it is "fundamental" to the American "scheme of ordered liberty," *ante,* at 19 (citing *Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968)), and "'deeply rooted in this Nation's history and tradition,'" *ante,* at 19 (quoting *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997)). I agree with that description of the right. But I cannot agree that it is enforceable against the States through a clause that speaks only to "process." Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause.

Opinion of THOMAS, J.

I

In *District of Columbia* v. *Heller,* 554 U. S. —— (2008), this Court held that the Second Amendment protects an individual right to keep and bear arms for the purpose of self-defense, striking down a District of Columbia ordinance that banned the possession of handguns in the home. *Id.,* at —— (slip op., at 64). The question in this case is whether the Constitution protects that right against abridgment by the States.

As the Court explains, if this case were litigated before the Fourteenth Amendment's adoption in 1868, the answer to that question would be simple. In *Barron ex rel. Tiernan* v. *Mayor of Baltimore,* 7 Pet. 243 (1833), this Court held that the Bill of Rights applied only to the Federal Government. Writing for the Court, Chief Justice Marshall recalled that the founding generation added the first eight Amendments to the Constitution in response to Antifederalist concerns regarding the extent of federal—not state—power, and held that if "the framers of these amendments [had] intended them to be limitations on the powers of the state governments," "they would have declared this purpose in plain and intelligible language." *Id.,* at 250. Finding no such language in the Bill, Chief Justice Marshall held that it did not in any way restrict state authority. *Id.,* at 248–250; see *Lessee of Livingston* v. *Moore,* 7 Pet. 469, 551–552 (1833) (reaffirming *Barron's* holding); *Permoli* v. *Municipality No. 1 of New Orleans,* 3 How. 589, 609–610 (1845) (same).

Nearly three decades after *Barron,* the Nation was splintered by a civil war fought principally over the question of slavery. As was evident to many throughout our Nation's early history, slavery, and the measures designed to protect it, were irreconcilable with the principles of equality, government by consent, and inalienable rights proclaimed by the Declaration of Independence and embedded in our constitutional structure. See, *e.g.,* 3 Records

of the Federal Convention of 1787, p. 212 (M. Farrand ed. 1911) (remarks of Luther Martin) ("[S]lavery is inconsistent with the genius of republicanism, and has a tendency to destroy those principles on which it is supported, as it lessens the sense of the equal rights of mankind" (emphasis deleted)); A. Lincoln, Speech at Peoria, Ill. (Oct. 16, 1854), reprinted in 2 The Collected Works of Abraham Lincoln 266 (R. Basler ed. 1953) ("[N]o man is good enough to govern another man, *without that other's consent*. I say this is the leading principle—the sheet anchor of American republicanism. . . . Now the relation of masters and slaves is, *pro tanto*, a total violation of this principle").

After the war, a series of constitutional amendments were adopted to repair the Nation from the damage slavery had caused. The provision at issue here, §1 of the Fourteenth Amendment, significantly altered our system of government. The first sentence of that section provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This unambiguously overruled this Court's contrary holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that the Constitution did not recognize black Americans as citizens of the United States or their own State. *Id.*, at 405–406.

The meaning of §1's next sentence has divided this Court for many years. That sentence begins with the command that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." On its face, this appears to grant the persons just made United States citizens a certain collection of rights—*i.e.*, privileges or immunities—attributable to that status.

This Court's precedents accept that point, but define the relevant collection of rights quite narrowly. In the *Slaughter-House Cases*, 16 Wall. 36 (1873), decided just five years after the Fourteenth Amendment's adoption, the

McDONALD v. CHICAGO

Opinion of THOMAS, J.

Court interpreted this text, now known as the Privileges or Immunities Clause, for the first time. In a closely divided decision, the Court drew a sharp distinction between the privileges and immunities of state citizenship and those of federal citizenship, and held that the Privileges or Immunities Clause protected only the latter category of rights from state abridgment. *Id.,* at 78. The Court defined that category to include only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.,* at 79. This arguably left open the possibility that certain individual rights enumerated in the Constitution could be considered privileges or immunities of federal citizenship. See *ibid.* (listing "[t]he right to peaceably assemble" and "the privilege of the writ of *habeas corpus*" as rights potentially protected by the Privileges or Immunities Clause). But the Court soon rejected that proposition, interpreting the Privileges or Immunities Clause even more narrowly in its later cases.

Chief among those cases is *United States* v. *Cruikshank,* 92 U. S. 542 (1876). There, the Court held that members of a white militia who had brutally murdered as many as 165 black Louisianans congregating outside a courthouse had not deprived the victims of their privileges as American citizens to peaceably assemble or to keep and bear arms. *Ibid.;* see L. Keith, The Colfax Massacre 109 (2008). According to the Court, the right to peaceably assemble codified in the First Amendment was not a privilege of United States citizenship because "[t]he right . . . existed long *before* the adoption of the Constitution." 92 U. S., at 551 (emphasis added). Similarly, the Court held that the right to keep and bear arms was not a privilege of United States citizenship because it was not "in any manner dependent upon that instrument for its existence." *Id.,* at 553. In other words, the reason the Framers codified the right to bear arms in the Second Amendment—its nature

5

Opinion of THOMAS, J.

as an inalienable right that pre-existed the Constitution's adoption—was the very reason citizens could not enforce it against States through the Fourteenth.

That circular reasoning effectively has been the Court's last word on the Privileges or Immunities Clause.[1] In the intervening years, the Court has held that the Clause prevents state abridgment of only a handful of rights, such as the right to travel, see *Saenz* v. *Roe*, 526 U. S. 489, 503 (1999), that are not readily described as essential to liberty.

As a consequence of this Court's marginalization of the Clause, litigants seeking federal protection of fundamental rights turned to the remainder of §1 in search of an alternative fount of such rights. They found one in a most curious place—that section's command that every State guarantee "due process" to any person before depriving him of "life, liberty, or property." At first, litigants argued that this Due Process Clause "incorporated" certain procedural rights codified in the Bill of Rights against the States. The Court generally rejected those claims, however, on the theory that the rights in question were not sufficiently "fundamental" to warrant such treatment. See, *e.g., Hurtado* v. *California*, 110 U. S. 516 (1884) (grand jury indictment requirement); *Maxwell* v. *Dow*, 176 U. S. 581 (1900) (12-person jury requirement); *Twining* v. *New Jersey*, 211 U. S. 78 (1908) (privilege against self-incrimination).

That changed with time. The Court came to conclude that certain Bill of Rights guarantees *were* sufficiently fundamental to fall within §1's guarantee of "due process." These included not only procedural protections listed in

---

[1]In the two decades after *United States* v. *Cruikshank*, 92 U. S. 542 (1876), was decided, this Court twice reaffirmed its holding that the Privileges or Immunities Clause does not apply the Second Amendment to the States. *Presser* v. *Illinois*, 116 U. S. 252, 266–267 (1886); *Miller* v. *Texas*, 153 U. S. 535 (1894).

Opinion of THOMAS, J.

the first eight Amendments, see, e.g., *Benton* v. *Maryland*, 395 U. S. 784 (1969) (protection against double jeopardy), but substantive rights as well, see, e.g., *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925) (right to free speech); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 707 (1931) (same). In the process of incorporating these rights against the States, the Court often applied them differently against the States than against the Federal Government, often on the theory that only those "fundamental" aspects of the right required Due Process Clause protection. See, e.g., *Betts* v. *Brady*, 316 U. S. 455, 473 (1942) (holding that the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, but that the Due Process Clause required appointment of counsel in state criminal cases only where "want of counsel . . . re-sul[ed] in a conviction lacking in . . . fundamental fairness"). In more recent years, this Court has "abandoned the notion that the guarantees in the Bill of Rights apply differently when incorporated against the States than they do when applied to the Federal Government. *Ante*, at 17–18 (opinion of the Court) (internal quotation marks omitted). But our cases continue to adhere to the view that a right is incorporated through the Due Process Clause only if it is sufficiently "fundamental," *ante*, at 42–44 (plurality opinion)—a term the Court has long struggled to define.

While this Court has at times concluded that a right gains "fundamental" status only if it is essential to the American "scheme of ordered liberty" or "'deeply rooted in this Nation's history and tradition,'" *ante*, at 19 (plurality opinion) (quoting *Glucksberg*, 521 U. S., at 721), the Court has just as often held that a right warrants Due Process Clause protection if it satisfies a far less measurable range of criteria, see *Lawrence* v. *Texas*, 539 U. S. 558, 562 (2003) (concluding that the Due Process Clause protects

Opinion of THOMAS, J.

liberty" of the person both in its spatial and in its more transcendent dimensions"). Using the latter approach, the Court has determined that the Due Process Clause applies rights against the States that are not mentioned in the Constitution at all, even without seriously arguing that the Clause was originally understood to protect such rights. See, e.g., Lochner v. New York, 198 U. S. 45 (1905); Roe v. Wade, 410 U. S. 113 (1973); Lawrence, supra.

All of this is a legal fiction. The notion that a constitutional provision that guarantees only "process" before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words. Moreover, this fiction is a particularly dangerous one. The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish "fundamental" rights that warrant protection from nonfundamental rights that do not. Today's decision illustrates the point. Replaying a debate that has endured from the inception of the Court's substantive due process jurisprudence, the dissents laud the "flexibility" in this Court's substantive due process doctrine, post, at 14 (STEVENS, J., dissenting); see post, at 6–8 (BREYER, J., dissenting), while the plurality makes yet another effort to impose principled restraints on its exercise, see ante, at 33–41. But neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification.

To be sure, the plurality's effort to cabin the exercise of judicial discretion under the Due Process Clause by focusing its inquiry on those rights deeply rooted in American history and tradition invites less opportunity for abuse than the alternatives. See post, at 7 (BREYER, J., dissenting) (arguing that rights should be incorporated against the States through the Due Process Clause if they are "well-suited to the carrying out of . . . constitutional prom-

Opinion of THOMAS, J.

ises"); *post*, at 22 (STEVENS, J., dissenting) (warning that there is no "all-purpose, top-down, totalizing theory of 'liberty'" protected by the Due Process Clause). But any serious argument over the scope of the Due Process Clause must acknowledge that neither its text nor its history suggests that it protects the many substantive rights this Court's cases now claim it does.

I cannot accept a theory of constitutional interpretation that rests on such tenuous footing. This Court's substantive due process framework fails to account for both the text of the Fourteenth Amendment and the history that led to its adoption, filling that gap with a jurisprudence devoid of a guiding principle. I believe the original meaning of the Fourteenth Amendment offers a superior alternative, and that a return to that meaning would allow this Court to enforce the rights the Fourteenth Amendment is designed to protect with greater clarity and predictability than the substantive due process framework has so far managed.

I acknowledge the volume of precedents that have been built upon the substantive due process framework, and I further acknowledge the importance of *stare decisis* to the stability of our Nation's legal system. But *stare decisis* is only an "adjunct" of our duty as judges to decide by our best lights what the Constitution means. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U. S. 833, 963 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part). It is not "an inexorable command." *Lawrence*, *supra*, at 577. Moreover, as judges, we interpret the Constitution one case or controversy at a time. The question presented in this case is not whether our entire Fourteenth Amendment jurisprudence must be preserved or revised, but only whether, and to what extent, a particular clause in the Constitution protects the particular right at issue here. With the inquiry appropriately narrowed, I believe this case presents an opportunity

to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.

II

"It cannot be presumed that any clause in the constitution is intended to be without effect." *Marbury v. Madison*, 1 Cranch 137, 174 (1803) (Marshall, C. J.). Because the Court's Privileges or Immunities Clause precedents have presumed just that, I set them aside for the moment and begin with the text.

The Privileges or Immunities Clause of the Fourteenth Amendment declares that "[n]o State . . . shall abridge the privileges or immunities of citizens of the United States." In interpreting this language, it is important to recall that constitutional provisions are "written to be understood by the voters." *Heller*, 554 U. S., at ___ (slip op., at 3) (quoting *United States v. Sprague*, 282 U. S. 716, 731 (1931)). Thus, the objective of this inquiry is to discern what "ordinary citizens" at the time of ratification would have understood the Privileges or Immunities Clause to mean. 554 U. S., at ___ (slip op., at 3).

A

1

At the time of Reconstruction, the terms "privileges" and "immunities" had an established meaning as synonyms for "rights." The two words, standing alone or paired together, were used interchangeably with the words "rights," "liberties," and "freedoms," and had been since the time of Blackstone. See 1 W. Blackstone, Commentaries *129 (describing the "rights and liberties" of Englishmen as "private immunities" and "civil privileges"). A number of antebellum judicial decisions used the terms in this manner. See, e.g., *Magill v. Brown*, 16 F. Cas. 408, 428 (No. 8,952) (CC ED Pa. 1833) (Baldwin, J.) ("The words privi-

Opinion of THOMAS, J.

leges and immunities" relate to the rights of persons, place
or property; a privilege is a peculiar right, a private law,
conceded to particular persons or places"). In addition,
dictionary definitions confirm that the public shared this
understanding. See, e.g., N. Webster, An American Dic-
tionary of the English Language 1039 (C. Goodrich & N.
Porter rev. 1865) (defining "privilege" as "a right or immu-
nity not enjoyed by others or by all" and listing among its
synonyms the words "immunity," "franchise," "right," and
"liberty"); id., at 661 (defining "immunity" as "[f]reedom
from an obligation" or "particular privilege"); id., at 1140
(defining "right" as "[p]rivilege or immunity granted by
authority").[2]

The fact that a particular interest was designated as a
"privilege" or "immunity," rather than a "right," "liberty,"
or "freedom," revealed little about its substance. Black-
stone, for example, used the terms "privileges" and "im-
munities" to describe both the inalienable rights of indi-
viduals and the positive-law rights of corporations. See 1
Commentaries, at *129 (describing "private immunities"
as a *residuum* of natural liberty," and "civil privileges" as
those "which society has engaged to provide, in lieu of the
natural liberties so given up by individuals" (footnote
omitted)); id., at *468 (stating that a corporate charter
enables a corporation to "establish rules and orders" that
serve as "the privileges and immunities . . . of the corpora-
tion"). Writers in this country at the time of Reconstruc-

—————

[2] See also 2 C. Richardson, A New Dictionary of the English Language
1612 (1839) (defining "privilege" as "an appropriate or peculiar law or
rule or right; a peculiar immunity, liberty, or franchise"); 1 id., at 1066
(defining "immunity" as "[f]reedom or exemption, (from duties,) liberty,
privilege"); The Philadelphia School Dictionary or Expositor of the
English Language 152 (3d ed. 1812) (defining "privilege" as a "peculiar
advantage"); id., at 105 (defining "immunity" as "privilege, exemption");
Royal Standard English Dictionary 411 (1788) (defining "privilege" as
"public right; peculiar advantage").

Opinion of THOMAS, J.

tion followed a similar practice. See, e.g., *Racine & Mississippi R. Co. v. Farmers' Loan & Trust Co.*, 49 Ill. 331, 334 (1868) (describing agreement between two railroad companies in which they agreed "'to fully merge and consolidate their[] capital stock, powers, privileges, immunities and franchises'"); *Hathorn v. Calef*, 53 Me. 471, 483–484 (1866) (concluding that a statute did not "modify any power, privileges, or immunity, pertaining to the franchise of any corporation"). The nature of a privilege or immunity thus varied depending on the person, group, or entity to whom those rights were assigned. See Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1256–1257 (2010) (surveying antebellum usages of these terms).

                                    2

The group of rights-bearers to whom the Privileges or Immunities Clause applies is, of course, "citizens." By the time of Reconstruction, it had long been established that both the States and the Federal Government existed to preserve their citizens' inalienable rights, and that these rights were considered "privileges" or "immunities" of citizenship.

This tradition begins with our country's English roots. Parliament declared the basic liberties of English citizens in a series of documents ranging from the Magna Carta to the Petition of Right and the English Bill of Rights. See 1 B. Schwartz, The Bill of Rights: A Documentary History 8–16, 19–21, 41–46 (1971) (hereinafter Schwartz). These fundamental rights, according to the English tradition, belonged to all people but became legally enforceable only when recognized in legal texts, including acts of Parliament and the decisions of common-law judges. See B. Bailyn, The Ideological Origins of the American Revolution 77–79 (1967). These rights included many that later

Opinion of THOMAS, J.

would be set forth in our Federal Bill of Rights, such as the right to petition for redress of grievances, the right to a jury trial, and the right of "Protestants" to "have arms for their defence." English Bill of Rights (1689), reprinted in 1 Schwartz 41, 43.

As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen. They consistently claimed the rights of English citizenship in their founding documents, repeatedly referring to these rights as "privileges" and "immunities." For example, a Maryland law provided that

"[A]ll the Inhabitants of this Province being Christians (Slaves excepted) Shall have and enjoy all such *rights liberties immunities priviledges and free customs* within this Province as any naturall born subject of England hath or ought to have or enjoy in the Realm of England . . . ." Md. Act for the Liberties of the People (1639), in id., at 68 (emphasis added).[3]

---

[3] See also, e.g., Charter of Va. (1606), reprinted in 7 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3783, 3788 (F. Thorpe ed. 1909) (hereinafter Thorpe) that "all and every the Persons being our Subjects . . . shall HAVE and enjoy all Liberties, Franchises, and Immunities . . . as if they had been abiding and born, *within this our Realm of England*" (emphasis in original)); Charter of New England (1620), in 3 id., at 1827, 1839 ("[A]ll and every the Persons, beinge our Subjects, . . . shall have and enjoy all Liberties, and Franchises, and Immunities of free Denizens and naturall subjects . . . as if they had been abidinge and born within this our Kingdome of England"); Charter of Mass. Bay (1629), in id. at 1846, 1856–1857 (guaranteeing that "all and every the Subjects of Us, . . . shall have and enjoy all liberties and immunities of free and naturall Subjects . . . as yf they and everie of them were borne within the Realme of England"); Grant of the Province of Me. (1639), in id., at 1625, 1635 (guaranteeing "Liberties Franchises and Immunityes of or belonging to any the naturall borne subjects of this our Kingdome of England"); Charter of Carolina (1663), in 5 id., at 2743, 2747 (guaranteeing to all subjects "all liberties franchises and priviledges of this our Kingdome of England"); Charter of R. I. and Providence Plantations (1663), in 6 id., at 3211.

Opinion of THOMAS, J.

As tensions between England and the Colonies increased, the colonists adopted protest resolutions reasserting their claim to the inalienable rights of Englishmen. Again, they used the terms "privileges" and "immunities" to describe these rights. As the Massachusetts Resolves declared:

"*Resolved*, That there are certain essential Rights of the *British* Constitution of Government, which are founded in the Law of God and Nature, and are the common Rights of Mankind—Therefore. . . .

"*Resolved*, That no Man can justly take the Property of another without his Consent: And that upon this *original* Principle the Right of Representation . . . is evidently founded. . . . *Resolved*, That this *inherent* Right, together with all other, essential Rights, Liberties, *Privileges* and *Immunities* of the People of Great *Britain*, have been fully confirmed to them by *Magna Charta.*" The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764–1766, p. 56 (E. Morgan ed. 1959) (some emphasis added).[4]

_____

[4] See also, *e.g.,* A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 174 (1968) (quoting 1774 Georgia resolution declaring that the colony's inhabitants were entitled to ".'the same rights, privileges, and immunities with their fellow-subjects in *Great Britain.*'" (emphasis in original)); The Virginia Resolves, The Resolutions as Printed in the Journal of the House of Burgesses, reprinted in Prologue to Revolution: Sources and Documents on the

3220 ("[A]ll and every the subjects of us . . . shall have and enjoye all libertyes and immunityes of free and naturall subjects within any the dominions of us, our heires, or successours, . . . as if they, and every of them, were borne within the realme of England"); Charter of Ga. (1732), in 2 *id.,* at 765, 773 ("[A]ll and every the persons which shall happen to be born within the said province . . . shall have and enjoy all liberties, franchises and immunities of free denizens and natural born subjects, within any of our dominions, to all intents and purposes, as if abiding and born within this our kingdom of Great-Britain").

Opinion of THOMAS, J.

In keeping with this practice, the First Continental Congress declared in 1774 that the King had wrongfully denied the colonists "the rights, liberties, and immunities of free and natural-born subjects ... within the realm of England." 1 Journals of the Continental Congress 1774–1789, p. 68 (1904). In an address delivered to the inhabitants of Quebec that same year, the Congress described those rights as including the "great" "right[s]" of "trial by jury," "Habeas Corpus," and "freedom of the press." Address of the Continental Congress to the Inhabitants of Quebec (1774), reprinted in 1 Schwartz 221–223.

After declaring their independence, the newly formed States replaced their colonial charters with constitutions and state bills of rights, almost all of which guaranteed the same fundamental rights that the former colonists previously had claimed by virtue of their English heritage. See, e.g., Pa. Declaration of Rights (1776), reprinted in 5 Thorpe 3081–3084 (declaring that "all men are born equally free and independent, and have certain natural, inherent and inalienable rights," including the "right to worship Almighty God according to the dictates of their own consciences" and the "right to bear arms for the defence of themselves and the state").[5] Several years later, the Founders amended the Constitution to expressly protect many of the same fundamental rights against interference by the Federal Government, consistent with their English heritage, the founding

---

Stamp Act Crisis, 1764–1766, at 46, 48 ("[T]he Colonists aforesaid are declared entitled to all Liberties, Privileges, and Immunities of Denizens and natural Subjects, to all Intents and Purposes, as if they had been abiding, and born within the Realm of *England*" (emphasis in original)).

[5] See also Va. Declaration of Rights (1776), reprinted in 1 Schwartz 234–236; Pa. Declaration of Rights (1776), in *id.*, at 263–275; Del. Declaration of Rights (1776), in *id.*, at 276–278; Md. Declaration of Rights (1776), in *id.*, at 280–285; N. C. Declaration of Rights (1776), in *id.*, 286–288.

Opinion of THOMAS, J.

generation generally did not consider many of the rights
identified in these amendments as new entitlements, but
as inalienable rights of all men, given legal effect by their
codification in the Constitution's text. See, *e.g.*, 1 Annals
of Cong. 431–432, 436–437, 440–442 (1834) (statement of
Rep. Madison) (proposing Bill of Rights in the first Con-
gress); The Federalist No. 84, pp. 531–533 (B. Wright ed.
1961) (A. Hamilton); see also *Heller*, 554 U. S., at ____ (slip
op., at 19) ("[I]t has always been widely understood that
the Second Amendment, like the First and Fourth Amend-
ments, codified a *pre-existing* right"). The Court's subse-
quent decision in *Barron*, however, made plain that the
codification of these rights in the Bill made them legally
enforceable only against the Federal Government, not the
States. See 7 Pet., at 247.

3

Even though the Bill of Rights did not apply to the
States, other provisions of the Constitution did limit state
interference with individual rights. Article IV, §2, cl. 1
provides that "[t]he Citizens of each State shall be entitled
to all Privileges and Immunities of Citizens in the several
States." The text of this provision resembles the Privi-
leges or Immunities Clause, and it can be assumed that
the public's understanding of the latter was informed by
its understanding of the former.

Article IV, §2 was derived from a similar clause in the
Articles of Confederation, and reflects the dual citizenship
the Constitution provided to all Americans after replacing
that "league" of separate sovereign States. *Gibbons v.
Ogden*, 9 Wheat. 1, 187 (1824); see 3 J. Story, Commentar-
ies on the Constitution of the United States §1800, p. 675
(1833). By virtue of a person's citizenship in a particular
State, he was guaranteed whatever rights and liberties
that State's constitution and laws made available. Article
IV, §2 vested citizens of each State with an additional

right: the assurance that they would be afforded the "privileges and immunities" of citizenship in any of the several States in the Union to which they might travel.

What were the "Privileges and Immunities of Citizens in the several States"? That question was answered perhaps most famously by Justice Bushrod Washington sitting as Circuit Justice in *Corfield* v. *Coryell*, 6 F. Cas. 546, 551–552 (No. 3,230) (CC ED Pa. 1825). In that case, a Pennsylvania citizen claimed that a New Jersey law prohibiting nonresidents from harvesting oysters from the State's waters violated Article IV, §2 because it deprived him, as an out-of-state citizen, of a right that New Jersey availed to its own citizens. *Id.*, at 550. Justice Washington rejected that argument, refusing to "accede to the proposition" that Article IV, §2 entitled "citizens of the several states . . . to participate in *all* the rights which belong exclusively to the citizens of any other particular state." *Id.*, at 552 (emphasis added). In his view, Article IV, §2 did not guarantee equal access to all public benefits a State might choose to make available to its citizens. See *id.*, at 552. Instead, it applied only to those rights "which are, in their nature, *fundamental*; which belong, of right, to the citizens of all free governments." *Id.*, at 551 (emphasis added). Other courts generally agreed with this principle. See, *e.g.*, *Abbott* v. *Bayley*, 23 Mass. 89, 92–93 (1827) (noting that the "privileges and immunities" of citizens in the several States protected by Article IV, §2 are "qualified and not absolute" because they do not grant a traveling citizen the right of "suffrage or of eligibility to office" in the State to which he travels).

When describing those "fundamental" rights, Justice Washington thought it "would perhaps be more tedious than difficult to enumerate" them all, but suggested that they could "be all comprehended under" a broad list of "general heads," such as "[p]rotection by the government," "the enjoyment of life and liberty, with the right to acquire

Opinion of THOMAS, J.

and possess property of every kind," "the benefit of the writ of habeas corpus," and the right of access to "the courts of the state," among others.[6] *Corfield, supra,* at 551–552.

Notably, Justice Washington did not indicate whether Article IV, §2 *required* States to recognize these fundamental rights in their own citizens and thus in sojourning citizens alike, or whether the Clause simply prohibited the States from discriminating against sojourning citizens with respect to whatever fundamental rights state law happened to recognize. On this question, the weight of legal authorities at the time of Reconstruction indicated that Article IV, §2 prohibited States from discriminating against citizens sojourning when recognizing fundamental rights, but did not require States to recognize those rights and did not prescribe their content. The highest courts of several States adopted this view, see, e.g., *Livingston v. Van Ingen,* 9 Johns. 507, 561 (N. Y. Sup. Ct. 1812) (Yates, J.); *id.,* at 577 (Kent, J.); *Campbell v. Morris,* 3 H. & McH. 535, 553–554 (Md. Gen. Ct. 1797) (Chase, J.), as did several influential treatise-writers, see T. Cooley, A Treatise

[6] Justice Washington's complete list was as follows:

"Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental; to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised." 6 Fed. Cas., at 551–552.

Opinion of THOMAS, J.

on the Constitutional Limitations Which Rest Upon the Legislative Power of the State of the American Union 15–16, and n. 3 (1868) (reprint 1972) (describing Article IV, §2 as designed "to prevent discrimination by the several States against the citizens and public proceedings of other States"); 2 J. Kent, Commentaries on American Law 35 (11th ed. 1867) (stating that Article IV, §2 entitles sojourning citizens "to the privileges that persons of the same description are entitled to in the state to which the removal is made, and to none other"). This Court adopted the same conclusion in a unanimous opinion just one year after the Fourteenth Amendment was ratified. See *Paul v. Virginia*, 8 Wall. 168, 180 (1869).

\*      \*      \*

The text examined so far demonstrates three points about the meaning of the Privileges or Immunities Clause in §1. First, "privileges" and "immunities" were synonyms for "rights." Second, both the States and the Federal Government had long recognized the inalienable rights of their citizens. Third, Article IV, §2 of the Constitution protected traveling citizens against state discrimination with respect to the fundamental rights of state citizenship. Two questions still remain, both provoked by the textual similarity between §1's Privileges or Immunities Clause and Article IV, §2. The first involves the nature of the rights at stake: Are the privileges or immunities of "citizens of the United States" recognized by §1 the same as the privileges and immunities of "citizens in the several States" to which Article IV, §2 refers? The second involves the restriction imposed on the States: Does §1, like Article IV, §2, prohibit only discrimination with respect to certain rights if the State chooses to recognize them, or does it require States to recognize those rights? I address each question in turn.

Opinion of THOMAS, J.

## B

I start with the nature of the rights that §1's Privileges or Immunities Clause protects. Section 1 overruled *Dred Scott's* holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy "the privileges and immunities of citizens" embodied in the Constitution. 19 How., at 417. The Court in *Dred Scott* did not distinguish between privileges and immunities of citizens of the United States and citizens in the several States, instead referring to the rights of citizens generally. It did, however, give examples of what the rights of citizens were—the constitutionally enumerated rights of "the full liberty of speech" and the right "to keep and carry arms." *Ibid.*

Section 1 protects the rights of citizens "of the United States" specifically. The evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution, including the right to keep and bear arms.

### I

Nineteenth-century treaties through which the United States acquired territory from other sovereigns routinely promised inhabitants of the newly acquired territories that they would enjoy all of the "rights," "privileges," and "immunities" of United States citizens. See, *e.g.*, Treaty of Amity, Settlement, and Limits, Art. 6, Feb. 22, 1819, 8 Stat. 256–258, T. S. No. 327 (entered into force Feb. 19, 1821) (cession of Florida) ("The inhabitants of the territories which his Catholic Majesty cedes to the United States, by this Treaty, shall be incorporated in the Union of the United States, as soon as may be consistent with the principles of the Federal Constitution, and admitted to the enjoyment of *all the privileges, rights, and immunities, of*

Opinion of THOMAS, J.

*the citizens of the United States.*"[1] (emphasis added)).
Commentators of the time explained that the rights and
immunities of "citizens of the United States" recognized in
these treaties "undoubtedly mean[t] those privileges that
are common to all citizens of this republic." Marcus, An
Examination of the Expediency and Constitutionality of
Prohibiting Slavery in the State of Missouri 17 (1819). It
is therefore altogether unsurprising that several of these
treaties identify liberties enumerated in the Constitution
as privileges and immunities common to all United States
citizens.

For example, the Louisiana Cession Act of 1803, which
codified a treaty between the United States and France
culminating in the Louisiana Purchase, provided that

"The inhabitants of the ceded territory shall be incor-
porated in the Union of the United States, and admit-
ted as soon as possible, according to the principles of
the Federal constitution, to the enjoyments of all the
*rights, advantages and immunities of citizens of the
United States; and in the mean time they shall be
maintained and protected in the free enjoyment of
their liberty, property and the religion which they pro-
fess.*" Treaty Between the United States of America

---

[1]See also Treaty Between the United States of America and the Ot-
tawa Indians of Blanchard's Fork and Roche De Boeuf, June 24, 1862,
12 Stat. 1237 ("The Ottawa Indians of the United Bands of Blanchard's
Fork and of Roche de Boeuf, having become sufficiently advanced in
civilization, and being desirous of becoming citizens of the United
States . . . [after five years from the ratification of this treaty] shall be
deemed and declared to be citizens of the United States, to all intents
and purposes, and shall be entitled to all the *rights, privileges, and
immunities of such citizens*" (emphasis added)); Treaty Between the
United States of America and Different Tribes of Sioux Indians, Art. VI,
April 29, 1868, 15 Stat. 637 ("[A]ny Indian or Indians receiving a patent
for land under the foregoing provisions, shall thereby and from thence-
forth become and be a citizen of the United States, and be entitled to all
*the privileges and immunities of such citizens*" (emphasis added)).

Opinion of THOMAS, J.

and the French Republic, Art. III, Apr. 30, 1803, 8 Stat. 202, T. S. No. 86 (emphasis added).[8]

The Louisiana Cession Act reveals even more about the privileges and immunities of United States citizenship because it provoked an extensive public debate on the meaning of that term. In 1820, when the Missouri Territory (which the United States acquired through the Cession Act) sought to enter the Union as a new State, a debate ensued over whether to prohibit slavery within Missouri as a condition of its admission. Some congressmen argued that prohibiting slavery in Missouri would deprive its inhabitants of the "privileges and immunities" they had been promised by the Cession Act. See, e.g., 35 Annals of Cong. 1083 (1855) (remarks of Kentucky Rep. Hardin). But those who opposed slavery in Missouri argued that the right to hold slaves was merely a matter of state property law, not one of the privileges and immunities of United States citizenship guaranteed by the Act.[9]

[8] Subsequent treaties contained similar guarantees that the inhabitants of the newly acquired territories would enjoy the freedom to exercise certain constitutional rights. See Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Art. IX, Feb. 2, 1848, 9 Stat. 930, T. S. No. 207 (cession of Texas) (declaring that inhabitants of the Territory were entitled "to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction"); Treaty concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russias to the United States of America, Art. III, Mar. 30, 1867, 15 Stat. 542, T. S. No. 301 (June 20, 1867) (cession of Alaska) ("The inhabitants of the ceded territory, . . . if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion").

[9] See, e.g., Speech of Mr. Joseph Hemphill (Pa.) on the Missouri Ques-

Opinion of THOMAS, J.

Daniel Webster was among the leading proponents of the antislavery position. In his "Memorial to Congress," Webster argued that "[t]he rights, advantages and immunities here spoken of [in the Cession Act] must . . . be such as are recognized or communicated by the Constitution of the United States," not the "rights," advantages and immunities, derived exclusively from the *State* governments . . . ." D. Webster, A *Memorial* to the Congress of the United States on the Subject of Restraining the Increase of Slavery in New States to be Admitted into the Union 15 (Dec. 15, 1819) (emphasis added). "The obvious meaning" of the Act, in Webster's view, was that "*the rights derived under the federal Constitution* shall be enjoyed by the inhabitants of [the territory]." *Id.*, at 15–16 (emphasis added). In other words, Webster articulated a distinction between the rights of United States citizenship and the rights of state citizenship, and argued that the former included those rights "recognized or communicated by the Constitution." Since the right to hold slaves was not mentioned in the Constitution, it was not a right of federal citizenship.

Webster and his allies ultimately lost the debate over slavery in Missouri and the territory was admitted as a slave State as part of the now-famous Missouri Compromise. Missouri Enabling Act of March 6, 1820, ch. 22, §8, 3 Stat. 548. But their arguments continued to inform public understanding of the privileges and immunities of

tion in the House of the Representatives 16 (1820), as published in pamphlet form and reprinted in 22 Moore Pamphlets, p. 16 ("If the right to hold slaves is a federal right and attached merely to citizenship of the United States, [then slavery] could maintain itself against state authority, and on this principle the owner might take his slaves into any state he pleased, in defiance of the state laws, but this would be contrary to the constitution"); see also Lash, The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art, 98 Geo. L. J. 1241, 1288–1290 (2010) (collecting other examples).

Opinion of THOMAS, J.

United States citizenship. In 1854, Webster's Memorial was republished in a pamphlet discussing the Nation's next major debate on slavery—the proposed repeal of the Missouri Compromise through the Kansas-Nebraska Act, see The Nebraska Question: Comprising Speeches in the United States Senate: Together with the History of the Missouri Compromise 9–12 (1854). It was published again in 1857 in a collection of famous American speeches. See The Political Text-Book, or Encyclopedia: Containing Everything Necessary for the Reference of the Politicians and Statesmen of the United States 601–604 (M. Cluskey ed. 1857); see also Lash, 98 Geo. L. J., at 1294–1296 (describing Webster's arguments and their influence).

2

Evidence from the political branches in the years leading to the Fourteenth Amendment's adoption demonstrates broad public understanding that the privileges and immunities of United States citizenship included rights set forth in the Constitution, just as Webster and his allies had argued. In 1868, President Andrew Johnson issued a proclamation granting amnesty to former Confederates, guaranteeing "to all and to every person who directly or indirectly participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason . . . with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof." 15 Stat. 712.

Records from the 39th Congress further support this understanding.

a

After the Civil War, Congress established the Joint Committee on Reconstruction to investigate circumstances in the Southern States and to determine whether, and on what conditions, those States should be readmitted to the

Union. See Cong. Globe, 39th Cong., 1st Sess., 6, 30 (1865) (hereinafter 39th Cong. Globe); M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 57 (1986) (hereinafter Curtis). That Committee would ultimately recommend the adoption of the Fourteenth Amendment, justifying its recommendation by submitting a report to Congress that extensively cataloged the abuses of civil rights in the former slave States and argued that "adequate security for future peace and safety . . . can only be found in such changes of the organic law as shall determine the civil rights and privileges of all citizens in all parts of the republic." See Report of the Joint Committee on Reconstruction, S. Rep. No. 112, 39th Cong., 1st Sess., p. 15 (1866); H. R. Rep. No. 30, 39th Cong., 1st Sess., p. XXI (1866).

As the Court notes, the Committee's Report" was widely reprinted in the press and distributed by members of the 39th Congress to their constituents." Ante, at 24; B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 264–265 (1914) (noting that 150,000 copies of the Report were printed and that it was widely distributed as a campaign document in the election of 1866). In addition, newspaper coverage suggests that the wider public was aware of the Committee's work even before the Report was issued. For example, the Fort Wayne Daily Democrat (which appears to have been unsupportive of the Committee's work) paraphrased a motion instructing the Committee to

"enquire into [the] expediency of amending the Constitution of the United States so as to declare with greater certainty the power of Congress to enforce and determine by appropriate legislation all the guarantees contained in that instrument." The Nigger Congress! Fort Wayne Daily Democrat, Feb. 1, 1866, p. 4 (emphasis added).

Opinion of THOMAS, J.

b

Statements made by Members of Congress leading up
to, and during, the debates on the Fourteenth Amendment
point in the same direction. The record of these debates
has been combed before. See *Adamson* v. *California*, 332
U. S. 46, 92–110 (1947) (Appendix to dissenting opinion of
Black, J.) (concluding that the debates support the conclu-
sion that §1 was understood to incorporate the Bill of
Rights against the States); *ante*, at 14, n. 9, 26–27, n. 23,
(opinion of the Court) (counting the debates among other
evidence that §1 applies the Second Amendment against
the States). Before considering that record here, it is
important to clarify its relevance. When interpreting
constitutional text, the goal is to discern the most likely
public understanding of a particular provision at the time
it was adopted. Statements by legislators can assist in
this process to the extent they demonstrate the manner in
which the public used or understood a particular word or
phrase. They can further assist to the extent there is
evidence that these statements were disseminated to the
public. In other words, this evidence is useful not because
it demonstrates what the draftsmen of the text may have
been thinking, but only insofar as it illuminates what the
public understood the words chosen by the draftsmen to
mean.

(1)

Three speeches stand out as particularly significant.
Representative John Bingham, the principal draftsman of
§1, delivered a speech on the floor of the House in Febru-
ary 1866 introducing his first draft of the provision. Bing-
ham began by discussing *Barron* and its holding that the
Bill of Rights did not apply to the States. He then argued
that a constitutional amendment was necessary to provide
"an express grant of power in Congress to enforce by penal
enactment these great canons of the supreme law, secur-

ing to all the citizens in every State all the privileges and immunities of citizens, and to all the people all the sacred rights of person." 39th Cong. Globe 1089–1090 (1866). Bingham emphasized that §1 was designed "to arm the Congress of the United States, by the consent of the people of the United States, with the power to enforce the bill of rights as it stands in the Constitution today. It 'hath that extent—no more.'" *Id.*, at 1088.

Bingham's speech was printed in pamphlet form and broadly distributed in 1866 under the title, "One Country, One Constitution, and One People," and the subtitle, "In Support of the Proposed Amendment to Enforce the Bill of Rights."[10] Newspapers also reported his proposal, with the New York Times providing particularly extensive coverage, including a full reproduction of Bingham's first draft of §1 and his remarks that a constitutional amendment to "enforc[e]" the "immortal bill of rights" was "absolutely essential to American nationality." N. Y. Times, Feb. 27, 1866, p. 8.

Bingham's first draft of §1 was different from the version ultimately adopted. Of particular importance, the first draft granted Congress the "power to make all laws . . . necessary and proper to secure" the "citizens of each State all privileges and immunities of citizens in the several States," rather than restricting state power to "abridge" the privileges or immunities of citizens of the United States.[11] 39th Cong. Globe 1088.

---

[10] One Country, One Constitution, and One People: Speech of Hon. John A. Bingham, of Ohio, In the House of Representatives, February 28, 1866, In Support of the Proposed Amendment to Enforce the Bill of Rights (Cong. Globe). The pamphlet was published by the official reporter of congressional debates, and was distributed presumably pursuant to the congressional franking privilege. See B. Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L. J. 1509, 1558, n. 167 (2007) (hereinafter Wildenthal).

[11] The full text of Bingham's first draft of §1 provided as follows:

That draft was met with objections, which the Times covered extensively. A front-page article hailed the "Clear and Forcible Speech" by Representative Robert Hale against the draft, explaining—and endorsing—Hale's view that Bingham's proposal would "confer upon Congress all the rights and power of legislation now reserved to the States" and would "in effect utterly obliterate State rights and State authority over their own internal affairs."[2] N. Y. Times, Feb. 28, 1866, p. 1.

Critically, Hale did *not* object to the draft insofar as it purported to protect constitutional liberties against state interference. Indeed, Hale stated that he believed (incorrectly in light of *Barron*) that individual rights enumerated in the Constitution were already enforceable against the States. See 39th Cong. Globe 1064 ("I have, somehow or other, gone along with the impression that there is that sort of protection thrown over us in some way, whether with or without the sanction of a judicial decision that we are so protected"); see N. Y. Times, Feb. 28, 1866, at 1. Hale's misperception was not uncommon among members of the Reconstruction generation. See *infra*, at 38–40. But that is secondary to the point that the Times' coverage of

---

[1] "The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." 39th Cong. Globe 1088.

[2] In a separate front-page article on the same day, the paper expounded upon Hale's arguments in even further detail, while omitting Bingham's chief rebuttals. N. Y. Times, Feb. 28, 1866, p. 1. The unbalanced nature of The New York Times' coverage is unsurprising. As scholars have noted, "[m]ost papers" during the time of Reconstruction "had a frank partisan slant . . . and the *Times* was no exception." Wildenthal 1599. In 1866, the paper "was still defending" President Johnson's resistance to Republican reform measures, as exemplified by the fact that it "supported Johnson's veto of the Civil Rights Act of 1866." *Ibid.*

MCDONALD v. CHICAGO

Opinion of THOMAS, J.

this debate over §1's meaning suggests public awareness of its main contours—*i.e.*, that §1 would, at a minimum, enforce constitutionally enumerated rights of United States citizens against the States.

Bingham's draft was tabled for several months. In the interim, he delivered a second well-publicized speech, again arguing that a constitutional amendment was required to give Congress the power to enforce the Bill of Rights against the States. That speech was printed in pamphlet form, see Speech of Hon. John A. Bingham, of Ohio, on the Civil Rights Bill, Mar. 9, 1866 (Cong. Globe); see 39th Cong. Globe 1837 (remarks of Rep. Lawrence) (noting that the speech was "extensively published"), and the New York Times covered the speech on its front page. Thirty-Ninth Congress, N. Y. Times, Mar. 10, 1866, p. 1.

By the time the debates on the Fourteenth Amendment resumed, Bingham had amended his draft of §1 to include the text of the Privileges or Immunities Clause that was ultimately adopted. Senator Jacob Howard introduced the new draft on the floor of the Senate in the third speech relevant here. Howard explained that the Constitution recognized "a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, . . . some by the first eight amendments of the Constitution," and that "there is no power given in the Constitution to enforce and to carry out any of these guarantees" against the States. 39th Cong. Globe 2765. Howard then stated that "the great object" of §1 was to "restrain the power of the States and compel them at all times to respect these great fundamental guarantees." *Id.*, at 2766. Section 1, he indicated, imposed "a general prohibition upon all the States, as such, from abridging the privileges and immunities of the citizens of the United States." *Id.*, at 2765.

In describing these rights, Howard explained that they included "the privileges and immunities spoken of" in

Opinion of THOMAS, J.

Article IV, §2. *Id.*, at 2765. Although he did not catalogue the precise "nature" or "extent" of those rights, he thought "Corfield v. Coryell" provided a useful description. However, he then submitted that

"[t]o these privileges and immunities, whatever they may be — ... should be added *the personal rights guaranteed and secured by the first eight amendments of the Constitution;* such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, [and] ... *the right to keep and to bear arms.*" *Ibid.* (emphasis added).

*News of Howard's speech was carried in major newspapers across the country, including the New York Herald,* see N. Y. Herald, May 24, 1866, p. 1, which was the best-selling paper in the Nation at that time, see A. Amar, The Bill of Rights: Creation and Reconstruction 187 (1998) (hereinafter Amar).[13] The New York Times carried the speech as well, reprinting a lengthy excerpt of Howard's remarks, including the statements quoted above. N. Y. Times, May 24, 1866, p. 1. The following day's Times editorialized on Howard's speech, predicting that "[t]o this, the first section of the amendment, the Union party throughout the country will yield a ready acquiescence, and the South could offer no justifiable resistance," suggesting that Bingham's narrower second draft had not been met with the same objections that Hale had raised against the first. N. Y. Times, May 25, 1866, p. 4.

---

[13] Other papers that covered Howard's speech include the following: Baltimore Gazette, May 24, 1866, p. 4; Boston Daily Journal, May 24, 1866, p. 4; Boston Daily Advertiser, May 24, 1866, p. 1; Daily National Intelligencer, May 24, 1866, p. 3; Springfield Daily Republican, May 24, 1866, p. 3; Charleston Daily Courier, May 28, 1866, p. 4; Charleston Daily Courier, May 29, 1866, p. 1; Chicago Tribune, May 29, 1866, p. 2; Philadelphia Inquirer, May 24, 1866, p. 8.

30       MCDONALD v. CHICAGO

*Opinion of* THOMAS, J.

As a whole, these well-circulated speeches indicate that §1 was understood to enforce constitutionally declared rights against the States, and they provide no suggestion that any language in the section other than the Privileges or Immunities Clause would accomplish that task.

(2)

When read against this backdrop, the civil rights legislation adopted by the 39th Congress in 1866 further supports this view. Between passing the Thirteenth Amendment—which outlawed slavery alone—and the Fourteenth Amendment, Congress passed two significant pieces of legislation. The first was the Civil Rights Act of 1866, which provided that "all persons born in the United States" were "citizens of the United States" and that "such citizens, of every race and color, . . . shall have the same right" to, among other things, "full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." Ch. 31, §1, 14 Stat. 27.

Both proponents and opponents of this Act described it as providing the "privileges" of citizenship to freedmen, and defined those privileges to include constitutional rights, such as the right to keep and bear arms. See 39th Cong. Globe 474 (remarks of Sen. Trumbull) (stating that the "the late slaveholding States" had enacted laws "depriving persons of African descent of privileges which are essential to freemen," including "prohibit[ing] any negro or mulatto from having fire-arms" and stating that "[t]he purpose of the bill under consideration is to destroy all these discriminations"); *id.*, at 1266–1267 (remarks of Rep. Raymond) (opposing the Act, but recognizing that to "[m]ake a colored man a citizen of the United States" would guarantee to him, *inter alia*, "a defined status . . . a right to defend himself and his wife and children; a right 'to bear arms'").

Opinion of THOMAS, J.

Three months later, Congress passed the Freedmen's Bureau Act, which also entitled all citizens to the "full and equal benefit of all laws and proceedings concerning personal liberty" and "personal security." Act of July 16, 1866, ch. 200, §14, 14 Stat. 176. The Act stated expressly that the rights of personal liberty and security protected by the Act "includ[ed] the constitutional right to bear arms." *Ibid.*

(3)

There is much else in the legislative record. Many statements by Members of Congress corroborate the view that the Privileges or Immunities Clause enforced constitutionally enumerated rights against the States. *See* Curtis 112 (collecting examples). I am not aware of any statement that directly refutes that proposition. That said, the record of the debates—like most legislative history—is less than crystal clear. In particular, much ambiguity derives from the fact that at least several Members described §1 as protecting the privileges and immunities of citizens "in the several States," harkening back to Article IV, §2. *See supra,* at 28–29 (describing Sen. Howard's speech). These statements can be read to support the view that the Privileges or Immunities Clause protects some or all the fundamental rights of "citizens" described in *Corfield.* *They* can also be read to support the view that the Privileges or Immunities Clause, like Article IV, §2, prohibits only state discrimination with respect to those rights it covers, but does not deprive States of the power to deny those rights to all citizens equally.

I examine the rest of the historical record with this understanding. But for purposes of discerning what the public most likely thought the Privileges or Immunities Clause to mean, it is significant that the most widely publicized statements by the legislators who voted on §1— Bingham, Howard, and even Hale—point unambiguously

32  McDONALD v. CHICAGO

Opinion of THOMAS, J.

toward the conclusion that the Privileges or Immunities Clause enforces at least those fundamental rights enumerated in the Constitution against the States, including the Second Amendment right to keep and bear arms.

### 3

Interpretations of the Fourteenth Amendment in the period immediately following its ratification help to establish the public understanding of the text at the time of its adoption.

Some of these interpretations come from Members of Congress. During an 1871 debate on a bill to enforce the Fourteenth Amendment, Representative Henry Dawes listed the Constitution's first eight Amendments, including "the right to keep and bear arms," before explaining that after the Civil War, the country "gave the most grand of all these rights, privileges, and immunities, by one single amendment to the Constitution, to four millions of American citizens" who formerly were slaves. Cong. Globe, 42d Cong., 1st Sess., 475–476 (1871). "It is all these," Dawes explained, "which are comprehended in the words 'American citizen.'" *Ibid.*; see also *id.*, at 334 (remarks of Rep. Hoar) (stating that the Privileges or Immunities Clause referred to those rights "declared to belong to the citizen by the Constitution itself"). Even opponents of Fourteenth Amendment enforcement legislation acknowledged that the Privileges or Immunities Clause protected constitutionally enumerated individual rights. See 2 Cong. Rec. 384–385 (1874) (remarks of Rep. Mills) (opposing enforcement law, but acknowledging, in referring to the Bill of Rights, that "[t]hese first amendments and some provisions of the Constitution of like import embrace the privileges and immunities of citizenship as set forth in article 4, section 2 of the Constitution and in the *fourteenth amendment*" (emphasis added)); see Curtis 166–170 (collecting examples).

Opinion of THOMAS, J.

Legislation passed in furtherance of the Fourteenth Amendment demonstrates even more clearly this understanding. For example, Congress enacted the Civil Rights Act of 1871, 17 Stat. 13, which was titled in pertinent part "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States," and which is codified in the still-existing 42 U. S. C. §1983. That statute prohibits state officials from depriving citizens of "any rights, privileges, or immunities secured by the Constitution." Rev. Stat. 1979, 42 U. S. C. §1983 (emphasis added). Although the judiciary ignored this provision for decades after its enactment, this Court has come to interpret the statute, unremarkably in light of its text, as protecting constitutionally enumerated rights. *Monroe v. Pape*, 365 U. S. 167, 171 (1961).

A Federal Court of Appeals decision written by a future Justice of this Court adopted the same understanding of the Privileges or Immunities Clause. See, e.g., *United States v. Hall*, 26 F. Cas. 79, 82 (No. 15,282) (CC SD Ala. 1871) (Woods, J.) ("We think, therefore, that the . . . rights enumerated in the first eight articles of amendment to the constitution of the United States, are the privileges and immunities of citizens of the United States"). In addition, two of the era's major constitutional treatises reflected the understanding that §1 would protect constitutionally enumerated rights from state abridgment.[14] A third such treatise unambiguously indicates that the Privileges or

[14] See J. Pomeroy, An Introduction to the Constitutional Law of the United States 155–156 (E. Bennett ed. 1886) (describing §1, which the country was then still considering, as a "needed" "remedy" for *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243 (1833), which held that the Bill of Rights was not enforceable against the States); T. Farrar, Manual of the Constitution of the United States of America 58–59, 145–146, 396–397 (1867) (reprint 1993); id., at 546 (3d ed. 1872) (describing the Fourteenth Amendment as having "swept away" the "decisions of many courts" that "the popular rights guaranteed by the Constitution are secured only against [the federal] government").

McDONALD v. CHICAGO

Opinion of THOMAS, J.

Immunities Clause accomplished this task. G. Paschal, The Constitution of the United States 290 (1868) (explaining that the rights listed in §1 had "already been guaranteed" by Article IV and the Bill of Rights, but that "[t]he new feature declared" by §1 was that these rights, "which had been construed to apply only to the national government, are thus imposed upon the States").

Another example of public understanding comes from United States Attorney Daniel Corbin's statement in an 1871 Ku Klux Klan prosecution. Corbin cited *Barron* and declared:

"[T]he fourteenth amendment changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States—that, as Congress heretofore could not interfere with the right of the citizen to keep and bear arms, now, after the adoption of the fourteenth amendment, the State cannot interfere with the right of the citizen to keep and bear arms. The right to keep and bear arms is included in the fourteenth amendment, under 'privileges and immunities.'" Proceedings in the Ku Klux Trials at Columbia, S. C., in the United States Circuit Court, November Term, 1871, p. 147 (1872).

*     *     *

This evidence plainly shows that the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights, including the right to keep and bear arms. As the Court demonstrates, there can be no doubt that §1 was understood to enforce the Second Amendment against the States. See *ante,* at 22–33. In my view, this is because the right to keep and bear arms was understood to be a privilege of American citizenship guaranteed by the Privileges or Immunities Clause.

Opinion of THOMAS, J.

## C

The next question is whether the Privileges or Immunities Clause merely prohibits States from discriminating among citizens if they recognize the Second Amendment's right to keep and bear arms, or whether the Clause requires States to recognize the right. The municipal respondents, Chicago and Oak Park, argue for the former interpretation. They contend that the Second Amendment, as applied to the States through the Fourteenth, authorizes a State to impose an outright ban on handgun possession such as the ones at issue here so long as a State applies it to all citizens equally.[18] The Court explains why this antidiscrimination-only reading of §1 as a whole is "implausible." *Ante*, at 31 (citing Brief for Municipal Respondents 64). I agree, but because I think it is the Privileges or Immunities Clause that applies this right to the States, I must explain why this Clause in particular protects against more than just state discrimination, and in fact establishes a minimum baseline of rights for all American citizens.

## I

I begin, again, with the text. The Privileges or Immunities Clause opens with the command that *"No State shall"* abridge the privileges or immunities of citizens of the

---

[18] The municipal respondents and JUSTICE BREYER's dissent raise a most unusual argument that §1 prohibits discriminatory laws affecting only the right to keep and bear arms, but offers substantive protection to other rights enumerated in the Constitution, such as the freedom of speech. See *post*, at 24. Others, however, have made the more comprehensive—and internally consistent—argument that §1 bars discrimination alone and does not afford protection to any substantive rights. See, *e.g.*, R. Berger, Government By Judiciary: The Transformation of the Fourteenth Amendment (1997). I address the coverage of the Privileges or Immunities Clause only as it applies to the Second Amendment right presented here, but I do so with the understanding that my conclusion may have implications for the broader argument.

United States. Amdt. 14, §1 (emphasis added). The very same phrase opens Article I, §10 of the Constitution, which prohibits the States from "pass[ing] any Bill of Attainder" or "ex post facto Law," among other things. Article I, §10 is one of the few constitutional provisions that limits state authority. In *Barron*, when Chief Justice Marshall interpreted the Bill of Rights as lacking "plain and intelligible language" restricting state power to infringe upon individual liberties, he pointed to Article I, §10 as an example of text that would have accomplished that task. 7 Pet., at 250. Indeed, Chief Justice Marshall would later describe Article I, §10 as "a bill of rights for the people of each state." *Fletcher v. Peck*, 6 Cranch 87, 138 (1810). Thus, the fact that the Privileges or Immunities Clause uses the command "[n]o State shall"—which Article IV, §2 does not—strongly suggests that the former imposes a greater restriction on state power than the latter.

This interpretation is strengthened when one considers that the Privileges or Immunities Clause uses the verb "abridge," rather than "discriminate," to describe the limit it imposes on state authority. The Webster's dictionary in use at the time of Reconstruction defines the word "abridge" to mean "[t]o deprive; to cut off; . . . as, to *abridge* one of his rights." Webster, An American Dictionary of the English Language, at 6. The Clause is thus best understood to impose a limitation on state power to infringe upon pre-existing substantive rights. It raises no indication that the Framers of the Clause used the word "abridge" to prohibit only discrimination.

This most natural textual reading is underscored by a well-publicized revision to the Fourteenth Amendment that the Reconstruction Congress rejected. After several Southern States refused to ratify the Amendment, President Johnson met with their Governors to draft a compromise. N. Y. Times, Feb. 5, 1867, p. 5. Their proposal

eliminated Congress' power to enforce the Amendment (granted in §5), and replaced the Privileges or Immunities Clause in §1 with the following:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the States in which they reside; and the Citizens of each State shall be entitled to *all the privileges and immunities of citizens in the several States.*" Draft reprinted in 1 Documentary History of Reconstruction 240 (W. Fleming ed. 1950) (hereinafter Fleming).

Significantly, this proposal removed the "[n]o State shall" directive and the verb "abridge" from §1, and also changed the class of rights to be protected from those belonging to "citizens of the United States" to those of the "citizens in the several States." This phrasing is materially indistinguishable from Article IV, §2, which generally was understood as an antidiscrimination provision alone. See *supra,* at 15–18. The proposal thus strongly indicates that at least the President of the United States and several southern Governors thought that the Privileges or Immunities Clause, which they unsuccessfully tried to revise, prohibited more than just state-sponsored discrimination.

2

The argument that the Privileges or Immunities Clause prohibits no more than discrimination often is followed by a claim that public discussion of the Clause, and of §1 generally, was not extensive. Because of this, the argument goes, §1 must not have been understood to accomplish such a significant task as subjecting States to federal enforcement of a minimum baseline of rights. That argument overlooks critical aspects of the Nation's history that underscored the need for, and wide agreement upon,

MCDONALD v. CHICAGO

Opinion of THOMAS, J.

federal enforcement of constitutionally enumerated rights against the States, including the right to keep and bear arms.

a

I turn first to public debate at the time of ratification. It is true that the congressional debates over §1 were relatively brief. It is also true that there is little evidence of extensive debate in the States. Many state legislatures did not keep records of their debates, and the few records that do exist reveal only modest discussion. See Curtis 145. These facts are not surprising.

First, however consequential we consider the question today, the nationalization of constitutional rights was not the most controversial aspect of the Fourteenth Amendment at the time of its ratification. The Nation had just endured a tumultuous civil war, and §§2, 3, and 4—which reduced the representation of States that denied voting rights to blacks, deprived most former Confederate officers of the power to hold elective office, and required States to disavow Confederate war debts—were far more polarizing and consumed far more political attention. See Wilden-that 1600; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866–1868, 30 Whittier L. Rev. 695, 699 (2009).

Second, the congressional debates on the Fourteenth Amendment reveal that many representatives, and probably many citizens, believed that the Thirteenth Amendment, the 1866 Civil Rights legislation, or some combination of the two, had already enforced constitutional rights against the States. Justice Black's dissent in Adamson chronicles this point in detail. 332 U. S., at 107–108 (Appendix to dissenting opinion). Regardless of whether that understanding was accurate as a matter of constitutional law, it helps to explain why Congressmen had little to say during the debates about §1. See ibid.

Opinion of THOMAS, J.

Third, while *Barron* made plain that the Bill of Rights was not legally enforceable against the States, see *supra*, at 2, the significance of that holding should not be over-stated. Like the Framers, see *supra*, at 14–15, many 19th-century Americans understood the Bill of Rights to declare inalienable rights that pre-existed all government. Thus, even though the Bill of Rights technically applied only to the Federal Government, many believed that it declared rights that no legitimate government could abridge.

Chief Justice Henry Lumpkin's decision for the Georgia Supreme Court in *Nunn* v. *State*, 1 Ga. 243 (1846), illus-trates this view. In assessing state power to regulate firearm possession, Lumpkin wrote that he was "aware that it has been decided, that [the Second Amendment], like other amendments adopted at the same time, is a restriction upon the government of the United States, and does not extend to the individual States." *Id.*, at 250. But he still considered the right to keep and bear arms as "an unalienable right, which lies at the bottom of every free government," and thus found the States bound to honor it. *Ibid.* Other state courts adopted similar positions with respect to the right to keep and bear arms and other enu-merated rights.[16] Some courts even suggested that the protections in the Bill of Rights were legally enforceable against the States, *Barron* notwithstanding.[17] A promi-nent treatise of the era took the same position. W. Rawle, A View of the Constitution of the United States of America

---

[16] See, e.g., *Raleigh & Gaston R. Co.* v. *Davis*, 19 N. C. 451, 458–462 (1837) (right to just compensation for government taking of property); *Rohan* v. *Swain*, 59 Mass. 281, 285 (1850) (right to be secure from unreasonable government searches and seizures); *State* v. *Buzzard*, 4 Ark. 18, 28 (1842) (right to keep and bear arms); *State* v. *Junel*, 13 La. Ann. 399, 400 (1858) (same); *Cockrum* v. *State*, 24 Tex. 394, 401–404 (1859) (same).

[17] See, e.g., *People* v. *Goodwin*, 18 Johns. Cas. 187, 201 (N. Y. Sup. Ct. 1820); *Rhinehart* v. *Schuyler*, 7 Ill. 473, 522 (1845).

124–125 (2d ed. 1829) (reprint 2009) (arguing that certain of the first eight Amendments "appl[y] to the state legisla-tures" because those Amendments "form parts of the declared rights of the people, of which neither the state powers nor those of the Union can ever deprive them"); *id.,* at 125–126 (describing the Second Amendment "right of the people to keep and bear arms" as "a restraint on both" Congress and the States); see also *Heller,* 554 U. S., at — (slip op., at 34) (describing Rawle's treatise as "influen-tial"). Certain abolitionist leaders adhered to this view as well. Lysander Spooner championed the popular aboli-tionist argument that slavery was inconsistent with con-stitutional principles, citing as evidence the fact that it deprived black Americans of the "natural right of all men 'to keep and bear arms' for their personal defence," which he believed the Constitution "prohibited] both Congress and the State governments from infringing," L. Spooner, The Unconstitutionality of Slavery 98 (1860).

In sum, some appear to have believed that the Bill of Rights *did* apply to the States, even though this Court had squarely rejected that theory. See, e.g., *supra,* at 27–28 (recounting Rep. Hale's argument to this effect). Many others believed that the liberties codified in the Bill of Rights were ones that no State *should* abridge, even though they understood that the Bill technically did not apply to States. These beliefs, combined with the fact that most state constitutions recognized many, if not all, of the individual rights enumerated in the Bill of Rights, made the need for federal enforcement of constitutional liberties against the States an afterthought. See *ante,* at 29 (opin-ion of the Court) (noting that, "[i]n 1868, 22 of the 37 States in the Union had state constitutional provisions explicitly protecting the right to keep and bear arms"). That changed with the national conflict over slavery.

b

In the contentious years leading up to the Civil War, those who sought to retain the institution of slavery found that to do so, it was necessary to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists. Congressman Tobias Plants explained that slaveholders "could not hold [slaves] safely where dissent was permitted," so they decided that "all dissent must be suppressed by the strong hand of power." 39th Cong., Globe 1013. The measures they used were ruthless, re-pressed virtually every right recognized in the Constitu-tion, and demonstrated that preventing only discrimina-tory state firearms restrictions would have been a hollow assurance for liberty. Public reaction indicates that the American people understood this point.

The overarching goal of pro-slavery forces was to repress the spread of abolitionist thought and the concomitant risk of a slave rebellion. Indeed, it is difficult to overstate the extent to which fear of a slave uprising gripped slave-holders and dictated the acts of Southern legislatures. Slaves and free blacks represented a substantial percent-age of the population and posed a severe threat to South-ern order if they were not kept in their place. According to the 1860 Census, slaves represented one quarter or more of the population in 11 of the 15 slave States, nearly half the population in Alabama, Florida, Georgia, and Louisi-ana, and more than 50% of the population in Mississippi and South Carolina. Statistics of the United States (In-cluding Mortality, Property, &c.) in 1860, The Eighth Census 336–350 (1866).

The Southern fear of slave rebellion was not unfounded. Although there were others, two particularly notable slave uprisings heavily influenced slaveholders in the South. In 1822, a group of free blacks and slaves led by Denmark Vesey planned a rebellion in which they would slay their masters and flee to Haiti. H. Aptheker, American Negro

Opinion of THOMAS, J.

Slave Revolts 268–270 (1983). The plan was foiled, leading to the swift arrest of 130 blacks, and the execution of 37, including Vesey. *Id.*, at 271. Still, slaveowners took notice—it was reportedly feared that as many as 6,600 to 9,000 slaves and free blacks were involved in the plot. *Id.*, at 272. A few years later, the fear of rebellion was realized. An uprising led by Nat Turner took the lives of at least 57 whites before it was suppressed. *Id.*, at 300–302.

The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense. Teaching slaves to read (even the Bible) was a criminal offense punished severely in some States. See K. Stampp, The Peculiar Institution: Slavery in the Ante-bellum South 208, 211 (1956). Virginia made it a crime for a member of an "abolition" society to enter the State and argue "that the owners of slaves have no property in the same, or advocate or advise the abolition of slavery." 1835–1836 Va. Acts ch. 66, p. 44. Other States prohibited the circulation of literature denying a master's right to property in his slaves and passed laws requiring postmasters to inspect the mails in search of such material. C. Eaton, The Freedom-of-Thought Struggle in the Old South 118–143, 199–200 (1964).

Many legislatures amended their laws prohibiting slaves from carrying firearms[18] to apply the prohibition to free blacks as well. See, *e.g.*, Act of Dec. 23, 1833, §7, 1833 Ga. Acts pp. 226, 228 (declaring that "it shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever"); H. Ap-

---

[18] See, *e.g.*, Black Code, ch. 33, §19, 1806 La. Acts pp. 160, 162 (prohibiting slaves from using firearms unless they were authorized by their master to hunt within the boundaries of his plantation); Act of Dec. 18, 1819, 1819 S. C. Acts pp. 29, 31 (same); An Act Concerning Slaves, §6, 1840 Tex. Laws pp. 42–43 (making it unlawful for "any slave to own firearms of any description").

Opinion of THOMAS, J.

theker, Nat Turner's Slave Rebellion 74–76, 83–94 (1966) (discussing similar Maryland and Virginia statutes); see also Act of Mar. 15, 1852, ch. 206, 1852 Miss. Laws p. 328 (repealing laws allowing free blacks to obtain firearms licenses); Act of Jan. 31, 1831 Fla. Acts p. 30 (same). Florida made it the "duty" of white citizen "patrol[s] to search negro houses or other suspected places, for fire arms." Act of Feb. 17, 1833 Fla. Acts pp. 26, 30. If they found any firearms, the patrols were to take the offending slave or free black "to the nearest justice of the peace," whereupon he would be "severely punished" by "whipping on the bare back, not exceeding thirty-nine lashes," unless he could give a "plain and satisfactory" explanation of how he came to possess the gun. Ibid.

Southern blacks were not alone in facing threats to their personal liberty and security during the antebellum era. Mob violence in many Northern cities presented dangers as well. Cottrol & Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L. J. 309, 340 (1991) (hereinafter Cottrol) (recounting a July 1834 mob attack against "churches, homes, and businesses of white abolitionists and blacks" in New York that in- volved "upwards of twenty thousand people and required the intervention of the militia to suppress"); ibid. (noting an uprising in Boston nine years later in which a confron- tation between a group of white sailors and four blacks led "a mob of several hundred whites" to "attac[k] and se- verely beat every black they could find").

c

After the Civil War, Southern anxiety about an uprising among the newly freed slaves peaked. As Representative Thaddeus Stevens is reported to have said, "[w]hen it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in

hysteria." K. Stampp, The Era of Reconstruction, 1865–1877, p. 104 (1965) (hereinafter Era of Reconstruction). As the Court explains, this fear led to "systematic efforts" in the "old Confederacy" to disarm the more than 180,000 freedmen who had served in the Union Army, as well as other free blacks. See *ante*, at 23. Some States formally prohibited blacks from possessing firearms. *Ante*, at 23–24 (quoting 1865 Miss. Laws p. 165, §1, reprinted in 1 Fleming 289). Others enacted legislation prohibiting blacks from carrying firearms without a license, a restriction not imposed on whites. See, *e.g.*, La. Statute of 1865, reprinted in *id.*, at 280. Additionally, "[t]hroughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves." *Ante*, at 24.

As the Court makes crystal clear, if the Fourteenth Amendment "had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African-Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers." *Ante*, at 32. In the years following the Civil War, a law banning firearm possession outright "would have been nondiscriminatory only in the formal sense," for it would have "left firearms in the hands of the militia and local peace officers." *Ibid.*

Evidence suggests that the public understood this at the time the Fourteenth Amendment was ratified. The publicly circulated Report of the Joint Committee on Reconstruction extensively detailed these abuses, see *ante*, at 23–24 (collecting examples), and statements by citizens indicate that they looked to the Committee to provide a federal solution to this problem, see, *e.g.*, 39th Cong. Globe 337 (remarks of Rep. Sumner) (introducing "a memorial from the colored citizens of the State of South Carolina" asking for, *inter alia*, "constitutional protection in keeping

arms, in holding public assemblies, and in complete liberty of speech and of the press").

One way in which the Federal Government responded was to issue military orders countermanding Southern arms legislation. See, e.g., Jan. 17, 1866, order from Major General D. E. Sickles, reprinted in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 37 (1871) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed"). The significance of these steps was not lost on those they were designed to protect. After one such order was issued, The Christian Recorder, published by the African Methodist Episcopal Church, published the following editorial:

"'We have several times alluded to the fact that the Constitution of the United States, guaranties to every citizen the right to keep and bear arms. . . . All men, without the distinction of color, have the right to keep arms to defend their homes, families, or themselves.'

"'We are glad to learn that [the] Commissioner for this State . . . has given freedmen to understand that they have as good a right to keep fire arms as any other citizens. The Constitution of the United States is the supreme law of the land, and we will be governed by that at present.' Right to Bear Arms," Christian Recorder (Phila.), Feb. 24, 1866, pp. 29–30.

The same month, The Loyal Georgian carried a letter to the editor asking "'Have colored persons a right to own and carry fire arms?'—A Colored Citizen." The editors responded as follows:

"'Almost every day, we are asked questions similar to the above. We answer *certainly you have the same right or other* fire arms that *other* citizens have. You are not only free but citizens of the United States and, as such, entitled to the same privileges

granted to other citizens by the Constitution of the United States.

"... Article II, of the amendments to the Constitution of the United States, gives the people the right to bear arms and states that this right shall not be infringed. ... All men, without distinction of color, have the right to keep arms to defend their homes, families or themselves." Letter to the Editor, Loyal Georgian (Augusta), Feb. 3, 1866, p. 3.

These statements are consistent with the arguments of abolitionists during the antebellum era that slavery, and the slave States' efforts to retain it, violated the constitutional rights of individuals—rights the abolitionists described as among the privileges and immunities of citizenship. See, e.g., J. Tiffany, Treatise on the Unconstitutionality of American Slavery 56 (1849) (reprint 1969) ("pledg[ing] ... to see that all the rights, privileges, and immunities, granted by the constitution of the United States, are extended to all"); id., at 99 (describing the "right to keep and bear arms" as one of those rights secured by "the constitution of the United States"). The problem abolitionists sought to remedy was that, under Dred Scott, blacks were not entitled to the privileges and immunities of citizens under the Federal Constitution and that, in many States, whatever inalienable rights state law recognized did not apply to blacks. See, e.g., Cooper v. Savannah, 4 Ga. 68, 72 (1848) (deciding, just two years after Chief Justice Lumpkin's opinion in Nunn recognizing the right to keep and bear arms, see supra, at 39, that "[f]ree persons of color have never been recognized here as citizens; they are not entitled to bear arms"). Section 1 guaranteed the rights of citizenship in the United States and in the several States without regard to race. But it was understood that liberty would be assured

little protection if § left each State to decide which privileges or immunities of United States citizenship it would protect. As Frederick Douglass explained before §1's adoption, "the Legislatures of the South can take from him the right to keep and bear arms, as they can—they would not allow a negro to walk with a cane where I came from, they would not allow five of them to assemble together." In What New Skin Will the Old Snake Come Forth? An Address Delivered in New York, New York, May 10, 1865, reprinted in 4 The Frederick Douglass Papers 79, 83–84 (J. Blassingame & J. McKivigan eds., 1991) (footnote omitted). "Notwithstanding the provision in the Constitution of the United States, that the right to keep and bear arms shall not be abridged," Douglass explained that "the black man has never had the right either to keep or bear arms." *Id.*, at 84. Absent a constitutional amendment to enforce that right against the States, he insisted that "the work of the Abolitionists [wa]s not finished." *Ibid.*

This history confirms what the text of the Privileges or Immunities Clause most naturally suggests: Consistent with its command that "[n]o State shall . . . abridge" the rights of United States citizens, the Clause establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them.[19]

## III

My conclusion is contrary to this Court's precedents, which hold that the Second Amendment right to keep and bear arms is not a privilege of United States citizenship.

[19] I conclude that the right to keep and bear arms applies to the States through the Privileges or Immunities Clause, which recognizes the rights of United States "citizens." The plurality concludes that the right applies to the States through the Due Process Clause, which covers all "person[s]." Because this case does not involve a claim brought by a noncitizen, I express no view on the difference, if any, between my conclusion and the plurality's with respect to the extent to which the States may regulate firearm possession by noncitizens.

MᶜDONALD v. CHICAGO

Opinion of THOMAS, J.

See *Cruikshank*, 92 U. S., at 548–549, 551–553. I must, therefore, consider whether *stare decisis* requires retention of those precedents. As mentioned at the outset, my inquiry is limited to the right at issue here. Thus, I do not endeavor to decide in this case whether, or to what extent, the Privileges or Immunities Clause applies any other rights enumerated in the Constitution against the States.[20] Nor do I suggest that the *stare decisis* considerations surrounding the application of the right to keep and bear arms against the States would be the same as those surrounding another right protected by the Privileges or Immunities Clause. I consider *stare decisis* only as it applies to the question presented here.

A

This inquiry begins with the *Slaughter-House Cases*. There, this Court upheld a Louisiana statute granting a monopoly on livestock butchering in and around the city of New Orleans to a newly incorporated company. 16 Wall. 36. Butchers excluded by the monopoly sued, claiming that the statute violated the Privileges or Immunities Clause because it interfered with their right to pursue and "exercise their trade." *Id.*, at 60. This Court rejected the butchers' claim, holding that their asserted right was not a

---

[20] I note, however, that I see no reason to assume that the constitutionally enumerated rights protected by the Privileges or Immunities Clause should consist of all the rights recognized in the Bill of Rights and no others. Constitutional provisions outside the Bill of Rights protect individual rights, see, *e.g.*, Art. I, §9, cl. 2 (granting the "Privilege of the Writ of Habeas Corpus"), and there is no obvious evidence that the Framers of the Privileges or Immunities Clause meant to exclude them. In addition, certain Bill of Rights provisions prevent federal interference in state affairs and are not readily construed as protecting rights that belong to individuals. The Ninth and Tenth Amendments are obvious examples, as is the First Amendment's Establishment Clause, which "does not purport to protect individual rights." *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 50 (2004) (THOMAS, J., concurring in judgment); see Amar 179–180.

Opinion of THOMAS, J.

privilege or immunity of American citizenship, but one
governed by the States alone. The Court held that the
Privileges or Immunities Clause protected only rights of
*federal* citizenship—those "which owe their existence to
the Federal government, its National character, its Con-
stitution, or its laws," *id.,* at 79—and did not protect *any*
of the rights of state citizenship, *id.,* at 74. In other
words, the Court defined the two sets of rights as mutually
exclusive.

    After separating these two sets of rights, the Court
defined the rights of state citizenship as "embrac[ing]
nearly every civil right for the establishment and protec-
tion of which organized government is instituted"—that is,
all those rights listed in *Corfield.* 16 Wall., at 76 (refer-
ring to "those rights" that "Judge Washington" described).
That left very few rights of federal citizenship for the
Privileges or Immunities Clause to protect. The Court
suggested a handful of possibilities, such as the "right of
free access to [federal] seaports," protection of the Federal
Government while traveling "on the high seas," and even
two rights listed in the Constitution. *Id.,* at 79 (noting
"[t]he right to peaceably assemble" and "the privilege of
the writ of habeas corpus"; see *supra,* at 4). But its deci-
sion to interpret the rights of state and federal citizenship
as mutually exclusive led the Court in future cases to
conclude that constitutionally enumerated rights were
excluded from the Privileges or Immunities Clause's scope.
See *Cruikshank, supra.*

    I reject that understanding. There was no reason to
interpret the Privileges or Immunities Clause as putting
the Court to the extreme choice of interpreting the "privi-
leges and immunities" of federal citizenship to mean ei-
ther all those rights listed in *Corfield,* or almost no rights
at all. 16 Wall., at 76. The record is scant that the public
understood the Clause to make the Federal Government
"a perpetual censor upon all legislation of the States" as

Opinion of THOMAS, J.

the *Slaughter-House* majority feared. *Id.,* at 78. For one thing, *Corfield* listed the "elective franchise" as one of the privileges and immunities of "citizens of the several states," 6 F. Cas., at 552, yet Congress and the States still found it necessary to adopt the Fifteenth Amendment—which protects "[t]he right of citizens of the United States to vote"—two years after the Fourteenth Amendment's passage. If the Privileges or Immunities Clause were understood to protect every conceivable civil right from state abridgment, the Fifteenth Amendment would have been redundant.

The better view, in light of the States and Federal Government's shared history of recognizing certain inalienable rights in their citizens, is that the privileges and immunities of state and federal citizenship overlap. This is not to say that the privileges and immunities of state and federal citizenship are the same. At the time of the Fourteenth Amendment's ratification, States performed many more functions than the Federal Government, and it is unlikely that, simply by referring to "privileges or immunities," the Framers of §1 meant to transfer every right mentioned in *Corfield* to congressional oversight. As discussed, "privileges" and "immunities" were understood only as synonyms for "rights." See *supra,* at 9–11. It was their attachment to a particular group that gave them content, and the text and history recounted here indicate that the rights of United States citizens were not perfectly identical to the rights of citizens "in the several States." Justice Swayne, one of the dissenters in *Slaughter-House,* made the point clear:

"The citizen of a State has *the same* fundamental rights as a citizen of the United States, *and also* certain others, local in their character, arising from his relation to the State, and in addition, those which belong to the citizen of the United States, he being in

Opinion of THOMAS, J.

that relation also. There may thus be a double citizenship, each having some rights peculiar to itself. It is only over those which belong to the citizen of the United States that the category here in question throws the shield of its protection." 16 Wall., at 126 (emphasis added).

Because the privileges and immunities of American citizenship include rights enumerated in the Constitution, they overlap to at least some extent with the privileges and immunities traditionally recognized in citizens in the several States.

A separate question is whether the privileges and immunities of American citizenship include any rights besides those enumerated in the Constitution. The four dissenting Justices in *Slaughter-House* would have held that the Privileges or Immunities Clause protected the unenumerated right that the butchers in that case asserted. See *id.*, at 83 (Field, J., dissenting); *id.*, at 111 (Bradley, J., dissenting); *id.*, at 124 (Swayne, J., dissenting). Because this case does not involve an unenumerated right, it is not necessary to resolve the question whether the Clause protects such rights, or whether the Court's judgment in *Slaughter-House* was correct.

Still, it is argued that the mere possibility that the Privileges or Immunities Clause may enforce unenumerated rights against the States creates "special hazards" that should prevent this Court from returning to the original meaning of the Clause.[21] *Post*, at 3 (STEVENS, J., dissenting). Ironically, the same objection applies to the

[21]To the extent JUSTICE STEVENS is concerned that reliance on the Privileges or Immunities Clause may invite judges to "write their personal views of appropriate public policy into the Constitution," *post*, at 3 (internal quotation marks omitted), his celebration of the alternative—the "flexibility," "transcendence," and "dynamism" of substantive due process—speaks for itself, *post*, at 14–15, 20.

Opinion of THOMAS, J.

Court's substantive due process jurisprudence, which illustrates the risks of granting judges broad discretion to recognize individual constitutional rights in the absence of textual or historical guideposts. But I see no reason to assume that such hazards apply to the Privileges or Immunities Clause. The mere fact that the Clause does not expressly list the rights it protects does not render it incapable of principled judicial application. The Constitution contains many provisions that require an examination of more than just constitutional text to determine whether a particular act is within Congress' power or is otherwise prohibited. See, e.g., Art. I, §8, cl. 18 (Necessary and Proper Clause); Amdt. 8 (Cruel and Unusual Punishments Clause). When the inquiry focuses on what the ratifying era understood the Privileges or Immunities Clause to mean, interpreting it should be no more "hazardous" than interpreting these other constitutional provisions by using the same approach. To be sure, interpreting the Privileges or Immunities Clause may produce hard questions. But they will have the advantage of being questions the Constitution asks us to answer. I believe those questions are more worthy of this Court's attention—and far more likely to yield discernable answers—than the substantive due process questions the Court has for years created on its own, with neither textual nor historical support.

Finding these impediments to returning to the original meaning overstated, I reject *Slaughter-House* insofar as it precludes any overlap between the privileges and immunities of state and federal citizenship. I next proceed to the *stare decisis* considerations surrounding the precedent that expressly controls the question presented here.

B

*Three years after Slaughter-House*, the Court in *Cruikshank* squarely held that the right to keep and bear arms was not a privilege of American citizenship, thereby over-

Opinion of THOMAS, J.

turning the convictions of militia members responsible for the brutal Colfax Massacre. *See supra*, at 4–5. *Cruikshank* is not a precedent entitled to any respect. The flaws in its interpretation of the Privileges or Immunities Clause are made evident by the preceding evidence of its original meaning, and I would reject the holding on that basis alone. But, the consequences of *Cruikshank* warrant mention as well.

*Cruikshank*'s holding that blacks could look only to state governments for protection of their right to keep and bear arms enabled private forces, often with the assistance of local governments, to subjugate the newly freed slaves and their descendants through a wave of private violence designed to drive blacks from the voting booth and force them into peonage, an effective return to slavery. Without federal enforcement of the inalienable right to keep and bear arms, these militias and mobs were tragically successful in waging a campaign of terror against the very people the Fourteenth Amendment had just made citizens. Take, for example, the Hamburg Massacre of 1876. There, a white citizen militia sought out and murdered a troop of black militiamen for no other reason than that they had dared to conduct a celebratory Fourth of July parade through their mostly black town. The white militia commander, "Pitchfork" Ben Tillman, later described this massacre with pride: "[T]he leading white men of Edgefield" had decided "to seize the first opportunity that the negroes might offer them to provoke a riot and teach the negroes a lesson by having the whites demonstrate their superiority by killing as many of them as was justifiable." S. Kantrowitz, Ben Tillman & the Reconstruction of White Supremacy 67 (2000) (ellipsis, brackets, and internal quotation marks omitted). None of the perpetrators of the Hamburg murders was ever brought to justice.[22]

---

[22] Tillman went on to a long career as South Carolina's Governor and,

54                MCDONALD v. CHICAGO

Opinion of THOMAS, J.

Organized terrorism like that perpetuated by Tillman and his cohorts proliferated in the absence of federal enforcement of constitutional rights. Militias such as the Ku Klux Klan, the Knights of the White Camelia, the White Brotherhood, the Pale Faces, and the '76 Associa- tion spread terror among blacks and white Republicans by breaking up Republican meetings, threatening political leaders, and whipping black militiamen. Era of Recon- struction, 199–200; Curtis 156. These groups raped, murdered, lynched, and robbed as a means of intimidat- ing, and instilling pervasive fear in, those whom they despised. A. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction 28–46 (1995).

Although Congress enacted legislation to suppress these activities,[23] Klan tactics remained a constant presence in the lives of Southern blacks for decades. Between 1882 and 1968, there were at least 3,446 reported lynchings of blacks in the South. Cottrol 351–352. They were tortured and killed for a wide array of alleged crimes, without even the slightest hint of due process. Emmitt Till, for example, was killed in 1955 for allegedly whistling at a white woman. S. Whitfield, A Death in the Delta: The Story of Emmett Till 15–31 (1988). The fates of other targets of mob violence were equally depraved. See, e.g., Lynched Negro and Wife First Mutilated, Vicksburg (Miss.)

later, United States Senator. Tillman's contributions to campaign finance law have been discussed in our recent cases on that subject. See Citizens United v. Federal Election Comm'n, 558 U. S. ___, ___ (2010) (STEVENS, J., dissenting) (slip. op., at 2, 42, 56, 87) (discussing at length the Tillman Act of 1907, 34 Stat. 864). His contributions to the culture of terrorism that grew in the wake of Cruikshank had an even more dramatic and tragic effect.

[23] In an effort to enforce the Fourteenth Amendment and halt this violence, Congress enacted a series of civil rights statutes, including the Force Acts, see Act of May 31, 1870, 16 Stat. 140; Act of Feb. 28, 1871, 16 Stat. 433; and the Ku Klux Klan Act, see Act of Apr. 20, 1871, 17 Stat. 13.

Opinion of THOMAS, J.

Evening Post, Feb. 8, 1904, reprinted in R. Ginzburg, 100 Years of Lynchings 63 (1988); Negro Shot Dead for Kissing His White Girlfriend, Chi. Defender, Feb. 31, 1915, in *id.*, at 95 (reporting incident in Florida); La. Negro Is Burned Alive Screaming "I Didn't Do It," Cleveland Gazette, Dec. 13, 1914, in *id.*, at 93 (reporting incident in Louisiana).

The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence. As Eli Cooper, one target of such violence, is said to have explained, "'[t]he Negro has been run over for fifty years, but it must stop now, and pistols and shotguns are the only weapons to stop a mob.'" Church Burnings Follow Negro Agitator's Lynching, Chicago Defender, Sept. 6, 1919, in *id.*, at 124. Sometimes, as in Cooper's case, self-defense did not succeed. He was dragged from his home by a mob and killed as his wife looked on. *Ibid.* But at other times, the use of firearms allowed targets of mob violence to survive. One man recalled the night during his childhood when his father stood armed at a jail until morning to ward off lynchers. See Cottrol, 354. The experience left him with a sense, "not 'of powerlessness, but of the "possibilities of salvation"'" that came from standing up to intimidation. *Ibid.*

In my view, the record makes plain that the Framers of the Privileges or Immunities Clause and the ratifying-era public understood—just as the Framers of the Second Amendment did—that the right to keep and bear arms was essential to the preservation of liberty. The record makes equally plain that they deemed this right necessary to include in the minimum baseline of federal rights that the Privileges or Immunities Clause established in the wake of the War over slavery. There is nothing about *Cruikshank's* contrary holding that warrants its retention.

*       *       *

I agree with the Court that the Second Amendment is

Opinion of THOMAS, J.

fully applicable to the States. I do so because the right to keep and bear arms is guaranteed by the Fourteenth Amendment as a privilege of American citizenship.

# SUPREME COURT OF THE UNITED STATES

### No. 08-1497

**NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL.,**

Petitioners

**v.**

## CITY OF CHICAGO, ILLINOIS, ET AL.

The Court today reversed the judgment below in *McDonald v. Chicago*, 561 U.S. ___ (2010). Therefore, the petition for a writ of certiorari is granted, and the case is remanded to the United States Court of Appeals for the Seventh Circuit for further proceedings .

**IT IS FURTHER ORDERED** that the petitioners National Rifle Association of America, Inc., et al. recover from City of Chicago, Illinois, et al., Three Hundred Dollars ($300.00) for costs herein expended.

June 29, 2010

**Clerk's costs:**          **$300.00**



A True Copy Test WILLIAM K. SUTER Clerk of the Supreme Court of the United States

A-102

# SUPREME COURT OF THE UNITED STATES

No. 08-1497

**NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL.,**

Petitioners

v.

## CITY OF CHICAGO, ILLINOIS, ET AL.

The Court today reversed the judgment below in *McDonald* v. *Chicago*, 561 U.S. ___ (2010). Therefore, the petition for a writ of certiorari is granted, and the case is remanded to the United States Court of Appeals for the Seventh Circuit for further proceedings.

**IT IS FURTHER ORDERED** that the petitioners National Rifle Association of America, Inc., et al. recover from City of Chicago, Illinois, et al. Three Hundred Dollars ($300.00) for costs herein expended.

June 29, 2010

Clerk's costs: **$300.00**

A True Copy WILLIAM K. SUTER
Test:

Clerk, Supreme Court of the United States

by

A-103

NONRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

August 25, 2010

Before

FRANK H. EASTERBROOK, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

**Nos.** 08-4241, 08-4243 & 08-4244

NATIONAL RIFLE ASSOCIATION OF AMERICA,
INC., et al.,
*Plaintiffs-Appellants,*

v.

CITY OF CHICAGO, ILLINOIS, and VILLAGE OF
OAK PARK, ILLINOIS,
*Defendants-Appellees.*

On Remand from the
Supreme Court of the
United States.

## Order

After the Supreme Court's decision in *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), both the City of Chicago and the Village of Oak Park repealed the ordinances that had been the subject of this litigation. Accordingly, we vacate the district court's judgments and remand with instructions to dismiss as moot. See *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Plaintiffs contend that the new ordinances enacted to supersede the ones challenged in these suits have constitutional flaws. Plaintiffs are entitled to pursue those contentions in new suits. The subject matter of this litigation, however, no longer exists.

If plaintiffs believe that the repeals entitle them to attorneys' fees under 28 U.S.C. §1988, they may file appropriate motions in the district court. We do not express any opinion on the question whether the repealers, enacted before the Supreme Court's decision could be implemented on remand, affect the availability of fees under the approach of *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001).

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

# FINAL JUDGMENT

August 25, 2010

BEFORE:    FRANK H. EASTERBROOK, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

| | |
|---|---|
| | NATIONAL RIFLE ASSOCIATION OF AMERICA, INCORPORATED, et al., Plaintiffs - Appellants |
| Nos: 08-4241, 08-4243 & 08-4244 | v. |
| | CITY OF CHICAGO, ILLINOIS and VILLAGE OF OAK PARK, ILLINOIS, Defendants - Appellees |

| Originating Case Information |
|---|
| District Court Nos: 1:08-cv-03697, 1:08-cv-03696 & 1:08-cv-03645 |
| Northern District of Illinois, Eastern Division |
| District Judge Milton I. Shadur |

## ON REMAND FROM THE UNITED STATES SUPREME COURT

We VACATE the district court's judgments and REMAND with instructions to dismiss as moot. The above is in accordance with the decision of this court entered on this date. Appellants (McDonald and NRA) recover costs.

form name: c7_FinalJudgment (form ID: 132)

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1
### Eastern Division

National Rifle Association of America, Inc., et al.

Plaintiff,

v.

Case No.: 1:08–cv–03697
Honorable Milton I. Shadur

The City of Chicago, et al.

_____

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, October 12, 2010:

MINUTE entry before Honorable Milton I. Shadur:This action is hereby dismissed as moot.Mailed notice(srn, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1**
**Eastern Division**

National Rifle Association of America, Inc., et al.

Plaintiff,

v.

Village of Oak Park, et al.

Defendant.

Case No.: 1:08-cv-03696
Honorable Milton I. Shadur

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, October 12, 2010:

MINUTE entry before Honorable Milton I. Shadur:This action is hereby dismissed as moot.Mailed notice(stm.) ( )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION | ( |
| OF AMERICA, INC., DR. KATHRYN TYLER, | ( |
| VAN F. WELTON, | ( |
| and BRETT BENSON, | ( |
| | ( |
| Plaintiffs, | ( |
| | ( |
| vs. | ( No. 08 CV 3697 |
| | ( |
| | ( Judge Milton I. Shadur |
| THE CITY OF CHICAGO, | ( |
| | ( |
| | ( |
| Defendant. | ( |

## MOTION FOR ENTRY OF SCHEDULE
## FOR MOTION FOR ATTORNEYS' FEES

Pursuant to Local Rule 54.3 and Federal Rule of Civil Procedure 54, plaintiffs the National Rifle Association of America, Inc., Dr. Kathryn Tyler, Van F. Welton and Brett Benson, by and through their attorneys, Stephen P. Halbrook and Stephen A. Kolodziej, hereby file this Motion for Entry of Schedule for Motion for Attorneys' Fees, and in support hereof state as follows:

1.    Pursuant to Northern District of Illinois Local Rule 54.3 ("LR 54.3"), the parties to this litigation are required to meet and confer regarding any potential motion by a party for the award of fees and/or costs. Local Rule 54.3 sets forth certain deadlines for the parties to exchange information, confer regarding objections to certain fee requests, and to create a joint statement regarding the fee request. Under LR 54.3(b), the Court may modify the deadlines set forth in LR 54.3.

2.    Plaintiffs and Defendant have conferred regarding an appropriate schedule for meeting LR 54.3's requirements. Defendant has confirmed that it does not object to the proposed dates set forth below. Defendant has further stated, however, that it does not stipulate

or agree that the Court has jurisdiction to consider a motion for fees and costs by Plaintiffs or that Plaintiffs are prevailing parties under 42 U.S.C. 1988.

3. Based on the parties' agreement on an appropriate schedule for compliance with LR 54.3, and without prejudicing Defendant's right to oppose an award of fees, Plaintiffs request that the Court enter the following schedule with regard to LR 54.3's requirements:

**November 23, 2010** – Plaintiffs shall comply with Local Rules 54.3(d)(1)-(4) by providing Defendant all information required under such Rules.

**December 21, 2010** – If necessary, Defendant shall comply with the first paragraph of Local Rule 54.3(d)(5) and subsections (A)-(D) thereunder, by providing Plaintiffs all information required under such rules.

**January 4, 2010** – If necessary, the parties shall comply with Local Rule 54.3(d)(5) by: (1) identifying all hours, billing rates, or related nontaxable expenses (if any) that will and will not be objected to, the basis of any objections and the specific hours, billing rates, and related nontaxable expenses that in the parties' respective views are reasonable and should be compensated; and (2) attempting to resolve any remaining disputes.

**January 18, 2010** – The parties shall comply with Local Rule 54.3(e) by filing a joint statement setting forth the information specified in such Rule.

**January 25, 2011** – If necessary, Plaintiffs shall file their motion for attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order setting the above schedule for the parties to comply with LR 54.3 and Federal Rule of Civil Procedure 54.

Dated: October 21, 2010.

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., Dr. KATHRYN TYLER,
VAN F. WELTON and BRETT BENSON
Plaintiffs

BY: s/ Stephen A. Kolodziej
One of Their Attorneys

Stephen P. Halbrook
Attorney at Law
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel. (703) 352-7276
Fax (703) 359-0938

Stephen A. Kolodziej
Brenner, Ford, Monroe & Scott, Ltd.
33 North Dearborn Street, Suite 300
Chicago, Illinois 60602
Tel (312) 781-1970
Fax (312) 781-9209

A-110

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ROBERT KLEIN ENGLER, and DR. GENE A. REISINGER, | ) ) ) ) |
| Plaintiffs, | ) ) No. 08 CV 3696 |
| v. | ) ) Honorable Milton I. Shadur |
| VILLAGE OF OAK PARK, | ) ) ) |
| Defendant. | ) ) |

## MOTION FOR ENTRY OF SCHEDULE
## FOR MOTION FOR ATTORNEYS' FEES

Pursuant to Local Rule 54.3 and Federal Rule of Civil Procedure 54, the National Rifle Association of America, Inc., Robert Klein Engler and Dr. Gene A. Reisinger, by and through their attorneys, Stephen P. Halbrook and Freeborn & Peters LLP, hereby file this Motion for Entry of Schedule for Motion for Attorneys' Fees, and in support hereof state as follows:

1. Pursuant to Northern District of Illinois Local Rule 54.3 ("LR 54.3"), the parties to this litigation are required to meet and confer regarding any potential motion by a party for the award of fees and/or costs. Local Rule 54.3 sets forth certain deadlines for the parties to exchange information, confer regarding objections to certain fee requests, and to create a joint statement regarding the fee request. Under LR 54.3(b), the Court may modify the deadlines set forth in LR 54.3.

2. Plaintiffs and Defendant have conferred regarding an appropriate schedule for meeting LR 54.3's requirements. Defendant has confirmed that it does not object to the proposed dates set forth below. Defendant has further stated, however, that it does not stipulate

A-111

or agree that the Court has jurisdiction to consider a motion for fees and costs by Plaintiffs or that Plaintiffs are prevailing parties under 42 U.S.C. 1988.

3.    Based on the parties' agreement on an appropriate schedule for compliance with LR 54.3, and without prejudicing Defendant's right to oppose an award of fees, Plaintiffs request that the Court enter the following schedule with regard to LR 54.3's requirements:

**November 23, 2010** – Plaintiffs shall comply with Local Rules 54.3(d)(1)-(4) by providing Defendant all information required under such Rules.

**December 21, 2010** – If necessary, Defendant shall comply with the first paragraph of Local Rule 54.3(d)(5) and subsections (A)-(D) thereunder, by providing Plaintiffs all information required under such rules.

**January 4, 2010** – If necessary, the parties shall comply with Local Rule 54.3(d)(5) by: (1) identifying all hours, billing rates, or related nontaxable expenses (if any) that will and will not be objected to, the basis of any objections and the specific hours, billing rates, and related nontaxable expenses that in the parties' respective views are reasonable and should be compensated; and (2) attempting to resolve any remaining disputes.

**January 18, 2010** – The parties shall comply with Local Rule 54.3(e) by filing a joint statement setting forth the information specified in such Rule.

**January 25, 2011** – If necessary, Plaintiffs shall file their motion for attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order setting the above schedule for the parties to comply with LR 54.3 and Federal Rule of Civil Procedure 54.

Dated: October 21, 2010

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., ROBERT KLEIN
ENGLER, and DR. GENE A. REISINGER
Plaintiffs

BY:    /s/ William N. Howard
One of Their Attorneys

Stephen P. Halbrook
Attorney at Law
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
Tel (703) 352-7276
Fax (703) 359-0938
21597.85v1/26457-0002

William N. Howard, Esq.
FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois 60606
Tel (312) 360-6415
Fax (312) 360-6573

# APPENDIX A

## ORIGINAL

1

```
 1          CITY OF CHICAGO
 2       COMMITTEE ON POLICE AND FIRE
 3
 4   RE:   HEARING TO DISCUSS GUN VIOLENCE AND
           FIREARM REGISTRATION REGULATION
 5
 6
 7
 8            REPORT OF PROCEEDINGS of a
 9   meeting of the City of Chicago, Committee on Police
10   and Fire, taken on June 18th, 2010, 10:00 a.m.,
11   City Council Chambers, Chicago, Illinois, and
12   presided over by ALDERMAN ANTHONY A. BEALE,
13   Chairman.
14
15
16       Reported by:  Bernice Betts, C.S.R.
17
18
19
20
21
22
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY 000001

2

1    ALDERMAN BEALE:  It's 10:08, and the

2    Committee on Police and Fire will now come to

3    order.  We have a public hearing today to discuss

4    gun violence and firearm registration regulation.

5    And we have quite a few people that want to

6    testify.  If there's anyone who wishes to testify,

7    if you can please fill out the appropriate paper

8    work and get it turned in.

9         We're going to try to move this

10   hearing along as quickly as possible, because we

11   have a lot of testimony.

12        First, we want to bring Mara Georges

13   up from Corporation Counsel to discuss the

14   importance of having gun registration, and to

15   discuss some gun violence.

16        CORPORATION COUNSEL GEORGES:  For the record,

17   my name is Mara Georges G-e-o-r-g-e-s.  I'm the

18   Corporation Counsel for the City of Chicago.

19   Mr. Chair, Members of the City Council's Police and

20   Fire Committee and honored guests.

21        After a duly noted finding that

22   firearms, and especially handguns, play a major

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

A-114

3

```
1      role in the commission of homicides, aggravated
2      assaults and armed robberies on March 19th of 1982,
3      Alderman Edward M. Burke moved to pass, and the
4      Chicago City Council enacted, by a vote of 30 yeas
5      and 11 nays a firearms ordinance, which renders
6      most handguns unregistrable in the city of Chicago.
7              The ordinance, still in effect today
8      with modification, allows for the registration of
9      rifles and shotguns that are not sawed off, short
10     barreled or assault weapons.  It requires
11     registrable firearms to be registered before being
12     possessed in Chicago and registration must be
13     renewed annually.  Failure to renew shall "cause
14     the firearm to become unregistrable."  The
15     ordinance provides that no person may possess "any
16     firearm which is unregistrable" within the city
17     confines.
18             On June 26th of 2008, 26 years after
19     the enactment of that handgun ban the Illinois
20     State Rifle Association and various other
21     Plaintiffs in the McDonald case filed in the
22     Federal District Court for the Northern District of
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY 000003

```
 1   Illinois a challenge to the city's handgun ban and
 2   certain registration requirements contained in the
 3   ordinance.
 4            The Plaintiffs in the McDonald case
 5   alleged in pertinent part that Chicago's handgun
 6   ban violates the Second Amendment as allegedly
 7   incorporated into the 14th Amendment's due process
 8   clause and privileges or immunities clause.
 9            The following day, June 27th of
10   2008, the National Rifle Association filed two
11   similar lawsuits.  One challenging Chicago's
12   handgun ban, and the other Oak Park's.  McDonald
13   and the two NRA cases proceeded before the same
14   District Court Judge, and on December 18th of 2008,
15   Judge Milton I. Schader (phonetic) entered judgment
16   on the pleadings in favor of the city and Oak Park
17   in all three cases on the basis that the Second
18   Amendment does not apply to the states.
19            The Seventh Circuit Court of Appeals
20   consolidated the cases and affirmed the District
21   Court's decisions on June 2nd of 2009.  The Court
22   held that it was bound by previous decisions of the
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY 000004

5

1  United States Supreme Court refusing to apply the

2  Second Amendment to the states.

3          The Supreme Court granted certiorari

4  in the McDonald case on September 30th of 2009 and

5  heard oral argument on March 2nd of 2010.  The

6  issue of incorporation of the Second Amendment to

7  the states is the issue being considered by the

8  United States Supreme Court.

9          The Supreme Court has publicized

10 that opinions will be issued on Monday, June 21st

11 and Monday, June 28th, and experts believe the

12 court will also release opinions on Thursday,

13 June 24th, and Wednesday, June 30th.

14          When the Supreme Court issued its

15 opinion in the Heller case involving Washington,

16 D.C.'s handgun ban, the opinion was issued on the

17 last day of the term.  If the Supreme Court were to

18 follow suit, that day would be June 30th of this

19 year.

20          If the Supreme Court were to find

21 incorporation of the Second Amendment, the city's

22 handgun ban would be invalidated.  As the Court's

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY 000005

A-117

9

1    decision in Heller has already found a right to

2    possess a handgun in the home for self-defense

3    purposes.

4            Assuming hypothetically that the

5    city's handgun ban were to be invalidated, the city

6    could seek approval from the City Council for a new

7    ordinance regulating firearms.  The Council could

8    consider limitations on number of firearms,

9    insurance and training requirements, ballistics

10   testing, and minimum qualifications for handgun

11   eligibility.

12           In today's hearing a number of

13   individuals who have spent years studying various

14   aspects of the firearms industry will testify.

15   These individuals have specific recommendations

16   regarding potential aspects of a new ordinance.

17   They realized that of the 412 homicides caused by

18   firearms in the city of Chicago during 2008, 98

19   percent of those or 402 resulted from handguns.

20   Thank you.

21   CHAIRMAN BEALE:  Thank you.  Any questions?

22   I'm sorry, not so fast.  Alderman Rugai.

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 14 of 39 PageID #:278

COPY

APPENDIX B

1

1          CITY OF CHICAGO

2

3          COMMITTEE ON POLICE AND FIRE

4

5

6

7

8

9

10

11             REPORT OF PROCEEDINGS of a

12      meeting of the City of Chicago, Committee on

13      Police and Fire, taken on June 29, 2010, 1:00

14      p.m., City Council Chambers, Chicago, Illinois,

15      and presided over by ALDERMAN ANTHONY BEALE,

16      Chairman.

17

18

19             Reported by:  Donna T. Wadlington, C.S.R.

20

21

22

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000103

CITY000104

1   CHAIRMAN BEALE: It's 1:10. The
2   Committee on Police and Fire is now called to
3   order. We're going to go out of regular order.
4   of business. Alderman Pope.
5   ALDERMAN POPE: Thank you,
6   Mr. Chairman.
7   I'd like to make a motion that
8   we reconsider the five items that were heard at
9   yesterday's hearing, all that were approved by
10  this body. So a motion to reconsider, please.
11  CHAIRMAN BEALE: There's a motion to
12  reconsider.
13  All in favor? All opposed?
14  The no's have it. Those items
15  will be reported out tomorrow at City Council.
16  The item before us now is off
17  the supplemental agenda regarding the gun ban.
18  We have expert testimony from quite a few
19  people. First, we're going to bring up Mara
20  George from Corporation Counsel.
21  CORPORATION COUNSEL GEORGES:
22  Alderman, do you mind if I turn this around?

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 16 of 39 PageID #:280

```
1    CHAIRMAN BEALE:  Sure.  Do you want me
2    to get that for you?
3         CORPORATION COUNSEL GEORGES:  Good
4    afternoon.  My name is Mara Georges,
5    G-e-o-r-g-e-s.  I'm the Corporation Counsel of
6    the City of Chicago.
7              Mr. Chair, members of the
8    Police and Fire Committee, yesterday in a
9    landmark five to four decision that reversed 130
10   years of case law, the United States Supreme
11   Court ruled that the Second Amendment of the
12   U.S. Constitution applies to state and local
13   governments, as well as the Federal Government.
14              As the Mayor said, this
15   decision was disappointing but not surprising
16   given the Court's ruling in the Heller case.
17              I'm sure that many of you have
18   questions about what this ruling means for
19   Chicago's current ordinance and the extent to
20   which we can regulate firearms in the future.
21              The Supreme Court did not
22   strike down any part of our ordinance.  The
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000105

A-121

1 Court reversed the lower court decision
2 upholding our handgun ban and remanded the case
3 to the Seventh Circuit Court of Appeals for
4 further proceedings. Therefore, technically,
5 our current ordinance is still in effect until
6 the Seventh Circuit invalidates it. However, as
7 a practical matter, the section of our ordinance
8 that prohibits the registration of handguns is
9 unenforceable.
10 It is clear that such a
11 provision will ultimately be struck down based
12 on the Supreme Court's decision in the *Heller*
13 case, in which the Court ruled that Washington,
14 DC's handgun ban violated the Second Amendment.
15 Therefore, it is important that we continue to
16 work to craft a new ordinance that promotes safe
17 and responsible gun ownership and complies with
18 the Court's ruling in this case.
19 As we move forward, I want to
20 emphasize that the case before the Supreme Court
21 involved only the ban on the ownership of a
22 handgun in the home for self-defense purposes.

APPENDIX C



1   CITY OF CHICAGO

2   COMMITTEE ON POLICE AND FIRE

3

4

5

6

7

8

9

10

11      REPORT OF PROCEEDINGS of a

12   meeting of the City of Chicago, Committee on

13   Police and Fire, taken on July 1, 2010, 10:00

14   a.m., City Council Chambers, Chicago, Illinois,

15   and presided over by ALDERMAN ANTHONY BEALE,

16   Chairman.

17

18

19   Reported by:  Donna T. Wadlington, C.S.R.

20

21

22

CITY000307

A-123

CITY000308

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

1    ALDERMAN BALCER: I'd like to call the
2    meeting to order of the Police and Fire
3    Committee.
4        And I'd also like to recess it
5    at this time until the Chairman returns.
6    Recessed until the Chairman gets here.
7        (WHEREUPON, the Committee is
8        in recess.)
9    CHAIRMAN BEALE: It's 11:25. The
10   Committee on Police and Fire will continue its
11   recessed meeting.
12       The sole purpose of this
13   meeting is to consider on the agenda an
14   ordinance introduced directly into Committee by
15   Corporation Counsel concerning responsible gun
16   ownership.
17       On June 18th and June 29th,
18   the Committee held a hearing on gun violence and
19   took testimony from experts on possible policies
20   to reduce such violence in our city. These
21   hearings contemplated the impact of the United
22   States Supreme Court's ruling -- *McDonald*

2

3

1　decision on the City's handgun ban and the

2　future policies the City can enact to address

3　gun violence.

4　　　　More than 30 people testified

5　at the hearing.  We heard from numerous experts

6　on gun violence from the Corporation Counsel,

7　other legal experts, from the Superintendent of

8　the Chicago Police Department, and other CPD

9　officers, from business owners, from leaders of

10　our faith-based community, community

11　organizations and others who have lost loved

12　ones to gun violence and even some from the

13　Plaintiffs in the McDonald case.

14　　　　Among those experts testified

15　were Robyn Thomas, David Hemenway, Thom Manard,

16　Tom Vandenberk, Mark Walsh, Dr. Marie Crandall,

17　Claude Robinson, Annette Holt, Juliet Leftwich,

18　and Daniel Webster.

19　　　　I would also like to

20　acknowledge one of the experts we invited.

21　Dr. Jens Ludwig, a Professor of Social Service

22　Administration, Law and Public Policy at the

1   University of Chicago's Crime Lab, was unable to
2   testify but we also distributed -- more
3   testimony from -- his testimony was also
4   submitted to the record.
5           During prior hearings we also
6   distributed and placed on the record testimony
7   from several of our other experts, as well as
8   references from other work of numerous and other
9   studies in case and effect of gun violence and
10  recommend that we -- what we can do to address
11  the problem.
12          From the evidence that we
13  presented at the hearing, the Committee would
14  like to make the following findings:
15          Chicago, like other big
16  cities, have serious problems of gun violence.
17  The total economic and social costs of gun
18  violence in Chicago are substantial.  Gun
19  violence severely impacts Chicago's criminal
20  justice and health care system.  Gun violence
21  foments fears in Chicago's communities, which
22  can harm property value and drive residents from

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000310

1   -- and also fleeing our neighborhoods.  It also

2   can increase -- I'm sorry.

3   An increase in the number of

4   guns in circulation can contribute to an

5   increase in the number of incidents of gun

6   violence.  The presence of guns can also make

7   crime more lethal and would be -- also it can be

8   -- I'm sorry.  I need some water.

9   An increase in the number of

10  guns in circulation contribute to an increase in

11  the number of incidents of gun violence.  The

12  presence of guns makes crime more lethal than

13  others when guns are not present.  Handguns are

14  extremely -- to an extreme degree

15  disproportionately contribute to gun violence

16  and death in Chicago.

17  A strong permitting system

18  from firearms owners is vital.  A vigorous

19  firearm registration system is necessary.

20  Registration gives law enforcement essential

21  information about firearm ownership allowing

22  first responders to determine in advance whether

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000311

6

1    individuals may be -- may have firearms.
2    Shootings -- I'm sorry.
3    Shootings in the home are a major cause of
4    death, particularly in children and minors,
5    requiring owners to secure or store their
6    firearms when minors are present.
7    Requiring owners to quickly
8    notify law enforcement of the lost, theft or
9    destruction of their firearm aid law enforcement
10   in reducing illegal gun trafficking and
11   identifying the -- and prosecuting gun
12   traffickers.
13   Limiting the number of guns in
14   circulation is essential to public safety.
15   Limiting registration of handguns to one person
16   per month would help limit handgun injuries and
17   also reduce crime.
18   The carrying of firearms in
19   public should be prohibited.  In a dense urban
20   environment like Chicago, public carrying
21   presents a high risk that everyday interpersonal
22   conflicts will result in injury.

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 25 of 39 PageID #:289

1   The public safety requires a
2   ban on assault weapons.
3   Okay, Mara, suggested that I
4   submit the rest of this for the record, and we
5   will get right into testimony.  Thank you.
6   Corporation Counsel, Mara
7   Georges.  And I do apologize.  I'm extremely
8   tired you all.  It's been a long day.
9   CORPORATION COUNSEL GEORGES:  Good
10  morning, Chairman Beale and members of the
11  Police and Fire Committee.  My name is Mara
12  Georges, G-e-o-r-g-e-s.  I'm the Corporation
13  Counsel for the City of Chicago.
14  With me and to my right is
15  Rose Kelly, who is the drafter of the
16  Responsible Gun Ownership Ordinance, which is
17  before you today and on which we urge your
18  support.
19  This was an ordinance drafted
20  in response to the Supreme Court decision
21  earlier this week in the *McDonald* case.  We
22  believe that this ordinance effectively balances

CITY0003714

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

8

1    the right to possess a gun in the home for the
2    purpose of self-defense, with the substantial
3    risks to public safety that are associated with
4    guns.
5         The proposed ordinance is
6    comprehensive.  It regulates the sale and
7    possession of firearms, establishes a permit
8    process for gun owners, and includes a
9    registration requirement for guns that allows
10   for the registration of handguns.
11        First, I think it's easiest to
12   begin by describing what is banned under this
13   ordinance.
14        Banned are the sale of
15   firearms in the city of Chicago, certain types
16   of ammunition, including metal and armor
17   piercing bullets and 50 caliber bullets, the
18   sale of any ammunition to minors, laser-sight
19   accessories, silencers, and mufflers, certain
20   types of guns including sawed-off shotguns, 50
21   caliber rifles, machine guns, short-barreled
22   rifles and assault weapons, and handguns deemed

9

1   unsafe by the Police Superintendent.

2       These guns are unregisterable

3   and it is illegal to possess an unregisterable

4   weapon within the city of Chicago.  Also banned

5   are shooting galleries and target ranges, except

6   for law enforcement purposes.

7       Consistent with the Supreme

8   Court's ruling, we are allowing the possession

9   of handguns in a limited circumstance.  That is,

10  within the home for self-defense purposes.

11      So that there is no confusion

12  about the scope of handgun possession within the

13  city of Chicago, home is defined in the

14  ordinance as the inside of a person's dwelling

15  unit which is traditionally used for living

16  purposes.  Not the garage, not porches, not the

17  stairs, not the back, side or front yard space.

18  Dormitories, hotels, and group living homes are

19  excluded from the definition of home within the

20  ordinance.

21      In addition, there is a two

22  step registration requirement for guns.  The

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000315

10

first step requires individuals to obtain a
Chicago Firearm Permit, a CFP, prior to owning a
gun.  And the second step requires gun owners to
obtain a registration certificate for each of
their firearms.  Both the CFP and the
registration certificate are issued by the
Chicago Police Department.
        The ordinance imposes
reasonable limitations on who can obtain a CFP.
For example, individuals must be at least 21
years of age or of 18 to 20 years of age with
parental permission to be eligible for a CFP.
They must possess a valid Illinois FOID card.
They must not have been convicted of a violent
crime or of two or more offenses for driving
under the influence of alcohol or drugs.
        They must not have been
convicted of an unlawful use of weapon charge
involving a firearm.   They must not have
violated any other Municipal Code provision
regarding possession of laser-sight accessories,
silencers or mufflers, or unlawful sales of

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000316

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 29 of 39 PageID #:293

1    firearms, or otherwise be ineligible to possess

2    a firearm under any law.

3         Individuals must demonstrate

4    that they've undergone firearm safety training

5    both in a classroom and on a firing range.

6         As I previously stated, the

7    CFP must be obtained prior to taking possession

8    of any gun, and it must be renewed every three

9    years.

10        As with our previous

11   ordinance, the responsible gun ownership

12   ordinance includes a registration requirement

13   for guns.  The new ordinance, however, allows

14   for the registration of handguns.  A

15   registration certificate is required for every

16   firearm.  The application for the registration

17   certificate must be submitted no more than five

18   business days after taking possession of the

19   gun.

20        Each applicant will be issued

21   only one registration certificate per month for

22   a handgun which must be used for the home in

1  which the applicant resides.  So, in other
2  words, we're limiting the amount of handguns to
3  one per month for use within the home.
4            Individuals have 90 days after
5  the effective date of the ordinance to register
6  weapons, including guns that were not previously
7  registered, like handguns.  So we're urging
8  members of the public to come in within this
9  90-day period after the ordinance's effective
10  date, assuming that this body were to approve
11  it, and register their unregistered weapons.
12            The ordinance also contains a
13  procedure for individuals who are denied either
14  a CFP or a firearm registration certificate to
15  appeal such denials.
16            I'd like to briefly discuss
17  the regulations contained in the responsible gun
18  ownership ordinance regarding where guns can be
19  possessed.  These regulations are in addition to
20  any applicable state laws.
21            As I previously mentioned,
22  handguns are only allowed in the registrant's

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000318

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 31 of 39 PageID #:295

1    home for self-defense purposes.  Long guns are
2    only allowed in the individual's home or fixed
3    place of business.  You cannot possess a gun in
4    your vehicle, unless it's broken down into a
5    non-functioning state.
6        Each person who keeps or
7    possesses a firearm in his or her home must keep
8    no more than one firearm in the home assembled
9    and operable.  All other firearms must be broken
10   down in a non-functioning state or have a
11   trigger lock or other mechanism making the
12   firearm temporarily inoperable.
13       In homes with minors under the
14   age of 18, guns must be kept secured, secured on
15   the person of the registrant, with trigger locks
16   or in locked boxes.
17       This ordinance also
18   establishes a gun offender registry.  Any gun
19   offender, a person convicted of a gun offense,
20   who lives, works or attends school in the city
21   must register with the Police Superintendent.
22   The registry will be posted on the Police

CITY0003l9

14

1    Department's website and available for review by
2    the public.
3                    Consequences for violating the
4    responsible gun ownership ordinance are severe.
5    Penalties include fines of $1,000 to $5,000 and
6    incarceration for not less than 20, nor more
7    than 90 days for certain offenses. Subsequent
8    convictions are punishable by fines of $5,000 to
9    $10,000 and by incarceration of not less than 30
10   days, nor more than six months, the maximum
11   allowable under state law for the City to
12   impose.
13                   Further, the ordinance
14   authorizes the seizure and destruction of any
15   weapons kept in violation of the chapter. This
16   ordinance was crafted through careful discussion
17   and review. We have listened to the Council and
18   tried to accommodate the Council's wishes in
19   crafting this ordinance.
20                   Further, we are confident that
21   this ordinance is consistent with the Supreme
22   Court's rulings in the *Heller* and *McDonald*

CITY000320

15

1   decisions.  We are hopeful that you will support

2   it.  Thank you.

3   CHAIRMAN BEALE:  Thank you.

4   Any questions from the

5   committee?  Alderman Rugai.

6   ALDERMAN RUGAI:  Thank you,

7   Mr. Chairman.

8   We heard it discussed this

9   morning that the ages of many that commit crimes

10  of handguns are 13 to 16 year olds, and there is

11  no real punishment for those youths.  As in some

12  of our previous legislation perhaps for curfew,

13  for example, we have the parents responsible and

14  they are fined in that instance.

15  Have we ever looked at or are

16  we just prohibited from making the parents

17  responsible if those young people are arrested

18  and convicted of possessing a handgun and using

19  it?

20  CORPORATION COUNSEL GEORGES:  It's a

21  good point, Alderman, but the problem is, of

22  course, if we were to prosecute a minor under

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000321

CITY000322

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

16

```
1    our ordinance, typically, that goes then to
2    juvenile court where we can't be imposing our
3    ordinance as a mechanism.
4         ALDERMAN RUGAI:  And not this
5    ordinance.  I mean, can we do something
6    separately to make parents responsible -- you
7    know, they are responsible for their children.
8    And if they -- their children were to be found
9    with guns, could they be prosecuted?
10        CORPORATION COUNSEL GEORGES:  I think
11   you raise a very good point and we will look at
12   it.
13        ALDERMAN RUGAI:  I mean, because it's
14   another side of our ordinance that's before us
15   today, but it was something that stuck in my
16   mind from the press conference this morning that
17   I thought we need to be attending to that side
18   of it as well.
19        CORPORATION COUNSEL GEORGES:  Yes.
20   Good point.
21        ALDERMAN RUGAI:  Thank you.
22        CHAIRMAN BEALE:  Alderman Balcer.
```

1     ALDERMAN BALCER:  Thank you,

2     Mr. Chairman.

3     What is the -- are there

4     provisions in here for retired police officers

5     --

6     CORPORATION COUNSEL GEORGES:  Yes.

7     ALDERMAN BALCER:  -- and their right

8     to carry a -- or have weapons?

9     CORPORATION COUNSEL GEORGES:  We

10    exclude many classes of people from many of the

11    ordinance requirements, and many of those

12    exclusions apply to current police officers,

13    retired police officers, current military

14    personnel and the like.  So we have tried to

15    accommodate what we heard from Chairman Burke

16    and the others in hearings, that many of these

17    provisions should not apply to retired CPD.

18    ALDERMAN BALCER:  So we're not --

19    people can still defend their homes if they're

20    inside of their homes?

21    CORPORATION COUNSEL GEORGES:  The idea

22    is that individuals have a right to a handgun

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000323

A-139

18

1    within the home for self-defense purposes, and

2    we're allowing them to register one per month;

3    one of those handguns per month to have within

4    their home to use for self-defense purposes.

5    ALDERMAN BALCER:  For self-defense

6    purposes.  No one's right is being taken away to

7    defend their home?

8    CORPORATION COUNSEL GEORGES:  Correct.

9    ALDERMAN BALCER:  Good.  My next

10   question and I just -- you can have long rifles

11   and shotguns except sawed-off shotguns; am I

12   correct?

13   CORPORATION COUNSEL GEORGES:  That is

14   correct.  We allow rifles and other long guns.

15   ALDERMAN BALCER:  And you can have

16   one, two, three, four -- you can have as many as

17   you want?

18   CORPORATION COUNSEL GEORGES:  Correct.

19   ALDERMAN BALCER:  And you can have a

20   pistol.  You can buy one pistol per month?

21   CORPORATION COUNSEL GEORGES:  Correct.

22   ALDERMAN BALCER:  They can have twelve

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000324

A-140

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 37 of 39 PageID #:301

```
 1              in a year?

 2              CORPORATION COUNSEL GEORGES:  Yes.

 3         Each qualified applicant:

 4              ALDERMAN BALCER:  Can have twelve in a

 5         year?

 6              CORPORATION COUNSEL GEORGES:  Can have

 7         twelve in a year.  Yes.

 8              ALDERMAN BALCER:  I think that's quite

 9         fair.  I'll be honest.  I think that's quite

10         fair to a person.

11              And right now you can have as

12         many rifles that meet the requirements and

13         shotguns if you -- if you want?  And they are

14         registered and so on?

15              CORPORATION COUNSEL GEORGES:  Correct.

16         And that continues.  That it is an unlimited

17         number.

18              ALDERMAN BALCER:  That continues.

19         That -- there's no -- nothing prohibiting that.

20         There's nothing saying you can't have one rifle,

21         one shotgun.  You can have --

22              I'll be honest.  I think
```

20

1    that's quite fair. And quite honest, if you
2    can't defend your home with umpteen rifles and
3    shotguns and a pistol, I don't see what else a
4    person can ask for in this. Thank you.
5    CORPORATION COUNSEL GEORGES: You're
6    welcome.
7    CHAIRMAN BEALE: Alderman Fioretti.
8    ALDERMAN FIORETTI: Thank you,
9    Mr. Chairman.
10   When we started the hearing
11   the other day, you described the -- still I want
12   to refer to the decision, that the mandate would
13   probably come down within 30 days give or take,
14   correct?
15   CORPORATION COUNSEL GEORGES: Correct.
16   ALDERMAN FIORETTI: And then you said
17   at that time that we can go into court to ask
18   for some kind of advisory assistance here in the
19   drafting of this -- of this ordinance. Wasn't
20   that correct?
21   CORPORATION COUNSEL GEORGES: I don't
22   believe that's what I said. No.

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000326

Case: 1:08-cv-03697 Document #: 71-1 Filed: 12/15/10 Page 39 of 39 PageID #:303

```
 1    I said when the mandate came
 2    back to the Court of Appeals, the Court of
 3    Appeals may ask us for briefs, position papers,
 4    kind of on where we stand, saying to us, all
 5    right, now in light of the decision from the
 6    Supreme Court in McDonald, saying you have a
 7    right to a handgun in your home for
 8    self-defense, City, how do you defend your
 9    handgun ban?  And at that point it really
10    becomes impossible to defend it.
11         ALDERMAN FIORETTI:  Okay.  And so what
12    was legal or what is illegal out of the
13    ordinance as it existed the day before the
14    decision was handed down?
15         CORPORATION COUNSEL GEORGES:  What the
16    Supreme Court has said is that the Second
17    Amendment applies to the City, and the Second
18    Amendment guarantees a right to a handgun in the
19    home for self-defense.
20         So in other words, a ban by
21    the City on handguns will not withstand the
22    McDonald decision.
```

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

CITY000327

A-143

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3     NATIONAL RIFLE ASSOCIATION OF   ( 08 C 3696
                                       )
 4     AMERICA, INC., et al.,          ( 08 C 3697
                                       )
 5            Plaintiffs,              ) Chicago, Illinois
                                       ) December 21, 2010
 6            -vs-                     ) 9:00 o'clock a.m.
                                       )
 7     VILLAGE OF OAK PARK, et al.,    )
                                       )
 8            Defendants.              )
                                       )
 9     NATIONAL RIFLE ASSOCIATION OF   )
       AMERICA, INC., et al.,          )
10                                     )
              Plaintiffs,              )
11                                     )
              -vs-                     )
12                                     )
       THE CITY OF CHICAGO, et al.,    )
13                                     )
              Defendants.              )

14              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MILTON I. SHADUR
15
               APPEARANCES:
16     For the Plaintiffs:   LAW OFFICE OF STEPHEN P. HALBROOK
                             10560 Main Street, Suite 404
17                           Fairfax Virginia 22030
                             BY:  MR. STEPHEN P. HALBROOK
18                                and
                             FREEBORN & PETERS LLP
19     For the Plaintiff in  311 South Wacker Drive, Suite 3000
       the Oak Park case:    Chicago, Illinois
20                           BY:  MR. DANIEL S. DOOLEY
21     For the Plaintiffs    BRENNER FORD MONROE & SCOTT, LTD.
       in the City of        33 North Dearborn Street, Suite 300
22     Chicago case:         Chicago, Illinois 60602
                             BY:  MR. STEPHEN A. KOLODZIEJ
23
       COURT REPORTER:       ROSEMARY SCARPELLI
24                           219 South Dearborn, Room 1412
                             Chicago, Illinois
25                           (312)435-5815
```

A-144

## Page 2

```
1     APPEARANCES: (Cont.)
2
3     For Defendant
      Oak Park:
      MAYER BROWN LLP
      71 South Wacker Drive
      Chicago Illinois 60606-4637
4     BY: MR. RANJIT J. HAKIM
5
6     For Defendant          CITY OF CHICAGO, DEPARTMENT OF LAW
      City of Chicago:
      30 North LaSalle Street
      Suite 900
      Chicago Illinois 60602
7     BY: MS. REBECCA A. HIRSCH
      MR. MICHAEL A. FORTI
8
```

## Page 3

```
1            THE CLERK: 08 C 3696, National Rifle versus
2      Village of Oak Park, and 08 C 3697, National Rifle versus
3      City of Chicago.
4            MR. DOOLEY: Good morning, your Honor, I am Daniel
5 10:05AM Dooley on behalf of National Rifle Association in the Oak
6      Park case.
7            MR. KOLODZIEJ: Good morning, Steve Kolodziej,
8      local counsel for plaintiffs in the NRA versus Chicago case.
9
10 10:05AM THE CLERK: Hi, Mr. Halbrook, please. Sandy with
11     Judge Shadur.
12           THE COURT: Counsel, out on the phone, could you
       Identify yourself for the record. Lawyers here in court are
13     doing that now.
14           MR. HALBROOK: This is Stephen Halbrook, I am
15 10:06AM counsel for the NRA plaintiffs in both the Chicago and Oak
16     Park cases.
17           THE COURT: Thank you.
18           MS. HIRSCH: Good morning, your Honor, Rebecca
19     Hirsch on behalf of the City of Chicago in the NRA versus
20 10:06AM City cases.
21           MR. FORTI: Good morning, your Honor, Michael Forti
22     on behalf of the City of Chicago in the NRA case.
23           MR. HAKIM: Good morning, your Honor, Ranjit Hakim
24     on behalf of the Village of Oak Park in NRA versus Village of
25 10:06AM Oak Park.
```

## Page 4

```
1            THE COURT: Good morning to all of you. I am
2      really sorry that all of you had to get assembled this way
3      because as I had thought of the thing, the real purpose of
4      today's was to deal with the unlikely event in which you
5 10:07AM hadn't run head on on issues that I know both sides were
6      familiar with. I have looked at both submissions -- at all
7      the submissions I should say -- and it seems to me that is a
8      non-problem. So I don't need responses other than what are
9      in hand. But if somebody thinks that there is slippage here,
10 10:08AM I will listen, although I am not encouraging filing.
11           So somebody tell me, is -- do you think that -- are
12     you satisfied that you have -- have you put the matter at
13     issue as effectively as you can?
14           MR. FORTI: Speaking for Chicago, yes, your Honor,
15 10:08AM I think that you -- you have the papers in front of you and
16     we do not need to add -- add to the weight of the filings.
17           THE COURT: Okay.
18           MR. HAKIM: Oak Park concurs.
19           THE COURT: How about on the plaintiffs' side?
20 10:08AM MR. HALBROOK: Your Honor, this is Stephen
21     Halbrook. We would like to reply to the pages that were
22     raised that we did not address directly. However, I think
23     probably it is true that the case is presented with our basic
24     argument. We think some of the cases that are cited by
25 10:09AM Chicago and Oak Park are distinguishable. But if your Honor
```

## Page 5

```
1      feels like you have sufficient argumentation of the parties,
2      then we would not request a reply brief.
3            THE COURT: Well, the best definition that I know
4      of an expert is somebody from out of town. And you have to
5 10:09AM understand that one of my flaws is that I read all the cases
6      that are submitted. So if you are going to tell me that
7      cases that they cite don't stand for the proposition they
8      cite them for, trust me, I will take a look at them. So I
9      think if your only purpose would be to try to distinguish
10 10:10AM their cases, that is not -- that is not really particularly
11     constructive because that is my job, you know, that is my
12     obligation.
13           What about counsel here in court for the NRA
14     people, anything else?
15 10:10AM MR. DOOLEY: Nothing else, your Honor. We would
16     stand by what Mr. Halbrook said.
17           MR. KOLODZIEJ: Agreed.
18           THE COURT: Okay. Then it is in the category don't
19     call us, we will call you. And I would expect that we ought
20 10:10AM to be in a position to deal with the thing promptly. It is
21     an issue that was not strange to any of us and not surprising
22     to encounter it. So you will be getting an opinion as soon
23     as it is possible to get it out for you.
24           MR. FORTI: Thank you, all, Honor.
25 10:11AM MR. FORTI: Your Honor, could I raise one other
```

6

1    issue? And if you think it is inappropriate, you can tell me
2    that it is best not to talk about it in this forum. As you
3    know honor -- your Honor, one of the cases that is related to
4    this but not consolidated is the McDonald case.
5    THE COURT: Right.
6    MR. FORTI: And Mr. Gura was surprised to learn,
7    counsel for McDonald, that we were in the course of briefing
8    this. Now, we, of course, don't believe that he has been
9    prejudiced in any way by the briefing and he, of course,
10   could appear in front of this Court. But our -- Chicago's
11   viewpoint is because this is already being briefed once,
12   let's wait before we get embroiled with Mr. Gura on the
13   prevailing party question because it may or may no longer be an
14   issue; we may defer to whatever your judgment is in the NRA
15   cases. But I want -- I am somewhat in the quandary here. On
16   the one hand I don't want to talk about a case without
17   counsel being present. On the other hand, Mr. Gura has
18   accused me of actively deceiving him, which I took -- take
19   extreme exception to.
20   THE COURT: I am not sure I understand that. I,
21   Frankly, don't understand why you people don't talk to each
22   other. If -- the issue is no different, as I understand it,
23   on -- with McDonald as plaintiff than it would be with
24   respect to the NRA, unless somebody thinks that there is
25   somehow a distinction that would not occur to me. So --

7

1    MR. SIGALE: Good morning, your Honor. I
2    apologize. David Sigale, S-I-G-A-L-E, on behalf of the
3    McDonald plaintiffs, 08 CV 3645.
4    THE COURT: Well, counsel was just -- for the City
5    was just indicating that there was a concern on the part of
6    you or your associate or partner in connection with the
7    McDonald's case because of the fact that the briefing has
8    taken place in the cases that were -- that were brought on
9    basically by the motion by the National Rifle Association for
10   an award of fees. And I don't know that -- as I had just
11   gotten through saying, that to my knowledge there is no
12   difference in law in terms of the status of plaintiff, your
13   client in this action, than would be the situation with the
14   National Rifle Association.
15   To your knowledge or in your sense, is that right
16   or wrong, or what?
17   MR. SIGALE: Well, your Honor, to answer that
18   briefly, I believe our positions are different. To answer it
19   a little lengthier, we are very concerned. And I won't wax
20   dramatic. We did file a motion very, very early this
21   morning, which I have a courtesy copy for the Court to be
22   presented on the 28th because that is the next court date
23   that your Honor will be holding court that I am able to
24   attend, so a week from today, to hold this matter in abeyance
25   until the McDonald plaintiffs have either a chance to weigh

8

1    in or file their own fee petition.
2    I wish to point out to the Court we are not asking
3    that our own Rule 56 motion -- Local Rule 56 schedule be
4    adjusted. We are just asking that this matter be held in
5    abeyance for a couple weeks.
6    THE COURT: Rule 56? What does Rule 56 have to do
7    with it?
8    MR. SIGALE: Because we had been talking to counsel
9    about the joint statement and that our -- by our
10   understanding of that rule, our fee petition would be due --
11   THE COURT: Rule 56, that is a motion for summary
12   judgment.
13   MR. SIGALE: Local Rule -- Local Rule 56, your
14   Honor.
15   MS. HIRSCH: I believe it is 54, your Honor.
16   MR. FORTI: 54.
17   MR. HAKIM: 54.
18   MR. SIGALE: 54. I am sorry, your Honor. Local
19   Rule --
20   THE COURT: They all look alike.
21   MR. SIGALE: I guess it depends on how late you are
22   up.
23   But by your account our fee petition under Local
24   Rule 54 would be due on about January 11th, I believe is the
25   date, and we would be asking the Court to hold this matter in

9

1    abeyance until such time. We are very concerned, your Honor.
2    We -- while we believe our position is somewhat different
3    from the NRA plaintiffs, we believe certainly that this issue
4    impacts --
5    THE COURT: Why are you -- wait a minute. Why
6    should I hold in abeyance something that is fully briefed by
7    competent counsel on both sides? If you think you have got a
8    different position and you want to file a motion and you are
9    asserting a different -- some kind of different theory, by my
10   guest, but that doesn't justify putting this motion on hold.
11   MR. SIGALE: It only would be for a couple weeks,
12   your Honor.
13   THE COURT: Our schedule -- what does that have to
14   do with it? Let's try again.
15   MR. SIGALE: Sure.
16   THE COURT: I get fully briefed motions in the two
17   NRA cases in which everybody has staked out the respective
18   positions, and at that point they have cited the authorities
19   that they rely on. Before you came in I just inquired as to
20   whether there was any need for a reply. And except for
21   out-of-town counsel who said, well, maybe it might be in
22   order to talk about whether the defendants have cited the
23   cases that they have for the propositions that they really
24   stand for, I said to him, well, that misses the point I
25   have to read them anyway, and that is what I am going to do.

**Page 10**

```
 1   So the idea of saying, well, let's hold off because
 2   you think that you have a different stance may affect your
 3   client perhaps, but it doesn't affect the -- the plaintiffs
 4   in the cases that are before me on these motions -- and
 5   got -- I don't know whether you got sandbagged or what it is
 6   that you are thinking about is just wrong. You want to file
 7   a motion. And you may have the benefit or detriment of what
 8   I have done with the other cases, that is -- that may impact
 9   on your position or not. But you are a free agent and you
10   have got a separate case.
11   MR. SIGALE: If I may, your Honor, I would submit
12   that the matter really hasn't been fully briefed only because
13   the cases were related.
14   THE COURT: What do you mean --
15   MR. SIGALE: The Court did --
16   THE COURT: -- it hasn't been fully briefed? I
17   don't understand. Are you -- now you think you are a better
18   lawyer than they are?
19   MR. SIGALE: I don't think I am a better lawyer
20   than anybody in the room. What I am saying is that my
21   the Court rules -- and I am not -- and I am sorry, I don't
22   has been going on, really without our knowledge; and we would
23   like an opportunity to weigh in. And we believe that we are
24   like is just another date for ruling, but what we would
25   prejudiced by the fact that we haven't had an opportunity to
```

**Page 11**

```
 1   even know about this much less present our position to the
 2   Court.
 3   Now, it might be that we are not going to do it
 4   anywhere near as well as they are going to do it -- for the NRA can -- as
 5   eloquently or as well as counsel is, but, you
 6   know, for the purpose of representing our clients and the
 7   fact that our -- that all this is going on and it impacts our
 8   clients, certainly potentially when we are talking about the
 9   prevailing party issue -- and that certainly affects us.
10   And, you know, that's going to happen, I would
11   think, is that the Court is going to -- if we hadn't showed
12   up here today, if we had done nothing, if we had never found
13   out about it; the Court would have ruled on the issue and
14   then we would have filed our fee petition by January 11th, I
15   believe is our date, and then we show up here and we find out
16   for the first time that, well, this has already been ruled
17   on. You have already won or you have already lost. And we
18   would be saying, well, how did all this happen? Why didn't
19   we know about it?
20   So all I am asking is an opportunity then before
21   the Court rules -- and I am not -- and I am sorry, I don't
22   know, maybe the Court was planning on ruling on this issue
23   right now or maybe the Court is saying you are going to rule
24   by mail or set another date for ruling, but what we would
25   like is just an opportunity to weigh in, especially since our
```

**Page 12**

```
 1   rights are going to be impacted.
 2   THE COURT: Your rights are not impacted in that
 3   sense. If the Court -- if the Court's approach to the issue
 4   of prevailing party is such that if you are on the downside
 5   of an argument that you have to cope with, that is one of the
 6   products of Court analysis and it is not a matter of your
 7   somehow having been deprived of a right. That is just not
 8   right, if I may make a bad pun. And as a result what you
 9   said is reality to you.
10   I expect -- I have got motions that were presented
11   to me. I don't know about whether you people have talked
12   with each other or not. That is really is among you, not for
13   me. If you think that your claim that somehow you have
14   been disadvantaged because people were doing things behind
15   your back, I don't understand that.
16   And so short answer is, I am not going to defer
17   giving people a determination of their rights and
18   responsibilities because you want to -- you want to weigh in
19   on their rights and responsibilities. You have just told me
20   that you think that your client is in a different position.
21   Maybe so. And what may affect the outcome in your case in a
22   different way from what is here. But that is not a
23   justification for what you are here pushing for, frankly.
24   So I am not -- you know, you are -- you have a
25   right to represent your client, to present the issues as you
```

**Page 13**

```
 1   wish and when you wish, but I have pending before me fully
 2   briefed motions on the issues in the other cases, and I
 3   expect to deal with them.
 4   MR. SIGALE: Well, I mean -- if I may, your Honor,
 5   perhaps I misspoke. While I believe that our parties are in
 6   a different position than the NRA plaintiffs that are -- but
 7   I don't think there is any doubt from -- and we only got --
 8   we only found out about this last Friday afternoon, so we
 9   know only had a chance to -- we haven't had a chance to fully
10   analyze all the briefs that have been filed. But it is
11   apparent from our reading that we have had an opportunity to
12   do so that there is significant overlap in the issues.
13   THE COURT: Maybe so. That is what
14   happens when courts decide and they do things that have
15   precedential value, as District Court decisions do not have.
16   But that is how -- that is how the legal system works. When
17   cases get decided, they may have an effect on other cases.
18   That is how the late Ed Levi, when he wrote Introduction to
19   Legal Reasoning, explained the growth of the law. And it has
20   always been thus and it will continue to be thus.
21   MR. SIGALE: Not disputing that, your Honor. We
22   are -- our umbrage comes from that our cases have -- were --
23   pursuant to Local Rule 40.4 were all reassigned for
24   relatedness at the beginning of the case.
25   THE COURT: But they weren't consolidated?
```

A-148

14

1    MR. SIEGEL: No, they weren't consolidated, but
2    when we were doing anything in the McDonald case, we were
3    faxing copies over to everybody else to make sure everybody
4    know what was going on. And we found out about this almost
5    by accident.
6    THE COURT: Well, I am not asking any comment on
7    questions of courtesy or lack of it. I am simply dealing
8    with the issue in the way that you have posed it. And the
9    short answer is the one that I gave you, and that is if -- if
10    the -- I resolve the pending issues before you have your
11    presentation, you will have either the advantage or
12    disadvantage of that decision in terms of how you present
13    your case. And you do that on your own time.
14    Thank you.
15    MR. FORTI: Thank you.
16    MR. HAKIM: Thank you
17    MS. HIRSCH: Thank you.
18    MR. DOOLEY: Thank you.
19    MR. KOLODZIEJ: Thank you.
20    (which were all the proceedings heard.)
21    CERTIFICATE
22    I certify that the foregoing is a correct transcript
23    from the record of proceedings in the above-entitled matter.
24
25    s/Rosemary Scarpelli/        Date: January 7, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION | ( | |
| OF AMERICA, INC., DR. KATHRYN TYLER, | ( | |
| VAN F. WELTON, | ( | |
| and BRETT BENSON, | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | No. 08 CV 3697 |
| | ( | |
| THE CITY OF CHICAGO, | ( | Judge Milton I. Shadur |
| | ( | |
| | ( | |
| Defendant. | ( | |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs, NATIONAL RIFLE ASSOCIATION OF

AMERICA, INC., DR. KATHRYN TYLER, VAN F. WELTON, and BRETT BENSON, appeal

to the United States Court of Appeals for the Seventh Circuit from this Court's Memorandum

Opinion and Order entered in this action on December 22, 2010 denying Plaintiffs' motion for

Section 1988 attorneys' fee award. (A true and correct copy of the December 22, 2010

Memorandum Opinion and Order is attached hereto as Exhibit "A" and made a part hereof.)

Dated: December 27, 2010

Respectfully submitted,

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., DR. KATHRYN TYLER,
VAN F. WELTON and BRETT BENSON,
Plaintiffs

BY: /s/ Stephen A. Kolodziej
One of Their Attorneys

A-149

Stephen P. Halbrook
Attorney at Law
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Tel. (703) 352-7276
Fax (703) 359-0938

Stephen A. Kolodziej

**Brenner, Ford, Monroe & Scott, Ltd.**
33 North Dearborn Street, Suite 300
Chicago, Illinois 60602
Tel (312) 360-6415
Fax (312) 360-6573

A-150

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC., DR. KATHRYN TYLER,
VAN F. WELTON,
and BRETT BENSON,

                  Plaintiffs,

vs.                        No. 08 CV 3697

                        Judge Milton I. Shadur

THE CITY OF CHICAGO,

                  Defendant.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of the foregoing

instrument to be served upon the parties of record, as shown below, via the Court's CM/ECF

filing system on the 27th day of **December 2010.**

Andrew W. Worseck
William Macy Aguiar
City of Chicago Department of Law
Constitutional and Commercial Litigation
Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602

                        /s/ Stephen A. Kolodziej

Local Counsel:                        Stephen P. Halbrook
Stephen A. Kolodziej            Attorney at Law
**Brenner, Ford, Monroe & Scott, Ltd.**     3925 Chain Bridge Road, Suite 403
33 North Dearborn Street, Suite 300    Fairfax, VA 22030
Chicago, Illinois 60602            Tel. (703) 352-7276
Tel (312) 781-1970               Fax (703) 359-0938
Fax (312) 781-1970              (*Pro Hac Vice*)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., et al., | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| v. | ( | No. 08 C 3696 |
| | ( | |
| VILLAGE OF OAK PARK, et al., | ( | |
| | ( | |
| Defendants. | ( | |

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., et al., | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| v. | ( | No. 08 C 3697 |
| | ( | |
| CITY OF CHICAGO, | ( | |
| | ( | |
| Defendant. | ( | |

MEMORANDUM OPINION AND ORDER

National Rifle Association of America, Inc. ("NRA") has

filed motions, pursuant to 42 U.S.C. §1988,[1] each seeking an

award of attorney's fees in a now-closed Section 1983 lawsuit

that had been initiated by NRA some 2-1/2 years ago -- one of

them targeting the Village of Oak Park ("Village") and the other

brought against the City of Chicago ("City"). Both motions[2]

_____

[1] All further references to Title 42's provisions will
simply take the form "Section --."

[2] Because NRA has filed identical motions in each case and
because Village has adopted City's response as its own, this
opinion cites to NRA's motions as "N. Mot. --" and to the City-

follow the cases' journey to the Supreme Court and back again, ending with the dismissal of both actions by this Court on mootness grounds. For the reasons stated below, both NRA motions are denied.

**Factual Background**

NRA filed these lawsuits one day after the Supreme Court decided Dist. of Columbia v. Heller, 554 U.S. 570 (2008). This Court properly requested, and the Executive Committee of this District Court granted, the reassignment of both cases to its docket based on their relatedness to McDonald v. City of Chicago, 08 C 3645, which had been filed on the same morning that Heller was decided. All three cases charged that municipal ordinances that made it unlawful for any person to possess a handgun ran afoul of the Second Amendment, as incorporated against the States via the Fourteenth Amendment.

Because this Court followed (as it was obligated to do) existing Supreme Court and Seventh Circuit precedent (both pre-Heller, of course), it ruled that the Second Amendment was not incorporated against the States, and Village and City were therefore granted judgment on the pleadings. After consolidating the appeals in all three cases, our Court of Appeals affirmed this Court's ruling in NRA v. City of Chi., 567 F.3d 856 (7th Cir. 2009).

Village responses as "C. Mot. -."

2

Case: 10-899 Document: 75-1 Filed: 11/22/2010 Pages: 65 of 114 (58 of 138)

3

NRA and McDonald then filed separate petitions for writs of
certiorari in the Supreme Court. Although the Supreme Court
granted the McDonald petition, it did not act on the NRA petition
until after it issued its June 28, 2010 opinion in McDonald v.
City of Chi., 130 S. Ct. 3020 (2010), holding that the Fourteenth
Amendment does incorporate the Second Amendment. On the next day
the Supreme Court granted NRA's petition and remanded the case to
the Seventh Circuit for further proceedings (NRA v. City of Chi.,
130 S.Ct. 3544 (2010)).

Three days later (on July 2) City replaced its gun ordinance
with one that does not contain a total ban on handguns (Journal
of the Proceedings of the City Council of the City of Chicago,
Illinois at 96235). For its part, Village repealed its gun
ordinance on July 19 (Approved Minutes -- Regular Board Meeting,
Village of Oak Park p.4, http://www.oak-
park.us/public/pdfs/2010%20Minutes/07.19.10_minutes.pdf). In
light of those actions, our Court of Appeals vacated this Court's
judgment in all three cases and remanded with instructions to
dismiss them as moot (NRA v. City of Chi., 2010 WL 3398935 (7th
Cir. Aug. 25)). On October 12, 2010 this Court followed that
direction.

**Attorney's Fee Awards under Section 1988**

Both sides agree that the Supreme Court opinion in

Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health &

4

Human Resources, 532 U.S. 598 (2001) brought a sea change in the jurisprudence governing Section 1988 attorney's fee awards. It deep-sixed the "catalyst" concept that the vast majority of federal courts had been applying consistently in that area, replacing it instead with a more demanding standard.

Section 1988(b) states that in a Section 1983 action "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." In the wake of Buckhannon the Supreme Court has reconfirmed its earlier view that "[t]he touchstone of the prevailing party inquiry ... is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute" (Sole v. Wyner, 551 U.S. 74, 82 (2007) (internal quotation marks omitted)).

On that score Buckhannon, 532 U.S. at 604 had held "that enforceable judgments on the merits and court-ordered consent decrees create" the essential "material alteration." Thus the Court distinguished settlements memorialized by consent decrees from private settlements on the ground that consent decrees are "court-ordered" (id.). In elaborating on its reasons for rejecting the "catalyst theory," the Court reasoned that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change"

5

(Id. at 605). Buckhannon, Id. at 606 (internal quotation marks omitted) succinctly summarized the Court's concerns and the applicable standard:

We cannot agree that the term "prevailing party" authorizes federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the sought-after designation without obtaining any judicial relief.

Closer to the bone, our Court of Appeals has implemented Buckhannon in Zessar v. Keith, 536 F.3d 788 (7th Cir. 2008), a case where as here a statute had been found unconstitutional. Zessar, Id. at 796 held that alone was not enough -- instead such a situation "gives a plaintiff a hurdle to overcome if he is to show that he is a prevailing party because the Supreme Court has repeatedly held that, other than a settlement made enforceable under a consent decree, a final judgment on the merits is the normative judicial act that creates a prevailing party." NRA fails to clear that hurdle.

Simply put, there has never been a final judgment on the merits in these cases. There was no final court order requiring Village or City to do anything. After the Supreme Court remanded the cases to the Seventh Circuit for proceedings consistent with its McDonald opinion, this Court never had the opportunity to conduct such proceedings because it was ordered by the Court of Appeals to dismiss the cases as moot. Both Village (by repealing its ordinance) and City (by adopting a new one that eliminated

Case: 1:08-cv-03696 Document #: 75-1 Filed: 12/22/10 Page 67 of 84 PageID #:3329

9

any outright prohibition) forwent the alternative of litigating the actions to an ultimate conclusion.

It must be remembered that these cases have been closed by final judgments of dismissal. If either Village or City were to decide to reenact its previous ordinance, NRA would not be able to bring an enforcement action based upon some action previously taken by this Court. It would instead be required to file new lawsuits to seek judgments on the merits. This is just another way of demonstrating that there was no court-ordered or court-implemented material alteration of any legal relationship in either action. Under the prevailing precedents, NRA cannot fairly be said to be a "prevailing party" under Section 1988.

And there is more to the same effect from our Court of Appeals. Walker v. Calumet City, 565 F.3d 1031 (7th Cir. 2009), considered a case that had originated before this Court, one in which plaintiff had sued claiming that municipality's point-of-sale ordinance violated plaintiff's constitutional rights. Upon reinspection of plaintiff's property, Calumet City found it to be in compliance and moved to dismiss the case as moot (id. at 1033). This Court issued a dismissal order that in part listed representations made by the city that it would not renege on its promises (id.). Then our Court of Appeals reversed this Court's later award of attorney's fees under Section 1988 because there, as here, this Court had "never reached the merits of

Case: 1:08-cv-03693 Document #: 765 Filed: 12/21/10 Page 162 of 184 PageID #:3330

[plaintiff's] claims" (id. at 1034) and its order "did not
provide for judicial enforcement" or "vest the court with
continuing jurisdiction" (id. at 1035).

Fed'n of Adver. Representatives, Inc. v. City of Chi., 326
F.3d 924 (7th Cir. 2003) is also instructive. There plaintiff
claimed that City's advertising restrictions violated the First
Amendment (id. at 928). After the Supreme Court had invalidated
a similar restriction in a Massachusetts case,³ Judge Kennelly
granted City's motion for dismissal on mootness grounds in
response to plaintiff's motion for summary judgment. In deciding
the "prevailing party" issue on appeal, the Seventh Circuit
assumed without deciding that City had changed its ordinance in
response to the Supreme Court decision but still found that
plaintiff was not entitled to "prevailing party" status (id. at
933).

NRA correctly points out that one reason for that decision
was that plaintiff was not a party to the relevant Supreme Court
case (id.). But even if NRA can distinguish the instant cases
from Federation on the basis that it was a party to the Supreme

---

³ Ironically the Federation case had originally been
assigned to this Court's calendar, and it held City's ordinance
invalid on preemption grounds. Then our Court of Appeals held
such total preemption was incorrect and reversed in part, sending
the case back. Further District Court proceedings were before
this Court's colleague Honorable Matthew Kennelly, and it was
during those later proceedings that the Supreme Court's decision
on the Massachusetts statute confirmed the correctness of this
Court's original preemption decision.

7

Case: 1:08-cv-03693 Document #: 156 Filed: 12/27/10 Page 63 of 64 PageID #:3341

Court decision in McDonald,[4] that contention blithely ignores the

second and independent reason announced in Federation, id. as to

why City's change of conduct in response to the Supreme Court

decision did not confer "prevailing party" status on the

plaintiff there:

Even assuming after [the Supreme Court decision], the
district court would have granted [plaintiff's] motion had
the [defendant] not repealed its ordinance, the fact remains
that no such ruling was made and thus no judicial relief was
awarded to Federation.

By the same token, even assuming that this Court would have ruled

for NRA had Village and City not done away with their challenged

ordinances, no such relief was awarded, and so no "prevailing

party" status can be conferred.

NRA fares no better with its other arguments. Though all of

them could be dispatched on the basis of the clear teaching of

---

[4] N. Mot. 2-3 argues in contrast that NRA should win
prevailing party status by virtue of being designated a party
respondent by the Supreme Court in McDonald. But that argument
is a red herring. As Village and City correctly point out and as
evidenced by the rest of this opinion, NRA's party-respondent
status in the Supreme Court is irrelevant because the Supreme
Court's decision in McDonald -- which, it will be remembered,
resulted in no judicial implementation on remand -- did not meet
the requirements of Section 1988 under Buckhannon (C. Mot. 5-6).
Indeed, NRA's argument demonstrates its essential reliance on the
"catalyst theory." Disputes over whether a litigant was a party
to a decision where the bound parties cannot easily be
determined, unlike a judgment on the merits or a consent decree,
invite the additional round of litigation expressly disfavored by
Buckhannon, 532 U.S. at 609. That said, this discussion should
not be misunderstood as foreclosing any arguments that the
plaintiff in McDonald may raise to differentiate himself from NRA
for the purposes of "prevailing party" inquiry (more on this
later).

Case: 1:08-cv-03696 Document #: 164 Filed: 12/27/10 Page 9 of 13 PageID #:852

Buckhannon and its progeny as already described, this action will
go on to treat them -- albeit with some brevity.

First NRA argues that in the wake of McDonald, Village and
City publicly acknowledged that their handgun bans were
unconstitutional (N. Mot. 6-9). NRA cites numerous public
statements to that effect, both to the press and in the context
of local political proceedings (id.). But that amounts to
nothing more than (to paraphrase Matthew 9:17) seeking to put the
old "catalyst theory" wine into new bottles. Public statements,
however numerous and forceful, do not grant "prevailing party"
status when they have not received the essential judicial
imprimatur.

NRA also contends that it received "judicial relief" because
Village and City "fought hard all the way to the Supreme Court"
(N. Mot. 11). But that is plainly not enough -- as Farrar v.
Hobby, 506 U.S. 103, 112-13 (1992) (internal quotation marks and
citation omitted) put it:

To be sure, a judicial pronouncement that the defendant has
violated the Constitution, unaccompanied by an enforceable
judgment on the merits, does not render the plaintiff a
prevailing party. Of itself, the moral satisfaction [that]
results from any favorable statement of law cannot bestow
prevailing party status. No material alteration of the
legal relationship between the parties occurs until the
plaintiff becomes entitled to enforce a judgment, consent
decree, or settlement against the defendant.

And at the risk of repetition, none of those things occurred in
these cases.

Case: 1:08-cv-00693 Document #: 7361 Filed: 11/22/10 Page 10 of 11 PageID #:3735

that seeks to call to its aid. Although a mere reading of these
opinions confirms their inapplicability to the situation here.
this opinion will touch on the obvious distinctions.

Thus Riviera Distribs., Inc. v. Jones, 517 F.3d 927-28 (7th
Cir. 2008) found that the plaintiffs were "prevailing parties"
under the Copyright Act of 1976, though the district judge had
never reached the merits of the case, because the case was
dismissed with prejudice. That of course materially altered the
legal relationship of the parties, in contrast to the wholly
nonsubstantive dismissal of the cases here as moot.

Palmetto Props., Inc. v. County of DuPage, 375 F.3d 542 (7th
Cir. 2004) presents a different scenario. There the district
court dismissed the case as moot when defendants repealed an
ordinance after the district court had held the ordinance
unconstitutional on a motion for summary judgment, but before the
court entered final judgment (id. at 545-46). NRA's efforts to
parallel its cases with Palmetto totally ignores the wholly
different posture of the judicial rulings involved, as explained
expressly in Palmetto, id. (emphasis in original):

In Buckhannon the challenged state law was repealed, thereby
mooting the case, before the district court had made any
substantive rulings. ... In this case, not only did the
district court make a substantive determination ... the
County repealed the ordinance only after that determination
had been made and presumably because of it.

Indeed, Zessar, 536 F.3d at 797 distinguished Palmetto from its

10

Case: 1:08-cv-03529 Document #: 7561 Filed: 12/27/10 Page 166 of 184 PageID #:3734

situation, where the district court found an Illinois statute unconstitutional on a motion for summary judgment but did not direct the parties to do anything pending further proceedings as to the appropriate relief.

Lastly in that group, NRA fares no better in its attempted reliance on Southworth v. Bd. of Regents of Univ. of Wis. Sys., 376 F.3d 757 (7th Cir. 2004). There our Court of Appeals (id. at 770) took pains to distinguish between post-trial court-ordered changes and voluntary changes made by the defendant -- the very distinction that this opinion has stressed in the present cases. NRA tries to attach one more string to its bow, but that too is broken. It cites Young v. City of Chi., 202 F.3d 1000 (7th Cir. 2000) (per curiam), in which the district court granted plaintiffs a preliminary injunction against City, enjoining its imposition of a security perimeter around the 1996 Democratic National Convention. Though City's appeal of the preliminary injunction was later dismissed as moot after the convention ended, because the preliminary injunction of course applied only to that specific convention, Young, id. at 1000-01 upheld the award of fees to plaintiff under Section 1988.

On that score the obvious distinction is that the district court there had already granted relief to plaintiffs via its preliminary injunction order, clearly altering the legal relationship between the two parties. Hence the awarding of fees

11

Case: 1:08-cv-03696 Document #: 61 Filed: 12/27/10 Page 1 of 4 PageID #:335

simply prevented City from "taking steps to moot the case after

the plaintiff has obtained the relief he sought" (Id.).

## Conclusion

In the context of this case, the lesson taught by Buckhannon

and its relevant progeny is that the proverbial handwriting on

the wall does not alone suffice to trigger a Section 1988

entitlement to attorney's fees, no matter how clear the

penmanship may appear to be. Instead that figurative handwriting

must have been memorialized in a judicial ruling or like judicial

action, and nothing of the sort had taken place in these two

cases before Village and City dispatched their challenged

ordinances and thus mooted the two cases. Accordingly NRA's

motions for Section 1988 fee awards are denied.[5]

Date:    December 22, 2010

Milton I. Shadur
Senior United States District Judge

[5] When these actions came on for a preset status hearing on
December 21 for the sole purpose of confirming that the litigants
had met head-on in addressing the issues posed by NRA's motions,
counsel for plaintiff in the McDonald case appeared and voiced
vigorous criticism at having assertedly been kept out of the loop
by NRA's counsel. This Court, which of course had no knowledge
of anything of the sort (it will be recalled that the cases had
been terminated by the dismissal orders based on mootness, so
that this Court had no need to follow its normal practice of
setting periodic status hearing in all cases pending on its
calendar), rejected the motion by McDonald's counsel to stay the
determination of the fully briefed motions in these two cases.
As this Court assured that lawyer, as and when he may advance a
Section 1988 motion in that case this Court will address it on
the merits, for which purpose it may or may not find that the
McDonald plaintiffs occupy the same position announced here as to
NRA (a function of whatever similarities and differences may
exist as between the McDonald case and the two NRA cases).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. and DR. GENE A. REISINGER, | ) ) ) |
| Plaintiffs, | ) ) No. 08 CV 3696 |
| v. | ) ) Honorable Milton I. Shadur |
| VILLAGE OF OAK PARK, | ) ) ) |
| Defendant. | ) ) ) ) |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. and DR. GENE A. REISINGER, appeal to the United States Court of Appeals for the Seventh Circuit from this Court's Memorandum Opinion and Order entered in this action on December 22, 2010 denying Plaintiffs' motion for Section 1988 attorneys' fee award. (A true and correct copy of the December 22, 2010 Memorandum Opinion and Order is attached hereto as **Exhibit "A"** and made a part hereof.)

Dated: December 27, 2010          Respectfully submitted,

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC. and DR. GENE A.
REISINGER
Plaintiffs

BY:     /s/ William N. Howard
        _____
        One of Their Attorneys

Stephen P. Halbrook                     William N. Howard, Esq.
Attorney at Law                         **FREEBORN & PETERS LLP**
3925 Chain Bridge Road, Suite 403       311 S. Wacker Dr., Suite 3000
Fairfax, VA 22030                       Chicago, Illinois 60606
Tel. (703) 352-7276                     Tel (312) 360-6415
Fax (703) 359-0938                      Fax (312) 360-6573

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL RIFLE ASSOCIATION OF ) 
AMERICA, INC. and DR. GENE A. REISINGER, )
)
Plaintiffs, )
)
v. ) Civil Action No. 08 C 3696
)
VILLAGE OF OAK PARK and )
DAVID POPE, President, )
)
Defendants. )
)

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of the foregoing instrument to be served upon the parties of record, as shown below, via the Court's CM/ECF filing system on the 27th day of December 2010.

| | |
|---|---|
| Ranjit Hakim | Lance C. Malina |
| Alexandra E. Shea | Jacob Henry Karaca |
| Mayer Brown LLP | Klein, Thorpe & Jenkins, Ltd. |
| 71 S. Wacker Dr. | 20 N. Wacker Dr., Suite 1660 |
| Chicago, IL 60606 | Chicago, IL 60606-2903 |
| e-mail: courtnotification@mayerbrown.com | email: lcmalina@ktjnet.com |
| | jhkaraca@ktjnet.com |

s/ William N. Howard

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION<br>OF AMERICA, INC., et al., ( | |
| Plaintiffs, ( | |
| v. ( | No. 08 C 3696 |
| VILLAGE OF OAK PARK, et al., ( | |
| Defendants. ( | |

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION<br>OF AMERICA, INC., et al., ( | |
| Plaintiffs, ( | |
| v. ( | No. 08 C 3697 |
| CITY OF CHICAGO, ( | |
| Defendant. ( | |

MEMORANDUM OPINION AND ORDER

National Rifle Association of America, Inc. ("NRA") has filed motions, pursuant to 42 U.S.C. §1988,[1] each seeking an award of attorney's fees in a now-closed Section 1983 lawsuit that had been initiated by NRA some 2-1/2 years ago — one of them targeting the Village of Oak Park ("Village") and the other brought against the City of Chicago ("City"). Both motions[2]

---

[1] All further references to Title 42's provisions will simply take the form "Section --."

[2] Because NRA has filed identical motions in each case and because Village has adopted City's response as its own, this opinion cites to NRA's motions as "N. Mot. --" and to the City-

follow the cases' journey to the Supreme Court and back again, ending with the dismissal of both actions by this Court on mootness grounds. For the reasons stated below, both NRA motions are denied.

**Factual Background**

NRA filed these lawsuits one day after the Supreme Court decided Dist. of Columbia v. Heller, 554 U.S. 570 (2008). This Court properly requested, and the Executive Committee of this District Court granted, the reassignment of both cases to its docket based on their relatedness to McDonald v. City of Chicago, 08 C 3645, which had been filed on the same morning that Heller was decided. All three cases charged that municipal ordinances that made it unlawful for any person to possess a handgun ran afoul of the Second Amendment, as incorporated against the States via the Fourteenth Amendment.

Because this Court followed (as it was obligated to do) existing Supreme Court and Seventh Circuit precedent (both pre-Heller, of course), it ruled that the Second Amendment was not incorporated against the States, and Village and City were therefore granted judgment on the pleadings. After consolidating the appeals in all three cases, our Court of Appeals affirmed this Court's ruling in NRA v. City of Chi., 567 F.3d 856 (7th Cir. 2009).

Village responses as "C. Mot. -."

2

NRA and McDonald then filed separate petitions for writs of certiorari in the Supreme Court. Although the Supreme Court granted the McDonald petition, it did not act on the NRA petition until after it issued its June 28, 2010 opinion in McDonald v. City of Chi., 130 S. Ct. 3020 (2010), holding that the Fourteenth Amendment does incorporate the Second Amendment. On the next day the Supreme Court granted NRA's petition and remanded the case to the Seventh Circuit for further proceedings (NRA v. City of Chi., 130 S.Ct. 3544 (2010)).

Three days later (on July 2) City replaced its gun ordinance with one that does not contain a total ban on handguns (Journal of the Proceedings of the City Council of the City of Chicago, Illinois at 96235). For its part, Village repealed its gun ordinance on July 19 (Approved Minutes -- Regular Board Meeting, Village of Oak Park p.4, http://www.oak-park.us/public/pdfs/2010%20Minutes/07.19.10_minutes.pdf). In light of those actions, our Court of Appeals vacated this Court's judgment in all three cases and remanded with instructions to dismiss them as moot (NRA v. City of Chi., 2010 WL 3398395 (7th Cir. Aug. 25)). On October 12, 2010 this Court followed that direction.

**Attorney's Fee Awards under Section 1988**

Both sides agree that the Supreme Court opinion in Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health &

3

Human Resources, 532 U.S. 598 (2001) brought a sea change in the jurisprudence governing Section 1988 attorney's fee awards. It deep-sixed the "catalyst" concept that the vast majority of federal courts had been applying consistently in that area, replacing it instead with a more demanding standard.

Section 1988(b) states that in a Section 1983 action "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." In the wake of Buckhannon the Supreme Court has reconfirmed its earlier view that "[t]he touchstone of the prevailing party inquiry ... is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute" (Sole v. Wyner, 551 U.S. 74, 82 (2007) (internal quotation marks omitted)).

On that score Buckhannon, 532 U.S. at 604 had held "that enforceable judgments on the merits and court-ordered consent decrees create" the essential "material alteration." Thus the Court distinguished settlements memorialized by consent decrees from private settlements on the ground that consent decrees are "court-ordered" (id.). In elaborating on its reasons for rejecting the "catalyst theory," the Court reasoned that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change"

4.

(*Id.* at 605). Buckhannon, *id.* at 606 (internal quotation marks

omitted) succinctly summarized the Court's concerns and the

applicable standard:

> We cannot agree that the term "prevailing party" authorizes
> federal courts to award attorney's fees to a plaintiff who,
> by simply filing a nonfrivolous but nonetheless potentially
> meritless lawsuit (it will never be determined), has reached
> the sought-after designation without obtaining any judicial
> relief.

Closer to the bone, our Court of Appeals has implemented

Buckhannon in Zessar v. Keith, 536 F.3d 788 (7th Cir. 2008), a

case where as here a statute had been found unconstitutional.

Zessar, *id.* at 796 held that alone was not enough -- instead such

a situation "gives a plaintiff a hurdle to overcome if he is to

show that he is a prevailing party because the Supreme Court has

repeatedly held that, other than a settlement made enforceable

under a consent decree, a final judgment on the merits is the

normative judicial act that creates a prevailing party." NRA

fails to clear that hurdle.

Simply put, there has never been a final judgment on the

merits in these cases. There was no final court order requiring

Village or City to do anything. After the Supreme Court remanded

the cases to the Seventh Circuit for proceedings consistent with

its *McDonald* opinion, this Court never had the opportunity to

conduct such proceedings because it was ordered by the Court of

Appeals to dismiss the cases as moot. Both Village (by repealing

its ordinance) and City (by adopting a new one that eliminated

5

A-173

any outright prohibition) forwent the alternative of litigating the actions to an ultimate conclusion.

It must be remembered that these cases have been closed by final judgments of dismissal. If either Village or City were to decide to reenact its previous ordinance, NRA would not be able to bring an enforcement action based upon some action previously taken by this Court. It would instead be required to file new lawsuits to seek judgments on the merits. This is just another way of demonstrating that there was no court-ordered or court-implemented material alteration of any legal relationship in either action. Under the prevailing precedents, NRA cannot fairly be said to be a "prevailing party" under Section 1988.

And there is more to the same effect from our Court of Appeals. Walker v. Calumet City, 565 F.3d 1031 (7th Cir. 2009), considered a case that had originated before this Court, one in which plaintiff had sued claiming that municipality's point-of-sale ordinance violated plaintiff's constitutional rights. Upon reinspection of plaintiff's property, Calumet City found it to be in compliance and moved to dismiss the case as moot (id. at 1033). This Court issued a dismissal order that in part listed representations made by the city that it would not renege on its promises (id.). Then our Court of Appeals reversed this Court's later award of attorney's fees under Section 1988 because there, as here, this Court had "never reached the merits of

6

A-174

[plaintiff's] claims" (Id. at 1034) and its order "did not

provide for judicial enforcement" or "vest the court with

continuing jurisdiction" (Id. at 1035).

Fed'n of Adver. Representatives, Inc. v. City of Chi., 326

F.3d 924 (7th Cir. 2003) is also instructive. There plaintiff

claimed that City's advertising restrictions violated the First

Amendment (Id. at 928). After the Supreme Court had invalidated

a similar restriction in a Massachusetts case,[3] Judge Kennelly

granted City's motion for dismissal on mootness grounds in

response to plaintiff's motion for summary judgment. In deciding

the "prevailing party" issue on appeal, the Seventh Circuit

assumed without deciding that City had changed its ordinance in

response to the Supreme Court decision but still found that

plaintiff was not entitled to "prevailing party" status (Id. at

933).

NRA correctly points out that one reason for that decision

was that plaintiff was not a party to the relevant Supreme Court

case (Id.). But even if NRA can distinguish the instant cases

from Federation on the basis that it was a party to the Supreme

---

[3] Ironically the Federation case had originally been
assigned to this Court's calendar, and it held City's ordinance
invalid on preemption grounds. Then our Court of Appeals held
such total preemption was incorrect and reversed in part, sending
the case back. Further District Court proceedings were before
this Court's colleague Honorable Matthew Kennelly, and it was
during those later proceedings that the Supreme Court's decision
on the Massachusetts statute confirmed the correctness of this
Court's original preemption decision.

7

Court decision in McDonald,[4] that contention blithely ignores the

second and independent reason announced in Federation, id. as to

why City's change of conduct in response to the Supreme Court

decision did not confer "prevailing party" status on the

plaintiff there:

> Even assuming after [the Supreme Court decision], the
> district court would have granted [plaintiff's] motion had
> the [defendant] not repealed its ordinance, the fact remains
> that no such ruling was made and thus no judicial relief was
> awarded to Federation.

By the same token, even assuming that this Court would have ruled

for NRA had Village and City not done away with their challenged

ordinances, no such relief was awarded, and so no "prevailing

party" status can be conferred.

NRA fares no better with its other arguments.  Though all of

them could be dispatched on the basis of the clear teaching of

---

[4] N. Mot. 2-3 argues in contrast that NRA should win
prevailing party status by virtue of being designated a party
respondent by the Supreme Court in McDonald.  But that argument
is a red herring.  As Village and City correctly point out and as
evidenced by the rest of this opinion, NRA's party-respondent
status in the Supreme Court is irrelevant because the Supreme
Court's decision in McDonald -- which, it will be remembered,
resulted in no judicial implementation on remand -- did not meet
the requirements of Section 1988 under Buckhannon (C. Mot. 5-6).
Indeed, NRA's argument demonstrates its essential reliance on the
"catalyst theory."  Disputes over whether a litigant was a party
to a decision where the bound parties cannot easily be
determined, unlike a judgment on the merits or a consent decree,
invite the additional round of litigation expressly disfavored by
Buckhannon, 532 U.S. at 609.  That said, this discussion should
not be misunderstood as foreclosing any arguments that the
plaintiff in McDonald may raise to differentiate himself from NRA
for the purposes of "prevailing party" inquiry (more on this
later).

8

Buckhannon and its progeny as already described, this action will

go on to treat them -- albeit with some brevity.

First NRA argues that in the wake of McDonald, Village and

City publicly acknowledged that their handgun bans were

unconstitutional (N. Mot. 6-9). NRA cites numerous public

statements to that effect, both to the press and in the context

of local political proceedings (id.). But that amounts to

nothing more than (to paraphrase Matthew 9:17) seeking to put the

old "catalyst theory" wine into new bottles. Public statements,

however numerous and forceful, do not grant "prevailing party"

status when they have not received the essential judicial

imprimatur.

NRA also contends that it received "judicial relief" because

Village and City "fought hard all the way to the Supreme Court"

(N. Mot. 11). But that is plainly not enough -- as Farrar v.

Hobby, 506 U.S. 103, 112-13 (1992) (internal quotation marks and

citation omitted) put it:

To be sure, a judicial pronouncement that the defendant has
violated the Constitution, unaccompanied by an enforceable
judgment on the merits, does not render the plaintiff a
prevailing party. Of itself, the moral satisfaction [that]
results from any favorable statement of law cannot bestow
prevailing party status. No material alteration of the
legal relationship between the parties occurs until the
plaintiff becomes entitled to enforce a judgment, consent
decree, or settlement against the defendant.

And at the risk of repetition, none of those things occurred in

these cases.

9

A-177

Nor is NRA assisted by any of the Seventh Circuit cases that

it seeks to call to its aid. Although a mere reading of these

opinions confirms their inapplicability to the situation here.

this opinion will touch on the obvious distinctions.

Thus Riviera Distribs., Inc. v. Jones, 517 F.3d 927-28 (7th

Cir. 2008) found that the plaintiffs were "prevailing parties"

under the Copyright Act of 1976, though the district judge had

never reached the merits of the case, because the case was

dismissed with prejudice. That of course materially altered the

legal relationship of the parties, in contrast to the wholly

nonsubstantive dismissal of the cases here as moot.

Palmetto Props., Inc. v. County of DuPage, 375 F.3d 542 (7th

Cir. 2004) presents a different scenario. There the district

court dismissed the case as moot when defendants repealed an

ordinance after the district court had held the ordinance

unconstitutional on a motion for summary judgment, but before the

Court entered final judgment (id. at 545-46). NRA's efforts to

parallel its cases with Palmetto totally ignores the wholly

different posture of the judicial rulings involved, as explained

expressly in Palmetto, id. (emphasis in original):

In Buckhannon the challenged state law was repealed, thereby
mooting the case, before the district court had made any
substantive rulings. ... In this case, not only did the
district court make a substantive determination ... the
County repealed the ordinance only after that determination
had been made and presumably because of it.

Indeed, Zessar, 536 F.3d at 797 distinguished Palmetto from its

10

A-178

situation, where the district court found an Illinois statute

unconstitutional on a motion for summary judgment but did not

direct the parties to do anything pending further proceedings as

to the appropriate relief.

Lastly in that group, NRA fares no better in its attempted

reliance on Southworth v. Bd. of Regents of Univ. of Wis. Sys.,

376 F.3d 757 (7th Cir. 2004). There our Court of Appeals (id. at

770) took pains to distinguish between post-trial court-ordered

changes and voluntary changes made by the defendant -- the very

distinction that this opinion has stressed in the present cases.

NRA tries to attach one more string to its bow, but that too

is broken. It cites Young v. City of Chi., 202 F.3d 1000 (7th

Cir. 2000)(per curiam), in which the district court granted

plaintiffs a preliminary injunction against City, enjoining its

imposition of a security perimeter around the 1996 Democratic

National Convention. Though City's appeal of the preliminary

injunction was later dismissed as moot after the convention

ended, because the preliminary injunction of course applied only

to that specific convention, Young, id. at 1000-01 upheld the

award of fees to plaintiff under Section 1988.

On that score the obvious distinction is that the district

court there had already granted relief to plaintiffs via its

preliminary injunction order, clearly altering the legal

relationship between the two parties. Hence the awarding of fees

11

A-179

simply prevented City from "taking steps to moot the case after

the plaintiff has obtained the relief he sought" (id.).

## Conclusion

In the context of this case, the lesson taught by Buckhannon

and its relevant progeny is that the proverbial handwriting on

the wall does not alone suffice to trigger a Section 1988

entitlement to attorney's fees, no matter how clear the

penmanship may appear to be. Instead that figurative handwriting

must have been memorialized in a judicial ruling or like judicial

action, and nothing of the sort had taken place in these two

cases before Village and City dispatched their challenged

ordinances and thus mooted the two cases. Accordingly NRA's

motions for Section 1988 fee awards are denied.[5]

Date:     December 22, 2010

_Milton I. Shadur_
Milton I. Shadur
Senior United States District Judge

---

[5] When these actions came on for a preset status hearing on
December 21 for the sole purpose of confirming that the litigants
had met head-on in addressing the issues posed by NRA's motions,
counsel for plaintiff in the McDonald case appeared and voiced
vigorous criticism at having assertedly been kept out of the loop
by NRA's counsel. This Court, which of course had no knowledge
of anything of the sort (it will be recalled that the cases had
been terminated by the dismissal orders based on mootness, so
that this Court had no need to follow its normal practice of
setting periodic status hearing in all cases pending on its
calendar), rejected the motion by McDonald's counsel to stay the
determination of the fully briefed motions in these two cases.
As this Court assured that lawyer, as and when he may advance a
Section 1988 motion in that case this Court will address it on
the merits, for which purpose it may or may not find that the
McDonald plaintiffs occupy the same position announced here as to
NRA (a function of whatever similarities and differences may
exist as between the McDonald case and the two NRA cases).

## CERTIFICATE OF SERVICE

The undersigned attorney hereby states that he caused three (3) true and correct copies of **Separate Appendix to Brief For Plaintiffs-Appellants National Rifle Association,** *et. al*, together with one (1) CD containing same, to be served upon the parties of record, as shown below, via MESSENGER, on the 14th day of February, 2011.

Ranjit Hakim
Alexandra E. Shea
Marc R. Kadish
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
*Attys. For Village of Oak Park*

Suzanne M. Loose
City of Chicago Law Department
30 N. LaSalle St., Suite 800
Chicago, IL 60602
*Attys. For City of Chicago.*

Stephen A. Kolodziej
Brenner, Ford, Monroe & Scott, Ltd.
33 North Dearborn Street, Suite 300
Chicago, IL 60602
*Atty. For NRA, et al.*

Alan Gura
Gura & Possesskky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
*Atty. For McDonald, et al.*

Lance C. Malina
Jacob Henry Karaca
Klein, Thorpe & Jenkins, Ltd.
20 N. Wacker Dr., Suite 1660
Chicago, IL 60606-2903
*Attys. For Village of Oak Park*

Mara S. Georges
Corporation Counsel
City of Chicago
121 S. LaSalle St., Suite 600
Chicago, IL 60602
*Atty. For City of Chicago*

David G. Sigale
Law Firm of Dave G. Sigale, P.C.
739 Roosevelt Rd., Suite 304
Glen Ellyn, IL 60137
*Atty. For McDonald, et al.*

William N. Howard
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6000